**Nos. 25-1927, 25-1928**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

IN RE: ENTRESTO (SACUBITRIL/VALSARTAN)

NOVARTIS PHARMACEUTICALS CORPORATION, *Plaintiff-Appellant*

v.

MSN PHARMACEUTICALS, INC., MSN LABORATORIES PRIVATE LTD., MSN LIFE SCIENCES PRIVATE LTD., *Defendants-Appellees*

Appeals from the U.S. District Court for the District of Delaware, Nos. 1:20-md-2930-RGA, 1:22-cv-01395-RGA, Hon. Richard G. Andrews

## NOVARTIS PHARMACEUTICALS CORPORATION'S OPENING BRIEF

NICHOLAS N. KALLAS
JARED L. STRINGHAM
CHRISTINA SCHWARZ
CHRISTOPHER E. LOH
VENABLE LLP
151 W. 42nd Street, 49th Floor
New York, NY 10036

DEANNE E. MAYNARD
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8740
DMaynard@mofo.com

REBECCA W. SETRAKIAN
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

*Counsel for Novartis Pharmaceuticals Corporation*

SEPTEMBER 12, 2025

## Claim 1 of U.S. Patent No. 11,096,918

**1.** An amorphous solid form of a compound comprising anionic (S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine, anionic (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester, and sodium cations in a 1:1:3 molar ratio.

# CERTIFICATE OF INTEREST

Counsel for Novartis Pharmaceuticals Corporation certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Novartis Pharmaceuticals Corporation

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Novartis AG

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47(a)(4).

McCarter & English, LLP: Daniel M. Silver, Alexandra M. Joyce, Maliheh Zare

Schrader Companion Duff & Law PLLC: Sandra K. Law, James F. Companion

Venable LLP: Laura K. Fishwick, Gregory J. Manas, Carrie S. Park, Erin Belfield, Melinda R. Roberts, Shannon K. Clark, Susanne L. Flanders, Whitney M. Howard, Daniel A. O'Brien

Morrison & Foerster LLP: Joel F. Wacks

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes, see separately filed notice

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not applicable

Dated: September 12, 2025

/s/ Deanne E. Maynard
Deanne E. Maynard

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ i

TABLE OF AUTHORITIES ........................................................................ vi

TABLE OF ABBREVIATIONS ........................................................................ ix

STATEMENT OF RELATED CASES ........................................................................ x

JURISDICTIONAL STATEMENT ........................................................................ x

INTRODUCTION ........................................................................ 1

STATEMENT OF THE ISSUES ........................................................................ 4

STATEMENT OF THE CASE ........................................................................ 4

A. Novartis Invented an Amorphous Solid Form of a Trisodium Valsartan-Sacubitril Complex ........................................ 4

1. Background on pharmaceutical solid forms ........................................ 4

2. Novartis's invention of a valsartan-sacubitril combination therapy and various solid forms of the combination, including the amorphous TVS complex ........................................ 8

B. Novartis Sued MSN for Infringement ........................................ 10

1. Claim construction ........................................ 10

2. Denial of preliminary relief ........................................ 11

3. Novartis's pretrial *Daubert* motion ........................................ 11

4. Trial on infringement and validity ........................................ 12

a. Novartis's evidence from witnesses with a skilled artisan's perspective ........................................ 13

b. MSN's evidence on noninfringement from a person lacking ordinary skill in the relevant art ........................................ 18

5. The district court's noninfringement decision based on a person who lacks ordinary skill in the art ....19

SUMMARY OF ARGUMENT ....24

STANDARD OF REVIEW ....28

ARGUMENT ....29

I. THE INFRINGEMENT JUDGMENT SHOULD BE SET ASIDE ....29

A. The Infringement Judgment Must Be Set Aside Because It Depends on Conclusions that Exceeded the Expert's Technical Experience ....29

1. A district court abuses its discretion by allowing experts to testify beyond their expertise, including testimony by experts lacking ordinary skill in the art on issues analyzed from the perspective of an ordinarily skilled artisan ....29

2. The district court committed reversible error in basing its noninfringement determination on conclusions from a witness who opined beyond his expertise, including on issues requiring an ordinarily skilled artisan's perspective ....31

3. Efforts to sweep aside the district court's errors are unavailing ....35

4. Because the district court's improper reliance on Dr. McCreery was essential to its noninfringement determination, that error alone requires setting aside the judgment ....39

B. Regardless, Even Considering Dr. McCreery's Testimony, the District Court Clearly Erred in Concluding Dr. Park's Raman Spectrum Is Unreliable ....40

1. The district court erred in relying on speculation to reach conclusions conflicting with both parties' and their experts' views ....40

2. The record does not support the district court's reliance on Redenti and the "amorphous LCZ" presentation, which cannot overcome the district court's other errors regardless ........ 44

C. The District Court's Flawed Adverse Inference, Related to Discovery MSN Never Requested, Independently Warrants Relief ........ 47

1. Only Noratech sought the relevant fact discovery ........ 47

2. For three independent reasons, the Court should reverse the adverse inference granted to MSN ........ 49

II. THIS COURT SHOULD CORRECT THE CLAIM CONSTRUCTION FOR REMAND, AS THE DISTRICT COURT ERRED IN READING LIMITATIONS INTO THE PLAIN CLAIM LANGUAGE ........ 58

A. The Claim Text's Plain Meaning, and Lack of Any Lexicography or Disclaimer, Require Reversal on Claim Construction ........ 60

B. The District Court Misread the Prosecution History and Contradicted Precedent in Injecting a "Predominance" Requirement into Claim 1 ........ 63

CONCLUSION ........ 66

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*,
111 F.4th 1358 (Fed. Cir. 2024) ....................................................................28

*Centricut, LLC v. Esab Grp., Inc.*,
390 F.3d 1361 (Fed. Cir. 2004) .....................................................................41

*Chimie v. PPG Indus., Inc.*,
402 F.3d 1371 (Fed. Cir. 2005) .....................................................................59

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)...................................................................24, 29, 30, 31, 35

*Drone Techs., Inc. v. Parrot S.A.*,
838 F.3d 1283 (Fed. Cir. 2016) .................................................................28, 53

*Duncan Parking Techs., Inc. v. IPS Grp., Inc.*,
914 F.3d 1347 (Fed. Cir. 2019) ............................................................29, 61, 63

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) ...........................................................29, 34, 38

*In re Entresto (Sacubitril/Valsartan) Pat. Litig.*,
No. 1:20-md-02930-LPS,
2021 WL 2856683 (D. Del. July 8, 2021) .......................................................65

*In re Entresto*,
125 F.4th 1090 (Fed. Cir. 2025) ......................................................................8

*Fox v. Vice*,
563 U.S. 826 (2011).........................................................................................28

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
339 U.S. 605 (1950).........................................................................................34

*Hanover Potato Prods., Inc. v. Shalala*,
989 F.2d 123 (3d Cir. 1993) ...................................................................28, 35, 58

*HVLPO2, LLC v. Oxygen Frog, LLC*,
949 F.3d 685 (Fed. Cir. 2020) ....................30, 34, 37

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................29

*Kyocera Senco Indus. Tools Inc. v. ITC*,
22 F.4th 1369 (Fed. Cir. 2022) ....................3, 28, 30, 35, 37

*Litecubes, LLC v. N. Light Prods., Inc.*,
523 F.3d 1353 (Fed. Cir. 2008) ....................34, 37

*Lowery v. Circuit City Stores, Inc.*,
158 F.3d 742 (4th Cir. 1998) ....................51

*Novartis Pharms. Corp. v. MSN Pharms., Inc.*,
Nos. 24-2211, 24-2212,
2024 WL 4969281 (Fed. Cir. Dec. 4, 2024)....................x, 11, 60, 63

*Payne v. Exxon Corp.*,
121 F.3d 503 (9th Cir. 1997) ....................50

*Poly-Am., L.P. v. API Indus., Inc.*,
839 F.3d 1131 (Fed. Cir. 2016) ....................60

*Quinn v. Consol. Freightways Corp.*,
283 F.3d 572 (3d Cir. 2002) ....................55

*Sierra Wireless, ULC v. Sisvel S.P.A.*,
130 F.4th 1019 (Fed. Cir. 2025) ....................30

*SmithKline Beecham Corp. v. Apotex Corp.*,
403 F.3d 1331 (Fed. Cir. 2005) ....................64

*Straight Path IP Grp., Inc. v. SIPNET EU S.R.O.*,
806 F.3d 1356 (Fed. Cir. 2015) ....................61

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
550 F.3d 1356 (Fed. Cir. 2008) .................... 30, 31, 34, 35, 38, 39

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ....................................................................61

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
949 F.3d 825 (3d Cir. 2020) ..........................................................................28, 29

*Ventana Med. Sys., Inc. v. Biogenex Lab'ys, Inc.*,
473 F.3d 1173 (Fed. Cir. 2006) ....................................................................65, 66

*Williams v. Rene*,
72 F.3d 1096 (3d Cir. 1995) ..........................................................................52, 53

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ..........................................................................56, 57

**Statutes & Rules**

28 U.S.C. § 1295 ..........................................................................................x

28 U.S.C. § 1331 ..........................................................................................x

28 U.S.C. § 1338 ..........................................................................................x

Fed. R. App. P. 4 ..........................................................................................x

Fed. R. Civ. P. 26 ..........................................................28, 48, 51, 52, 53

Fed. R. Civ. P. 37 ..................................................................28, 50, 51, 55

Fed. R. Evid. 104 ..........................................................................................38

Fed. R. Evid. 702 .............................................................. 24, 29, 30, 31, 34, 38

**Other Authorities**

8A Wright & Miller's Fed. Prac & Proc. § 2032 (3d ed. 2025) ..............................51

8B Wright & Miller's Fed. Prac. & Proc. § 2282 (3d ed. 2025) ............................51

8B Wright & Miller's Fed. Prac. & Proc. § 2289 (3d ed. 2025) ............................57

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ’918 patent | U.S. Patent No. 11,096,918 |
| amorphous LCZ | “amorphous LCZ” in a presentation by Charles Pan, which the district court also called “amorphous LCZ-696” (Appx18-19) |
| ANDA | abbreviated new drug application |
| API | active pharmaceutical ingredient |
| crystalline TSVH | crystalline trisodium sacubitril-valsartan hemipentahydrate, a complex of valsartan, sacubitril, and water molecules claimed in other Novartis patents but not the ’918 patent |
| MSN | defendants-appellees MSN Pharmaceuticals, Inc., MSN Laboratories Private Ltd., and MSN Life Sciences Private Ltd. |
| Noratech | prior defendants Nanjing Noratech Pharmaceutical Co., Limited and Gerbera Therapeutics Inc., which settled after trial but before the district court’s post-trial opinion and noninfringement judgment |
| the amorphous physical mixture/the amorphous physical mixture of valsartan and sacubitril | the physical mixture solid form of amorphous valsartan disodium and amorphous sacubitril sodium |
| the amorphous TVS complex | the amorphous solid form of the trisodium valsartan sacubitril complex claimed in the ’918 patent |
| the glassy solid | the glassy solid sample prepared by Novartis’s expert Dr. Park following the ’918 patent’s teachings |
| TVS | trisodium valsartan sacubitril complex |

## STATEMENT OF RELATED CASES

An appeal from the same underlying district court proceeding on U.S. Patent No. 11,096,918 ("'918 patent") was previously decided by this Court as *Novartis Pharmaceuticals Corp. v. MSN Pharmaceuticals, Inc.*, Nos. 24-2211 and 24-2212, 2024 WL 4969281 (Fed. Cir. Dec. 4, 2024). The non-precedential decision is unreported and was decided by a panel of Judges Lourie, Prost, and Reyna. *Id.*

Counsel for Novartis Pharmaceuticals Corporation (Novartis) know of no other cases pending in this or any other court that will directly affect or be affected by this Court's decision here.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331 and 1338. Appx2. The district court entered final judgment resolving all asserted legal claims and counterclaims on July 11, 2025. Appx23-24. Novartis filed a timely notice of appeal the same day. Fed. R. App. P. 4; ECF1. This Court has jurisdiction under 28 U.S.C. §1295(a)(1).

## INTRODUCTION

The district court erred by predicating its noninfringement judgment on opinions from an expert witness who lacks ordinary skill in the relevant art and who opined beyond his technical experience. This case involves the highly technical field of solid forms of pharmaceutical drugs. The same drug can have different solid forms, in other words, the molecules of the drug can be arranged in different ways when the drug is in a solid state. Although each solid form is the same drug, different solid forms can affect drug safety, manufacturability, and efficacy. Novartis invented a specific solid form of two active ingredients—valsartan and sacubitril—arranged in what is known as an amorphous complex. MSN abandoned any invalidity challenge to Novartis's '918 patent on that invention, so the only issue is infringement.

The parties agreed that a person of ordinary skill in the art for the '918 patent would have certain experience with pharmaceutical solid forms. To prove MSN's infringement of the claimed amorphous complex solid form, Novartis relied on Dr. Park, who runs a lab dedicated to developing, testing, and characterizing pharmaceutical solid forms. No one questioned that she met the level of ordinary skill in the art. Following the teachings of Novartis's patent, Dr. Park made a sample of the amorphous complex within the claim's scope and used Raman spectroscopy—as she has done for 25 years—to obtain a unique "fingerprint" reference spectrum of

the sample for use in proving that MSN's products include that same solid form and therefore infringe.

The district court concluded that Dr. Park's "fingerprint" reference spectrum was not reliable, hinging that conclusion on testimony from MSN's expert, Dr. McCreery. But as Novartis consistently challenged, Dr. McCreery has *no* experience with pharmaceutical solid forms, like complexes. Dr. McCreery has never studied them nor used Raman spectroscopy to characterize or distinguish different solid forms of the same pharmaceutical drug. Instead, his expertise was in using Raman spectroscopy more generally.

The district court acknowledged that Dr. McCreery's lack of experience with pharmaceutical solid forms meant he lacked the minimum experience of a person of ordinary skill in the art. Yet the district court allowed and then relied on Dr. McCreery's testimony about issues like how to characterize pharmaceutical solid forms using Raman spectroscopy and whether Dr. Park's reference spectrum was evidence of the infringing amorphous complex solid form or evidence of a different solid form. The district court thus accepted testimony that went beyond Dr. McCreery's technical expertise, including on issues requiring an ordinarily skilled artisan's perspective.

This case exemplifies this Court's warning that "admitting testimony from a person with no skill in the pertinent art" on issues requiring an ordinarily skilled

artisan's perspective "'serves only to cause mischief and confuse the factfinder.'" *Kyocera Senco Indus. Tools v. ITC*, 22 F.4th 1369, 1377 (Fed. Cir. 2022) (alterations/citation omitted). This was not a battle of two qualified experts or a question of credibility. Instead, the district court improperly accepted testimony from a witness who the district court acknowledged lacked the experience of an ordinarily skilled artisan and who, in any event, lacked the technical experience that was critical to his conclusions. While that error alone requires setting aside the noninfringement judgment, the district court compounded that error by striking out on its own to reach conclusions on highly technical issues that neither the parties nor their experts advocated and that the record does not support.

The district court further legally and factually erred by concluding that Novartis had made a discovery mistake in not producing expert discovery that was never requested; regardless, the district court abused its discretion in granting an adverse inference to MSN, which had never even sought to join this discovery dispute until trial. At the least, the district court's express rationale makes clear that the inference cannot alone sustain the noninfringement judgment.

The judgment should be set aside, and the case remanded for further proceedings.

## STATEMENT OF THE ISSUES

1. Whether to set aside the noninfringement judgment for any of the following reasons, alone or combined:

   a. the district court's decision hinges on expert witness testimony beyond the expert's expertise, including on issues judged from the perspective of a person of ordinary skill in the relevant art;

   b. regardless, the district court's decision is self-contradictory and unsupported by the record evidence; and

   c. the district court partially relied on an adverse inference related to discovery that MSN never requested or pursued.

2. Whether the district court erroneously read limitations into the plain claim language, which should be corrected for remand.

## STATEMENT OF THE CASE

### A. Novartis Invented an Amorphous Solid Form of a Trisodium Valsartan-Sacubitril Complex

#### *1. Background on pharmaceutical solid forms*

Finding a new drug with disease-treating properties is often not enough to develop that drug into a pharmaceutical product for patients. Appx17258; Appx17256-64. Bringing product to market frequently requires determining a suitable solid form (or forms) for the drug, because the same drug can often exist in more than one solid form. Appx17258. These various solid forms of the drug are

all "fundamentally the same chemical, but they differ," for example, "in how the molecules pack into a solid." Appx17258. The figure below illustrates two different solid forms of the same pharmaceutical combination of two compounds:




*See* Appx6; Appx12376(376:5-16), Appx12001-3177; Appx15623; Appx15616-87. The hypothetical pharmaceutical combination shown includes two different active pharmaceutical ingredients ("APIs," depicted as purple and yellow ovals). Appx12376(376:5-16). The solid form on the left shows an "amorphous physical mixture"—the two different APIs are randomly packed without any interactions among them. Appx12376(376:5-16). The solid form on the right shows the same two APIs as an "amorphous complex." Appx12376(376:5-16), Appx12383-84(383:21-384:3). In a complex (also called a supramolecular complex) of two APIs, the APIs are linked by non-covalent bonds. Appx12376(376:5-16), Appx12383-84(383:21-384:3). Thus in the "amorphous complex" example on the right each yellow API is bonded to a purple API by a non-covalent bond.

Appx12376(376:5-16), Appx12383-84(383:21-384:3). But the complexes themselves are in an amorphous form, meaning they are randomly distributed without any long-range order. Appx12376(376:5-16), Appx12383-84(383:21-384:3). Other solid forms can exist, such as crystalline complex forms where components are bonded to form a complex and the complexes are arranged in a repeating three-dimensional pattern:




Appx17258; *see* Appx15623.

Understanding solid forms can be critical for pharmaceutical development. Despite being the same drug, different solid forms of a drug may have different properties that can make or break a drug's success. Appx17258. Differences in solid form may change drug properties like stability, manufacturability, and solubility—affecting how a patient's body absorbs the drug. Appx16414; Appx16414-22; Appx15980; Appx15979-6029; Appx17258. These differences, in turn, can affect a drug's efficacy and patient safety. Appx15980. In at least some contexts, even "miniscule" amounts of one solid form of a drug instead of another

can have "dramatic" effects on performance. Appx16740-41; Appx16740-48. And a drug may have different solid forms at different stages of manufacturing or may be unintentionally transformed into a different solid form due to environment or handling. Appx16740-41; Appx16414.

Developing and studying pharmaceutical solid forms is difficult. Appx17258. "Solid-state analysis of pharmaceuticals is a challenging field and a number of complementary techniques are frequently needed to understand the complete system." Appx15979-80. Analyzing pharmaceutical solid forms requires specific knowledge of drug "polymorphic forms, salts, and solvates." Appx15979-80. Those in the field combine this specialized knowledge with general-purpose characterization methods that are not unique to the study of pharmaceutical solid forms. Appx51(col.17:46-58); Appx12377(377:4-22). These methods include infrared ("IR") spectroscopy, solid-state nuclear magnetic resonance ("ssNMR") spectroscopy, and Raman spectroscopy. Appx51(col.17:46-58); Appx12377(377:4-22).

Much of the dispute here focuses on Raman spectroscopy. Raman spectroscopy involves scattering laser light off a substance to generate a "spectrum" showing the intensity at different scattered energies, plotted in $cm^{-1}$ (also called wavenumbers). Appx12718(718:8-24), Appx12385(385:11-17); Appx5. Because the specific bonds in a substance cause the scattering, including the non-covalent

bonds in a complex, the peaks in a Raman spectrum are unique to the substance and can act "as a fingerprint" (or reference) to identify it. Appx12385-86(385:24-386:5), Appx12719(719:19-24), Appx12829(829:19-24); Appx5. Matching the Raman spectrum from an unknown substance to a reference Raman spectrum of a known substance can thus identify the unknown substance. Appx5-6; Appx12493-99(493:13-499:5). Similarly, comparing the respective Raman spectra of two samples of the same drug can show whether the samples have the same or different solid forms. Appx5-6; Appx12493-99(493:13-499:5); Appx15688-863.

#### ***2. Novartis's invention of a valsartan-sacubitril combination therapy and various solid forms of the combination, including the amorphous TVS complex***

Novartis scientists invented a lifesaving heart-failure treatment combining two APIs—valsartan and sacubitril. *In re Entresto*, 125 F.4th 1090, 1093-94 (Fed. Cir. 2025). Sold as ENTRESTO®, the combination has become the preferred first-line treatment for certain types of heart failure. *See id.* Novartis patented that new combination as U.S. Patent No. 8,101,659, and this Court in *Entresto* rejected MSN's validity challenges to that patent, which MSN stipulated to infringing. *Id.* at 1097-100.

Developing the valsartan-sacubitril combination into the lifesaving commercial drug product ENTRESTO® required further inventions. Novartis investigated various solid forms of the combination, and the '918 patent claims one

of those forms: an "amorphous solid form" of the valsartan-sacubitril complex called Trisodium Valsartan Sacubitril ("TVS,"), a compound in which anionic valsartan, anionic sacubitril, and sodium cations are non-covalently bonded in a 1:1:3 molar ratio. Appx58(col.32:41-46); Appx12375(375:11-16), Appx12476(476:1-15). Such a complex is "beneficial over" "simply physically mixing the two active agents" for "use as a first line therapy, ease of formulation, and ease of manufacture." Appx51(col.17:46-51); Appx56(col.28:27-32). Claim 1 is the sole asserted claim and recites:

> 1. An amorphous solid form of a compound comprising anionic [valsartan], anionic [sacubitril], and sodium cations in a 1:1:3 molar ratio.

Appx58(col.32:42-46); Appx12475-77(475:21-477:21), Appx12375-76(375:19-376:16).[1] The patent expires November 8, 2026. Appx36.

The patent describes ways for skilled artisans to distinguish different solid forms of the combination of valsartan and sacubitril. It explains that the TVS complex exhibits "distinct spectral peaks and shifts" relative to a non-complexed physical mixture of sacubitril and valsartan when examined using techniques like

[1] The square-bracketed words replace the chemical names recited in claim 1, "(S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine" and "(2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester," which refer to valsartan and sacubitril respectively. Appx50-51(col.16:40-col.17:45); Appx12376-77(376:19-377:1); Appx4 & nn.2-3 (same from district court).

IR, ssNMR, and Raman spectroscopy. Appx51(col.17:46-58); Appx52-43(col.20:43-col.21:3); Appx12377(377:4-22). The patent also details in Example 1 a process for making a "glassy solid" amorphous TVS complex within claim 1's scope. Appx56(col.28:39-67); Appx12378-80(378:2-380:9). The amorphous TVS complex can be used to make a "crystalline solid" form of a valsartan-sacubitril complex. Appx56(col.28:38-67). ENTRESTO® contains a valsartan-sacubitril combination in a crystalline-complex solid form, claimed in separate patents in the same family. Appx12025(25:12-17).

### B. Novartis Sued MSN for Infringement

After MSN sought approval to market generic ENTRESTO®, Novartis sued MSN and another defendant, Noratech, for infringing the '918 patent. Appx1-2.

#### *1. Claim construction*

In construing the sole disputed phrase, the district court rejected Novartis's request to give the phrase "an amorphous solid form of a compound" its plain meaning. Appx29-30; Appx26-35. It also rejected MSN's proposal to require the amorphous compound to be "substantially pure." Appx29-30, Appx33-34. Instead, the district court adopted its own construction: "a solid form of a compound in which the amorphous form of the compound predominates. An amorphous solid form is mutually exclusive from a crystalline solid form, but not necessarily mutually exclusive from a partially crystalline solid form." Appx4; Appx29-30.

#### *2. Denial of preliminary relief*

In mid-2024, when FDA initially approved MSN's ANDA, the district court denied Novartis a preliminary injunction. Appx7549-59. Novartis appealed, challenging the preliminary-injunction denial, including the district court's claim construction. *Novartis*, 2024 WL 4969281, at *5. This Court affirmed without reaching the grounds appealed here, although the Court "admit[ted] concern with the district court's construction" given the lack of intrinsic support showing "the claims require any particular amount of amorphous TVS to be present." *Id.*

#### *3. Novartis's pretrial* **Daubert** *motion*

Before trial, Novartis moved to exclude testimony from defendants' expert Dr. McCreery. Appx7942-66. Novartis explained that defendants were relying on Dr. McCreery for opinions he was unqualified to give, including opinions that required at least ordinary skill in the art. Appx7954-61. As the district court found, the parties' agreed definition of the level of ordinary skill in the art requires "a Ph.D. in chemistry or related field and two or more years of experience with solid forms of pharmaceutical compounds, such as synthesizing, crystallizing, and characterizing solid forms of pharmaceutical compounds." Appx4-5. Yet Dr. McCreery lacked experience studying pharmaceutical solid forms, like supramolecular complexes; pharmaceuticals were not an area of interest for him. Appx7948; Appx12744-47(744:21-747:22). Despite that lack of experience,

defendants proposed to have Dr. McCreery testify about, for example, what changes would be expected in a Raman spectrum from the formation of a pharmaceutical supramolecular complex and how to use Raman spectroscopy to distinguish different solid forms of the same pharmaceutical combination. Appx7959-60.

The district court declined to resolve the issue pretrial. Appx10110-17. It believed that "live testimony and cross-examination" would better allow it to resolve whether Dr. McCreery was "giving appropriate scientific testimony," and instructed Novartis to renew its objection at trial. Appx10113. The court did note that defendants had no response to Novartis's showing that Dr. McCreery lacked even ordinary skill in the art, given his lack of experience with pharmaceutical solid forms like supramolecular complexes. Appx10115 n.6. Yet without support, the district court speculated that Dr. McCreery may "ha[ve] such experience based on his many years of performing Raman spectroscopy." Appx10115 n.6.

#### *4. Trial on infringement and validity*

The parties proceeded to a December 2024 bench trial on infringement and validity. Nearing the trial's end, MSN abandoned its invalidity challenge "based on the Court's comments" that the challenge was "incredibly weak." Appx13035(1035:5-21); Appx4.

#### *a. Novartis's evidence from witnesses with a skilled artisan's perspective*

Novartis's infringement case proceeded in two parts, relying on two experts who each possess (or exceed) ordinary skill in the art. Appx12372(372:11-14), Appx12474(474:18-23). First, following the patent's teachings in Example 1, Novartis's expert Dr. Park made a sample of the infringing amorphous TVS complex and, using that sample, created a Raman spectrum as a fingerprint (or reference) for the infringing amorphous complex. Appx12345-46(345:17-346:16), Appx12372-73(372:16-373:19), Appx12396(396:1-18). Second, Novartis's expert Dr. Matzger matched Raman spectra taken from MSN's products to Dr. Park's reference Raman spectrum to show that MSN's products contain the infringing amorphous TVS complex. Appx12346-48(346:20-348:24), Appx12493-95(493:13-495:15), Appx12498-99(498:12-499:5).

As the district court heard, Dr. Park holds a Ph.D. in organic chemistry and is an expert in testing and characterizing pharmaceutical solid forms with 25 years' experience, including using Raman spectroscopy. Appx12371-72(371:10-372:1); Appx16294-98. She runs a professional laboratory dedicated to that work. Appx12371-72(371:10-372:1). Dr. Park has characterized solid-state drug substances "[m]ultiple thousands of times," and has specifically "characterized a supramolecular complex and distinguished it from a physical mixture" "[m]ultiple hundreds of times." Appx12371-72(371:10-372:1). She was offered without

objection at trial as "an expert in solid-state chemistry and the testing and characterization of solid forms of pharmaceutical compounds." Appx12372(372:11-13).

Dr. Park followed the '918 patent's Example 1 to prepare a glassy solid sample of the infringing amorphous TVS. Appx12372-73(372:17-373:19). She then followed the patent's teachings to identify the pharmaceutical solid form of the glassy solid by using four techniques: X-ray powder diffraction, and ssNMR, IR, and Raman spectroscopy. Appx12372-73(372:17-373:19).

All four tests confirmed that Dr. Park's glassy solid was the amorphous solid form of the TVS complex taught and claimed by the '918 patent, and not merely the physical mixture of amorphous valsartan disodium and amorphous sacubitril sodium ("the amorphous physical mixture"). Appx12396(396:1-18). Following the '918 patent's teachings, Dr. Park identified the infringing amorphous TVS complex by its "distinct spectral peaks and shifts" compared to the amorphous physical mixture. Appx51(col.17:46-58), Appx52-53(col.20:43-col.21:3); Appx12377(377:4-22). For each of her ssNMR, IR, and Raman spectroscopy tests, she identified at least three spectral features distinguishing the glassy solid from the amorphous physical mixture. Appx12388-96(388:20-396:18). For example, in the ssNMR spectra below, the glassy solid exhibited two new peaks at points A and B and the absence of a peak at point C:




Appx16585; Appx12388-89(388:20-389:19), Appx12396(396:1-18); *see also* Appx12392-93(392:3-393:1) (discussing IR spectra); Appx16591; Appx15634. MSN's experts did not dispute Dr. Park's ssNMR and IR testing showing the glassy solid differs from the amorphous physical mixture. Appx16.

Dr. Park's Raman spectrum for the glassy solid also showed changes relative to the amorphous physical mixture. Dr. Park first created a Raman spectrum of the amorphous physical mixture by adding the spectrum of an amorphous valsartan disodium sample to the spectrum of an amorphous sacubitril sodium sample, which the district court found was "an accepted way to create the spectrum of that physical mixture." Appx6-7 (agreeing with Dr. Park and rejecting MSN's contrary argument). Dr. Park then used a regularly calibrated, commercial Raman instrument to generate 256 scans of the Raman spectrum of the glassy solid and average the

results. Appx12411-15(411:10-415:25). The resulting Raman spectrum showed several key differences compared to the Raman spectrum of the amorphous physical mixture. Appx12409(409:1-14). For example, Dr. Park found peak shifts in varying amounts (e.g., 5.7 $cm^{-1}$, 3.8 $cm^{-1}$, and 2.8 $cm^{-1}$), including the two peak shifts shown below in the region between 1570-1640 $cm^{-1}$:

**Dr. Park's Raman Spectra for the Glassy Solid of**
**Example 1 (Red) and Physical Mixture (Black) (1570-1640 $cm^{-1}$ region)**




Appx12394(394:15-395:14), Appx12409(409:1-14); Appx16592-93; Appx15639. Spectral changes in this region were known to ordinarily skilled artisans to be associated with "the formation of intermolecular hydrogen bonding," i.e., non-covalent bonding from complex formation. Appx12394-95(394:15-395:14).[2]

[2] Dr. Park adjusted the peak heights (also called peak "intensities") when preparing her spectral comparisons to make it easier to compare the peaks' horizontal x-axis positions and identify shifts in their positions. Appx8002 n.4. As MSN never disputed, this is a standard technique in the field of pharmaceutical solid forms. Appx8002 n.4.

Dr. Park identified at least ten significant Raman peak position differences (i.e., shifts) of varying amounts showing the glassy solid is the claimed amorphous TVS complex and thus has a distinct solid form compared with the amorphous physical mixture, summarized in the chart below:

| Physical Mixture | Glassy Solid | Difference | Difference (rounded) |
|---|---|---|---|
| 1243.881 $cm^{-1}$ | 1245.716 $cm^{-1}$ | 1.835 $cm^{-1}$ | 1.8 $cm^{-1}$ |
| 1283.414 $cm^{-1}$ | 1287.177 $cm^{-1}$ | 3.763 $cm^{-1}$ | 3.8 $cm^{-1}$ |
| 1423.223 $cm^{-1}$ | 1425.057 $cm^{-1}$ | 1.834 $cm^{-1}$ | 1.8 $cm^{-1}$ |
| 1457.934 $cm^{-1}$ | 1459.768 $cm^{-1}$ | 1.834 $cm^{-1}$ | 1.8 $cm^{-1}$ |
| 1519.643 $cm^{-1}$ | 1522.441 $cm^{-1}$ | 2.798 $cm^{-1}$ | 2.8 $cm^{-1}$ |
| 1600.635 $cm^{-1}$ | 1603.434 $cm^{-1}$ | 2.799 $cm^{-1}$ | 2.8 $cm^{-1}$ |
| 1611.242 $cm^{-1}$ | 1614.040 $cm^{-1}$ | 2.798 $cm^{-1}$ | 2.8 $cm^{-1}$ |
| 2871.451 $cm^{-1}$ | 2875.214 $cm^{-1}$ | 3.763 $cm^{-1}$ | 3.8 $cm^{-1}$ |
| 2931.231 $cm^{-1}$ | 2934.030 $cm^{-1}$ | 2.799 $cm^{-1}$ | 2.8 $cm^{-1}$ |
| 2961.122 $cm^{-1}$ | 2966.813 $cm^{-1}$ | 5.691 $cm^{-1}$ | 5.7 $cm^{-1}$ |

Appx16594; Appx12409(409:7-14). Because Dr. Park's Raman spectroscopy instrument was accurate to within ± 1 $cm^{-1}$, these shifts all reflected "real difference[s]" between the spectrum of the glassy solid and the amorphous physical mixture. Appx12413-19(413:15-419:6). These differences in the Raman spectra were consistent with Dr. Park's other testing and confirmed to her, as someone possessing at least ordinary skill in the art, that the glassy solid was the claimed amorphous TVS complex. Appx12394-96(394:15-396:18).

#### *b. MSN's evidence on noninfringement from a person lacking ordinary skill in the relevant art*

At trial, defendants disputed whether Dr. Park's glassy solid was a sample of the infringing amorphous TVS complex by arguing, based on Dr. McCreery's testimony, that the solid was instead a sample of the noninfringing amorphous physical mixture of valsartan and sacubitril. Appx13291-306, Appx13283-343; Appx12726-30(726:20-730:2). Dr. McCreery admitted his experience is in using Raman spectroscopy to characterize distinct chemicals generally—not in distinguishing different solid forms of the same chemical or the same combination. Appx12716(716:14-17), Appx12744-48(744:1-748:7). And he admitted that he has never "studied supramolecular complexes" nor used Raman spectroscopy to characterize them. Appx12744-48(744:1-748:7). Indeed, he has never even identified pharmaceutical compounds as a research interest. Appx12744-48(744:1-748:7).

Without contesting Dr. McCreery's lack of experience with solid forms of pharmaceutical compounds, including characterizing and distinguishing them, defendants offered Dr. McCreery as an expert on Raman spectroscopy generally. Appx12716-17(716:14-717:3); Appx13288-39. Novartis renewed its objection "to the use of Dr. McCreery as an expert on the use of Raman spectroscopy to characterize pharmaceutical compounds and supramolecular complexes." Appx12717(717:4-15). Over Novartis's objection, defendants proceeded to have

Dr. McCreery testify about whether Dr. Park's glassy solid Raman spectrum showed "evidence of complexation" and to opine that distinguishing an amorphous complex from an amorphous physical mixture would require new Raman spectral peaks to appear and disappear, changes in peak shape, "and the like." Appx13288-89, Appx13292 (defendants' post-trial brief summarizing Dr. McCreery's testimony). Dr. McCreery opined that Dr. Park's Raman testing was evidence that the glassy solid was the noninfringing amorphous physical mixture and that the peak shifts Dr. Park identified were the result of an unspecified calibration error with her Raman spectroscopy instrument. Appx13291-96 (defendant's post-trial brief summarizing testimony); *see* Appx15 (district court acknowledging Dr. McCreery did not identify what caused any alleged error). At the close of Dr. McCreery's testimony, the district court stated that "Dr. McCreery's fully qualified to testify about everything he testified about" because the court believed that he had not testified about "infringement opinions." Appx12765(765:7-11).

#### *5. The district court's noninfringement decision based on a person who lacks ordinary skill in the art*

After trial but before the district court issued its post-trial decision, Novartis and Noratech settled. Appx14314-17. And given MSN's withdrawal of its invalidity defense, the district court's post-trial decision addressed only Novartis's infringement claims against MSN. Appx4-19.

On the parties' dispute about the solid form of Dr. Park's glassy solid, the district court found "no reason to doubt Dr. Park's testimony that [her company] followed Example 1 as faithfully as possible" to produce the amorphous TVS complex and not the amorphous physical mixture. Appx8 n.7. The district court also "credit[ed] Dr. Park's testimony that the ssNMR and IR spectra tend to show that her glassy solid is amorphous TVS." Appx16. Indeed, the district court found that MSN had "forfeited" any challenge to Dr. Park's non-Raman spectroscopy tests showing the glassy solid is the amorphous TVS complex claimed by the '918 patent. Appx16.

The district court similarly rejected MSN's theory that Dr. Park had failed properly to calibrate her Raman spectrometer before testing the glassy solid. Appx14-16. The court found that Dr. Park's Raman instrument "was calibrated three times around the time of her testing." Appx15-16. The district court did "not doubt the accuracy of the[se] calibration tests," which Dr. Park explained would have ensured Raman spectrum accuracy "within plus/minus one wavenumber." Appx15-16 (quoting Appx12414-15(414:25-415:19)). Likewise, the district court rejected MSN's challenge to Dr. Park's Raman spectrum of the amorphous physical mixture, expressly finding it "reliable." Appx7.

Despite rejecting MSN's only arguments for disputing whether Dr. Park's Raman spectrum was a spectrum of the infringing amorphous TVS complex, the

district court nevertheless concluded Dr. Park's amorphous TVS Raman spectrum was "not reliable." Appx7-19. To reach that conclusion, the district court primarily relied on Dr. McCreery's opinions. Although the district court had speculated pretrial that perhaps the trial would show that Dr. McCreery had the requisite experience to be an ordinarily skilled artisan, the court acknowledged Novartis's unrebutted evidence that Dr. McCreery lacks the expertise of a person of ordinary skill in the art because he lacks experience with solid forms of pharmaceutical compounds, including characterizing complexes. Appx7 n.5. The district court reasoned it could nevertheless rely on Dr. McCreery's "opinions about Raman spectroscopy," labeling them "not POSA opinions." Appx7 n.5.

Despite Dr. McCreery's lack of ordinary skill in the pertinent art and lack of experience characterizing different solid forms of pharmaceuticals, the district court proceeded to rely on Dr. McCreery's views about distinguishing complexes from other solid forms of pharmaceutical compounds. Appx9-17. For example, adopting Dr. McCreery's view that Dr. Park's glassy solid Raman spectrum contained a uniform "systematic shift" of 3 $cm^{-1}$ compared to the spectrum for the amorphous physical mixture, the court accepted Dr. McCreery's conclusion that it was "impossible" for the observed shift to result from "the bonds and molecular interactions present in an amorphous complex that are not present in an amorphous physical mixture." Appx13. The district court also purported to "credit

Dr. McCreery's testimony" about what evidence would be needed to conclude that two different solid forms of the same pharmaceutical combination "are in fact different." Appx17. It similarly agreed with Dr. McCreery about how to read a prior-art reference—Redenti—about distinguishing different solid forms of the same pharmaceutical combination. Appx12-13. And partly relying on Dr. McCreery as well as the district court's own interpretations of other limited technical evidence, the district court thought an unexplained Novartis presentation showing a Raman spectrum of something labeled "amorphous LCZ" that differed from Dr. Park's glassy solid Raman spectrum provided "further support" for the court's conclusions. Appx17-19.

In so concluding, the district court identified no explanation for the different peaks in Dr. Park's Raman spectrum beyond the one Dr. Park gave from her perspective as someone with at least ordinary skill in the art and based on her decades of experience: they revealed the glassy solid was the claimed amorphous TVS complex and not the unclaimed amorphous physical mixture. Appx16 (recognizing lack of alternative explanation); *see* Appx12394-96(394:15-396:18) (Dr. Park explaining differences between glassy solid and amorphous physical mixture Raman spectra). Instead, based on Dr. McCreery's testimony, the court concluded that MSN had "sow[ed] doubt" about the reliability of Dr. Park's glassy solid reference spectrum. Appx16.

The court thus found noninfringement without even addressing the second step of Novartis's infringement evidence comparing that reference spectrum to Raman spectra from MSN's ANDA products. Appx5-19. And despite recognizing that this Court's preliminary-injunction decision had "called [its claim] construction into question," the district court declined to alter that construction, stating instead that it would find noninfringement "[e]ven if [it] had adopted" Novartis's construction. Appx4 & n.4.

In addition, although MSN never "sought production of Dr. Park's glassy solid," the district court gave MSN the benefit of an adverse inference against Novartis for not producing Dr. Park's glassy solid sample to Noratech, which had already settled with Novartis. Appx19, Appx21. The district court made clear the inference alone was not enough to support noninfringement. Appx21-22 ("not complete foreclosure of Novartis' claim"). Instead, the district court stated generally that it would infer that "had Novartis produced the glassy solid sample to Defendants, it would have been unfavorable to Novartis' case." Appx22. Nevertheless, the court did not cite the adverse inference as a basis for any of its determinations about the supposed unreliability of Dr. Park's glassy solid reference spectrum. Appx19-22.

Based on its post-trial decision, the district court entered final judgment of noninfringement, also dismissing with prejudice MSN's invalidity counterclaim.

Appx23-24. The district court, and then this Court, denied Novartis's motion for an injunction preventing MSN from launching its generic version of ENTRESTO® pending this appeal. Appx25; ECF19. MSN has since launched its generic.

## SUMMARY OF ARGUMENT

I.A. The district court fundamentally erred in resting its noninfringement judgment on views from Dr. McCreery that exceeded his expertise. Rule 702 and *Daubert* prohibit courts from permitting an expert to testify to conclusions beyond the expert's experience in the applicable field. That is why this Court has repeatedly held that Rule 702 and *Daubert* mean that an expert who offers testimony about issues judged from an ordinarily skilled artisan's perspective must possess at least that ordinary skill in the art. A district court abuses its discretion when it accepts expert testimony on issues beyond the expert's expertise, including on issues analyzed from the perspective of an ordinarily skilled artisan from someone lacking that skill.

Here, the district court accepted conclusions from Dr. McCreery that depended on experience in pharmaceutical solid forms, including characterizing pharmaceutical supramolecular complexes. Yet it was undisputed that Dr. McCreery lacks any experience with pharmaceutical solid forms and had never studied supramolecular complexes nor used Raman spectroscopy to distinguish one solid form from another. Despite that lack of experience, the district court admitted

and relied on Dr. McCreery's conclusions about issues like: whether the results in the Raman spectrum of the claimed amorphous TVS spectrum created by Novartis's expert Dr. Park were "impossible" "*considering* the bonds and molecular interactions present in an amorphous complex that are not present in an amorphous physical mixture"; whether "small changes" in a Raman spectrum are enough "to *classify*" two pharmaceuticals as having different solid forms; and how to interpret prior-art teachings about how to "*differentiate* between an amorphous complex and a physical mixture." Appx10-17 (emphases added).

The district court's own descriptions of the opinions it accepted thus contradict its assertion that it admitted and relied on Dr. McCreery only for his expertise in Raman spectroscopy generally. Rather, the district court accepted opinions that all go to the heart of the infringement dispute here—distinguishing noninfringing pharmaceutical solid forms from the claimed pharmaceutical solid form, i.e., the amorphous TVS complex. That acceptance of these conclusions from Dr. McCreery requires setting aside the judgment.

I.B. In any event, the noninfringement judgment must be set aside because the district court clearly erred even if Dr. McCreery's opinions were deemed properly considered. The district court rejected the only explanations MSN offered for alleged unreliability: that Dr. Park's glassy solid was allegedly the amorphous physical mixture and not the amorphous TVS complex; and that Dr. Park's Raman

instrument was allegedly not properly calibrated so her testing just showed the spectrum of the amorphous physical mixture with a purported uniform “systematic” shift. The district court correctly found that Dr. Park “faithfully” followed the ’918 patent’s teachings to make the claimed amorphous TVS complex and that MSN forfeited any challenge to Dr. Park’s non-Raman testing confirming that the glassy solid is indeed the amorphous TVS complex. Appx8 n.7, Appx15-16. The district court also found that Dr. Park properly calibrated her Raman instrument. Appx14-16.

That left the district court to rely on only its own unsupported speculation that, although Dr. Park’s glassy solid is the claimed amorphous TVS complex and she tested it with a properly operating Raman instrument, her Raman spectra was unreliable. Because such unfounded speculation is clear error, the noninfringement judgment cannot stand.

I.C. The district court independently erred in imposing and partially relying on an adverse inference based on discovery that MSN never sought. The discovery dispute was between a different defendant and Novartis. And that defendant, Noratech, asked in fact discovery for “A sample” of amorphous TVS and “A sample of the glassy solid prepared according to Example 1.” Appx10364-69; Appx10361-71. Novartis objected, among other things, that Noratech was prematurely seeking expert discovery. After Novartis later identified Dr. Park as a testifying expert and

disclosed in detail that she had made a sample of the glassy solid for use in her expert report, Noratech never sought Dr. Park's sample through expert discovery.

The district court was thus wrong to give MSN an adverse inference, for three independent reasons. First, *MSN* never requested *any* sample of amorphous TVS, much less Dr. Park's glassy solid sample. Second, neither Noratech nor MSN ever made a request that required producing *Dr. Park's* glassy solid sample, so there was no discovery violation in not producing it. Third, even had Novartis made what the district court called "some discovery mistake" by not updating its previous fact-discovery response to Noratech, the district court abused its discretion by turning that mistake into a windfall for MSN, which neither sought the discovery nor moved for a sanction pretrial, and instead belatedly sought at trial any adverse inference Noratech might receive. Once Noratech settled and withdrew from the case, there was no longer any discovery dispute before the district court warranting a sanction, let alone one benefitting MSN.

II. Although this Court need not reach claim construction to set aside the current judgment, the Court should do so to streamline proceedings for remand. Claim 1 plainly recites amorphous TVS, and nothing more. Yet the district court injected an additional limitation: a requirement that the amorphous TVS complex "predominate" over any crystalline form of TVS. Nothing about the plain claim text suggests such a limitation. The district court itself "concede[d]" the "intrinsic record

provides virtually no useful guidance" about a predominance limitation. Appx34. Basic claim-construction principles preclude the district court's addition.

**STANDARD OF REVIEW**

The Court reviews the admission of expert testimony for abuse of discretion. *Kyocera*, 22 F.4th at 1376; *UGI Sunbury v. Easement for 1.7575 Acres*, 949 F.3d 825, 831-33 (3d Cir. 2020) (same in Third Circuit). A district court abuses its discretion when its decision rests on legal error, "an improper application of law to fact," or a "clearly erroneous finding of fact." *Hanover Potato Prods. v. Shalala*, 989 F.2d 123, 127 (3d Cir. 1993) (citation omitted); *Fox v. Vice*, 563 U.S. 826, 838-39 (2011) (error of law "by definition" an abuse of discretion). Following a bench trial, this Court reviews legal conclusions de novo and factual findings for clear error. *Allergan v. MSN Lab'ys*, 111 F.4th 1358, 1366 (Fed. Cir. 2024). A finding "is clearly erroneous when, despite some supporting evidence," the Court is "left with a definite and firm conviction that the district court was in error." *Id.* at 1373 (citation omitted).

This Court applies regional circuit law when reviewing discovery sanctions. *Drone Techs. v. Parrot S.A.*, 838 F.3d 1283, 1297 (Fed. Cir. 2016) (applying Third Circuit law). The Third Circuit reviews discovery rulings and sanctions under Federal Rules of Civil Procedure 26 and 37 for an abuse of discretion. *Id.*

The Court reviews a claim construction based on intrinsic evidence de novo. *Duncan Parking v. IPS Grp.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019).

## ARGUMENT

## I. THE INFRINGEMENT JUDGMENT SHOULD BE SET ASIDE

### A. The Infringement Judgment Must Be Set Aside Because It Depends on Conclusions that Exceeded the Expert's Technical Experience

#### *1. A district court abuses its discretion by allowing experts to testify beyond their expertise, including testimony by experts lacking ordinary skill in the art on issues analyzed from the perspective of an ordinarily skilled artisan*

Courts have an obligation to ensure that expert testimony is reliable. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); Fed. R. Evid. 702; *UGI*, 949 F.3d at 832-33 (*Daubert* and Rule 702 apply to bench trials). Fulfilling that role is essential because expert testimony is a departure from "the usual requirement of firsthand knowledge." *Daubert*, 509 U.S. at 592. This departure is justified only when courts ensure a proposed "expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* Even when allowed to testify, courts cannot permit an expert to testify to conclusions that "'go beyond what the expert's basis and methodology may reliably support.'" *EcoFactor v. Google*, 137 F.4th 1333, 1339 (Fed. Cir. 2025) (en banc) (quoting advisory committee's notes). Thus, when a proposed expert offers opinions but lacks "personal knowledge or experience" in the applicable field, that testimony is inadmissible. *Kumho Tire v.*

*Carmichael*, 526 U.S. 137, 147-50 (1999); *Daubert*, 509 U.S. at 589-90 (courts may not permit "subjective belief or unsupported speculation").

These rules apply in patent cases just as in others. *Sundance v. DeMonte Fabricating*, 550 F.3d 1356, 1359-60 (Fed. Cir. 2008). Given the often highly technical issues of patent infringement and invalidity, this Court has repeatedly recognized the importance of ensuring the reliability of expert testimony. *Id.* at 1361-63; *Kyocera*, 22 F.4th at 1376-78; *HVLPO2 v. Oxygen Frog*, 949 F.3d 685, 688-89 (Fed. Cir. 2020). "Testimony proffered by a witness lacking the relevant technical expertise fails the standard of admissibility under Fed. R. Evid. 702." *Sundance*, 550 F.3d at 1363.

This Court has been clear about how this general rule applies in the context of patent law, where issues like claim construction, infringement, and invalidity are all generally analyzed from "the perspective of a person of ordinary skill in the art." *Id.* at 1361. To offer reliable expert opinions on technical issues from that hypothetical ordinarily skilled artisan's perspective, a specific minimum level of experience is required to ensure the expert's conclusions are grounded in the required technical expertise. *Id.* When a witness who does not "at a minimum possess ordinary skill in the art" is allowed to offer "testimony on any issue that is analyzed through the lens of an ordinarily skilled artisan," a district court abuses its discretion. *Id.* at 1377-78; *Sundance*, 550 F.3d at 1362-65; *Sierra Wireless v. Sisvel*, 130 F.4th

1019, 1024-25 (Fed. Cir. 2025) (similar). Allowing such testimony "serves only to cause mischief," as it amounts to little more than "advocacy from the witness stand." *Sundance*, 550 F.3d at 1362-65.

#### *2. The district court committed reversible error in basing its noninfringement determination on conclusions from a witness who opined beyond his expertise, including on issues requiring an ordinarily skilled artisan's perspective*

The district court here abused its discretion by doing what Rule 702, *Daubert*, and this Court's precedent prohibit: admitting and relying on opinions from Dr. McCreery that exceeded his expertise, including opinions that required a skilled artisan's expertise. As explained, in the first step of Novartis's infringement case, Novartis's expert Dr. Park—who possessed at least ordinary skill in the art—followed the '918 patent's teachings to make a sample of the infringing amorphous solid form of the TVS complex. Appx12371-73(371:8-373:19), Appx12379(379:1-17); *see* Appx8. She then followed the '918 patent's teachings to test that sample and distinguish it from the amorphous physical mixture, a different solid form of the same pharmaceutical combination of valsartan and sacubitril. Appx12377(377:4-22); Appx12396(396:1-18). In this way, Dr. Park followed the '918 patent's teachings to produce a reference Raman spectrum—a fingerprint for infringement—for use in identifying the infringing amorphous TVS complex in MSN's products. *Supra* pp.13-15. In holding her Raman spectrum not "reliable" proof of infringement, the district court improperly accepted Dr. McCreery's opinions that it

was "impossible" for Dr. Park's Raman spectrum to correspond to the infringing amorphous TVS complex. Appx9-17.

There is no dispute that Dr. McCreery lacks the bare minimum experience required here to offer testimony from the perspective of a person of ordinary skill in the art. The agreed level of skill requires "two or more years of experience with solid forms of pharmaceutical compounds, such as synthesizing, crystallizing, and characterizing solid forms of pharmaceutical compounds." Appx4-5. Dr. McCreery lacked even a year of such experience and had never personally tested any pharmaceutical compound by Raman spectroscopy, let alone used Raman spectroscopy to distinguish one pharmaceutical solid form from another. Appx12744-48(744:1-748:7). He had never "studied supramolecular complexes," the '918 patent's subject matter, and had no experience characterizing complexes. Appx12744-48(744:1-748:7). The district court thus correctly found Dr. McCreery's lack of this experience unrebutted, instead accepting him as an expert only in "Raman spectroscopy." Appx7 n.5 (MSN had "no responsive arguments" to Novartis's objection to the limits of Dr. McCreery's expertise).

Despite so finding, the district court allowed Dr. McCreery to testify and purported to credit his opinions about issues going beyond his expertise:

- whether Dr. Park's glassy solid "Raman spectrum is of amorphous TVS," the infringing solid form (Appx8);

- whether the spectral shifts Dr. Park observed in the glassy solid Raman spectrum were possible "considering the bonds and molecular interactions present in an amorphous complex that are not present in an amorphous physical mixture" (Appx10-13);

- whether "several tests" and "several Raman spectra" would be needed to "classify" Dr. Park's glassy solid and to conclude that Dr. Park's reference Raman spectrum reflects the same or a different solid form when compared with the amorphous physical mixture (Appx13, Appx15-17); and

- what the Redenti reference teaches about "differentiat[ing] between an amorphous complex and a physical mixture" (Appx12-14, Appx16).

The district court's own descriptions thus make clear it relied on opinions from Dr. McCreery that required the very expertise he lacks in characterizing and distinguishing different pharmaceutical solid forms like supramolecular complexes. For instance, the district court (and Dr. McCreery) acknowledged that whether Dr. Park's Raman spectrum is "impossible" requires "*considering* the bonds and molecular interactions present in an amorphous complex that are not present in an amorphous physical mixture"—but Dr. McCreery had no expertise in "considering" differences between pharmaceutical solid forms. Appx13-14 (emphasis added). The same goes for opining on whether "small changes" in Raman spectra are sufficient "to *classify*" Dr. Park's glassy solid as having one pharmaceutical solid form or another—but Dr. McCreery had no experience classifying different pharmaceutical solid forms and admitted that "one spectrum of a sample is typically all that is needed." Appx13 (emphasis added). The district court's acceptance of these opinions alone suffices to show an abuse of discretion, as it was "contradictory to

Rule 702 to allow" Dr. McCreery to testify "as a technical expert" on opinions going beyond his expertise. *Sundance*, 550 F.3d at 1363; *EcoFactor*, 137 F.4th at 1339.

That is especially true here, as these opinions all went to technical issues that must be analyzed from an ordinarily skilled artisan's perspective, which Dr. McCreery indisputably lacked. Questions about whether matter falls within a patent claim's scope must be viewed from the perspective of "a person skilled in the art." *Litecubes v. N. Light Prods.*, 523 F.3d 1353, 1374 (Fed. Cir. 2008) (literal infringement); *Graver Tank v. Linde Air Prods.*, 339 U.S. 605, 609-10 (1950) (doctrine-of-equivalents infringement). That skilled artisan's perspective is required for both "the ultimate conclusions" of infringement as well as "underlying technical questions." *HVLPO2*, 949 F.3d at 688-89.

Here, the whole point of Dr. McCreery's testimony was to dispute whether Dr. Park "successfully made amorphous TVS," the infringing pharmaceutical solid form, or instead made merely the noninfringing "amorphous physical mixture." Appx7-8. MSN's theory (offered through Dr. McCreery) was that Dr. Park's Raman spectrum revealed that the glassy solid was not the infringing amorphous complex, but the noninfringing amorphous physical mixture because a supposed calibration error allegedly caused her spectrum of the glassy solid to be "uniformly shifted" relative to the spectrum of the amorphous physical mixture. Appx8-12, Appx16. The entire dispute was thus about infringement: whether the glassy solid was the

infringing amorphous solid form of the TVS complex; and whether Dr. Park's Raman spectrum was evidence to a person of ordinary skill in the art of that infringement. Far from being "not POSA opinions" merely "about Raman spectroscopy" (Appx7 n.5), the district court relied on opinions from Dr. McCreery about how to distinguish matter within the claim's scope from matter outside that scope, such as what spectral features would be expected, what the art teaches, and how many tests would be needed. Appx9-17; *supra* pp.32-33. Because only an expert with at least ordinary skill in the art could reliably opine on these issues, the district court abused its discretion in admitting and relying on those opinions from an expert witness lacking that expertise. *Sundance*, 550 F.3d at 1362; *Kyocera*, 22 F.4th at 1377-78. This is true whether the district court's determination to accept Dr. McCreery's testimony and opinions is viewed as an error of law, misapplication of *Daubert* and patent law to the facts here, or as a clear error of fact. *See Hanover*, 989 F.2d at 127 (abuse-of-discretion standard).

#### ***3. Efforts to sweep aside the district court's errors are unavailing***

The district court, and MSN in appellate motions briefing, suggested several reasons why Dr. McCreery's testimony could be relied on, but all are wrong.

*First*, the district court said it was admitting and relying on Dr. McCreery's testimony addressing only "Raman spectroscopy" and not any "POSA opinions." Appx7 n.5. As just shown, that is not what the district court did. Instead, it allowed

and relied on opinions from Dr. McCreery that required an ordinarily skilled artisan's experience with pharmaceutical solid forms, like supramolecular complexes. Appx9-17.

Indeed, the district court rejected the opinions from Dr. McCreery on the issues within his expertise about Raman spectroscopy generally. Appx15-16. For example, while recognizing that Dr. McCreery had developed the standards for calibrating Raman instruments, the district court rejected Dr. McCreery's view that Dr. Park's Raman instrument was insufficiently calibrated. Appx15-16. The district court instead agreed with Dr. Park's well-supported explanation that she maintained an accurately calibrated instrument according to Dr. McCreery's own calibration standards. Appx15-16. Similarly, after discussing Dr. McCreery's general statements about peak-picking software, the district court noted Dr. McCreery "did not perform an analysis showing a peak selection" that would contradict Dr. Park's results. Appx14. Instead, the district court tied its assessment of the peaks in Dr. Park's Raman spectrum to Dr. McCreery's views about whether two different solid forms of the same pharmaceutical combination could exhibit the shifts Dr. Park observed. Appx14-16. The district court's actual analysis thus contradicts its own explanation of relying only on "not POSA opinions." Appx7 n.5.

*Second*, the district court accepted MSN's arguments that Dr. McCreery's testimony could be admitted and relied on because Dr. McCreery was not "offering

any direct noninfringement opinion" and had not "looked at the product at all," meaning MSN's generic. Appx12716-17(716:14-717:7); Appx7 n.5; Appx10115 n.6. But that is wrong on both the law and the facts. As this Court has made clear, an ordinarily skilled artisan's perspective is required not only for "the ultimate conclusions" of infringement but also for "underlying technical questions" like comparing subject matter to the claimed invention or reading the prior art. *HVLPO2*, 949 F.3d at 688-89.

Regardless, the dispute about Dr. Park's glassy solid and its Raman spectrum *was* a dispute about infringement—the core question of how to identify an infringing product. Dr. Park followed the '918 patent's teachings both to make a sample of the claimed amorphous TVS complex and to test that sample with Raman spectroscopy. Appx12371-73(371:10-373:19), Appx12379(379:1-17). Relying on Dr. McCreery, MSN disputed whether the glassy solid Dr. Park made was the claimed amorphous solid form of the TVS complex and whether Dr. Park's Raman spectrum was "reliable" evidence of that fact. Appx9, Appx15-17. That is a dispute about distinguishing matter within the claim's scope from matter outside that scope, and such disputes are judged from a skilled-artisan's perspective. *Litecubes*, 523 F.3d at 1374; *HVLPO2*, 949 F.3d at 688-89; *Kyocera*, 22 F.4th at 1377-78. It does not matter that the specific material tested was Dr. Park's sample rather than MSN's products.

*Third*, the district court characterized "the crux of the dispute" as being the "credibility of expert testimony." Appx7 n.6. Not so. The dispute here is antecedent to credibility: "a determination of reliability under Rule 702 is an essential prerequisite." *EcoFactor*, 137 F.4th at 1339-40; Fed. R. Evid. 104(a) (witness qualification is "preliminary question" that "court must decide"). Indeed, Rule 702 was amended in 2023 to "clarify and emphasize" that it is "an incorrect application of Rules 702 and 104(a)" to treat "the critical question[] of the sufficiency of an expert's basis" as a "question[] of weight and not admissibility." Fed. R. Evid. 702, advisory committee's note to 2023 amendment. The district court was thus wrong to the extent it believed the dispute about Dr. McCreery's experience went merely to his credibility as a witness.

*Finally*, in opposing Novartis's motion for an injunction pending appeal, MSN wrongly painted Novartis's appeal as depending on a broad rule that "*every* expert a district court relies on to resolve *every* fact dispute in a patent case must be a POSA." ECF16 at 1 (MSN's emphasis). Reversal here follows from settled law, not any such overly broad rule. This Court recognized in *Sundance* that an expert "not skilled in the particular art at issue" might "appropriately testify" about background principles that do not depend on expertise in the relevant art. 550 F.3d at 1363 & n.5. But this Court has repeatedly held that a district court abuses its discretion when, as here, it allows such an expert to stray beyond his technical

expertise, including by testifying on issues requiring an ordinarily skilled artisan's perspective. *Id.*; *supra* pp.29-31.

#### *4. Because the district court's improper reliance on Dr. McCreery was essential to its noninfringement determination, that error alone requires setting aside the judgment*

The district court's infringement analysis depended on accepting opinions from Dr. McCreery that exceeded his expertise over the skilled-artisan opinions from Dr. Park. Appx7-19. To be sure, the district court briefly pointed to evidence about "amorphous LCZ," but even then, the district court relied on Dr. McCreery. Appx17-19. More importantly, the district court never suggested that any evidence about "amorphous LCZ" could alone defeat infringement, instead pointing to it as "further support" that "too cause[d] [it] to doubt" Dr. Park's spectrum. Appx17-19. Similarly, the district court was express that its "adverse inference" supported noninfringement only when "combined with" its conclusions based on Dr. McCreery; it explicitly rejected the notion that its sanction alone was case dispositive. Appx21-22. The district court's reliance on the testimony beyond Dr. McCreery's expertise was thus the linchpin of the post-trial decision, and the noninfringement judgment cannot stand without it.

### B. Regardless, Even Considering Dr. McCreery's Testimony, the District Court Clearly Erred in Concluding Dr. Park's Raman Spectrum Is Unreliable

Even were this Court to conclude Dr. McCreery's opinions could be considered, the noninfringement judgment must be set aside because the record does not support the district court's determination that Dr. Park's Raman spectrum of the glassy solid "is unreliable." Appx16.

#### *1. The district court erred in relying on speculation to reach conclusions conflicting with both parties' and their experts' views*

The district court's unreliability determination is divorced from the record here, including because it conflicts with the district court's own separate findings that Dr. Park proved the glassy solid is the amorphous TVS complex and that she used a properly calibrated Raman spectroscopy instrument to test that glassy solid. The district court found that Dr. Park "faithfully" followed the patent's teachings describing how to make the claimed amorphous TVS complex, rejecting MSN's contrary view. Appx8 n.7. It found that Dr. Park's independent "ssNMR and IR spectra tend to show that her glassy solid is amorphous TVS." Appx16. It also found that Dr. Park's "amorphous physical mixture spectrum is reliable," which Dr. Park used to show that the glassy solid Raman spectrum was evidence of complex formation. Appx6-7. The district court further found that Dr. Park's Raman instrument was properly calibrated and that Dr. McCreery failed to identify

any calibration error. Appx14-16. And the district court was express that "[i]t is the Raman spectrum, not the glassy solid sample" that it believed "unreliable." Appx16.

But the arguments and evidence before the district court for the supposed "unreliability" of Dr. Park's Raman spectrum were all based on MSN's allegations (presented through Dr. McCreery) that: (1) the glassy solid was not the claimed amorphous TVS complex but instead the amorphous physical mixture of valsartan and sacubitril; and (2) Dr. Park's spectrum thus showed merely the spectrum of such a physical mixture, albeit with an alleged uniform "systematic" shift due to her supposedly mis-calibrated instrument. Appx13291-306; Appx12726-30(726:20-730:2); Appx16-17 (district court recognizing same). Yet the district court rejected MSN's views because other, independent evidence showed that the glassy solid *was* amorphous TVS and that Dr. Park's instrument was properly calibrated. Appx8 n.7, Appx14-16. That left no basis for the unreliability conclusion that MSN sought—just the district court's own unsupported speculation, which is an insufficient basis for decision on such a technical issue. *Centricut v. Esab*, 390 F.3d 1361, 1369-70 (Fed. Cir. 2004) (reversing infringement determination based on "district court's own interpretation" of "complex technology").

That error is also clear from how the district court relied on Dr. McCreery. In holding Dr. Park's reference spectrum unreliable, the district court purported to "credit Dr. McCreery's testimony" that "he would have conducted further testing"

given the alleged closeness of the Raman spectrum from the glassy solid to the one from the amorphous physical mixture. Appx13, Appx15-16 (citing Appx12736-38(736:21-738:13)). But the district court lost sight of the conclusion Dr. McCreery was offering: Dr. McCreery "would want to see more," such as "rigorous statistical" analysis from multiple Raman tests, to determine whether the glassy solid Raman spectrum shows "a new compound" rather than the amorphous physical mixture. Appx12736-38(736:21-738:13). In other words, Dr. McCreery testified he would want additional testing before concluding that the glassy solid was the amorphous TVS complex. Yet as the district court itself found, Dr. Park did do "more" testing (even if not more Raman testing) to show precisely that: Dr. Park performed ssNMR and IR testing that further confirmed the glassy solid has a different solid form—it is the amorphous TVS complex. Appx16.

To the extent the district court's concern (as it twice stated) was whether "the two *spectra* are in fact different," both Dr. McCreery and Dr. Park agreed the two spectra are different. Appx15-16 (emphasis added); Appx12726-27(726:21-727:4), Appx12733(733:15-16). Dr. McCreery testified to differences in 26 out of 40 peaks between the glassy solid Raman spectrum and the amorphous physical mixture Raman spectrum; he just thought the differences could be explained by an unknown calibration error. Appx12726-27(726:21-727:16), Appx12733(733:15-16). But the district court rejected that view. Appx14-16.

The district court also erred by engaging in other unsupported speculation to reach conclusions no party sought and no evidence supports. The district court expressly made its own "observation" about "the similarity in peak heights" between the Raman spectrum for the glassy solid and the one for the amorphous physical mixture. Appx10 & n.8. Despite acknowledging that the "parties do not address" this supposed "similarity," the district court went on to repeatedly rely on a purported absence of a "change in intensity" (i.e., peak height) between Dr. Park's Raman spectra as support for finding unreliability. Appx10 & n.8, Appx16, Appx17 (no "changes in intensity"), Appx18 (similar).

That was clear error. Dr. Park's spectral comparisons showed similar peak heights because she had deliberately adjusted the heights to make it easier to compare the peak positions. Appx8002 n.4. No expert questioned that approach. *Supra* p.16 n.2. And her focus on peak positions/shifts rather than heights followed directly from the '918 patent's own description of distinct "spectral shifts" in the spectrum of the amorphous TVS complex compared to the amorphous physical mixture. Appx51(col.17:46-58); Appx12376-77(376:19-377:24).

Even so, certain peaks in the two spectra showed different intensities even after adjusting peak heights, such as the change in intensity (and peak shape) at around 1010 $cm^{-1}$ in the comparison below created by Dr. McCreery (using Dr. Park's data):




Appx17270 (cropped); Appx17265-75; Appx12. The district court thus again erred by elevating speculation over record evidence.

#### *2. The record does not support the district court's reliance on Redenti and the "amorphous LCZ" presentation, which cannot overcome the district court's other errors regardless*

The district court also clearly erred in relying on the Redenti article and evidence about "amorphous LCZ." Appx12-13, Appx17-19.

On Redenti, MSN (through Dr. McCreery) insisted that because Redenti shows differences besides peak shifts between the spectra of a different amorphous complex and a different amorphous physical mixture, such differences were required to conclude that Dr. Park's glassy solid is the claimed amorphous TVS complex and not the unclaimed amorphous physical mixture. Appx12730-31(730:11-731:17). In agreeing, the district court overlooked that Dr. Park and Dr. McCreery agreed that

Redenti's Raman spectrum would not be representative of a spectrum for the amorphous TVS complex. Appx12-13, Appx16. Both agreed that the complex in Redenti, piroxicam-β-cyclodextrin, is structurally different from the amorphous TVS complex and thus would show different Raman spectrum features. Appx12433-34(433:18-434:4), Appx12757-58(757:10-758:3). For example, Dr. Park explained that the amorphous TVS complex is "a very big complex" and "very complex system" that could easily form more than twenty non-covalent bonds; Dr. McCreery never disagreed. Appx12435-37(435:12-437:4). Regardless, given the other evidence—credited by the district court—showing Dr. Park's glassy solid is the amorphous TVS complex and not the amorphous physical mixture, Novartis had no need to identify other differences in the Raman spectra besides the peak shifts. Appx16.

Similarly flawed is the district court's speculation that "there is a reasonable likelihood" that amorphous LCZ "is amorphous TVS." Appx17-19. The court thought an unexplained slide in an internal Novartis presentation referencing "amorphous LCZ" could be a Raman spectrum of amorphous TVS and thus could cast further "doubt" on the reliability of Dr. Park's Raman spectrum. Appx17-19. The slide was authored by non-inventor Charles Pan three years after the '918 patent's priority date. Appx15889; Appx12430-31(430:7-431:25). The slide gives virtually no details about the "amorphous LCZ" or even where the Raman spectrum

on the slide came from (besides a date that differs by years from the presentation date). Appx15896. Nothing on the slide suggests "amorphous LCZ" is an amorphous *complex*, let alone that it is the claimed amorphous TVS complex. Appx15896; Appx12430-31(430:7-431:25).

Nor did any witness testify that the "amorphous LCZ" spectrum in the Pan presentation is the spectrum of the amorphous TVS complex. Instead, Dr. McCreery agreed that "whatever amorphous LCZ is in the Pan presentation, that's not the glassy solid material from the '918 patent" because "[t]he spectrum is different." Appx12762(762:2-10), Appx12430-31(430:7-431:25) (Dr. Park; similar). Given the district court's well-supported determination that Dr. Park's glassy solid *is* the amorphous TVS complex claimed in the patent, Dr. McCreery's testimony supports that amorphous LCZ is something different, just as Dr. Park similarly testified. Appx12762(762:2-10), Appx12430-31(430:7-431:25). And in the deposition excerpt on which the district court relied, the Novartis employee—Dr. Motto—said nothing about the presentation and instead opined on whether the patent's Example 1 described making the amorphous TVS complex, confirming that it does. Appx12694-97(694:18-697:18). The district court thus again clearly erred in adopting conclusions at odds with the technical witnesses and the record.

In sum, whether with or without Dr. McCreery's testimony, the noninfringement judgment cannot stand.

## C. The District Court's Flawed Adverse Inference, Related to Discovery MSN Never Requested, Independently Warrants Relief

The district court's errors in imposing and then partially relying on an adverse inference based on discovery that MSN never sought also requires setting aside the noninfringement judgment.

### *1. Only Noratech sought the relevant fact discovery*

In October 2023 during fact discovery, Noratech—but not MSN—served requests for production on Novartis. Appx10184 (Noratech conceding requests were "[d]uring fact discovery"); Appx675-76. The requests asked Novartis to provide "A sample" of amorphous TVS and "A sample of the glassy solid prepared according to Example 1 of the '918 patent." Appx10364-69. Noratech did not ask for any particular sample. *See* Appx10364-69. Novartis raised several objections, including that Noratech was "prematurely seek[ing] expert discovery"; "[s]ubject to" those objections, Novartis answered that it did not have a sample of either. Appx10364-69.

A year later in November 2024 and on the eve of trial, Noratech—but again not MSN—filed a letter with the district court asserting that Novartis had violated Federal Rule of Civil Procedure 26 because Noratech's fact-discovery request had obligated Novartis to produce Dr. Park's amorphous TVS sample made for her expert report. Appx10184; Appx10181-85. Novartis responded that, when it answered the fact-discovery request in October 2023, Dr. Park had not been

identified as a testifying expert and thus her work was not then subject to discovery. Appx10863; Appx10860-77. Novartis also explained that, during expert discovery, after Dr. Park had been identified as a testifying expert and had provided a May 2024 report disclosing her preparation and use of the amorphous TVS sample, Noratech never requested her amorphous TVS sample, despite requesting other items from Dr. Park. Appx10863.

At the pretrial conference, the district court orally sided with Noratech. Appx11061-63(31:21-33:16); Appx11031-130. The court "assume[d]" without deciding that Novartis's fact-discovery response to the production request "was correct at the time it was given." Appx11061-63(31:21-33:16). But the district court believed Novartis committed a "discovery mistake" by "giving an answer and then not updating it." Appx11061-63(31:21-33:16); Appx13105(1104:3-4). At the pretrial conference, the district court declined to exclude any evidence but said it was considering "taking an adverse inference from the failure to produce" the amorphous TVS sample Dr. Park made. Appx11061-63(31:21-33:16).

Later at trial, MSN for the first time requested the benefit of any adverse inference given to Noratech. Appx13104-05(1103:17-1104:23). The district court questioned whether MSN could make such a request given the lack of "any record that you [MSN] had asked for" Dr. Park's sample. Appx13105(1104:3-12). After trial and before the post-trial decision, Novartis settled with Noratech, which

stipulated to infringement. Consent Judgment, *In re Entresto*, 1:20-md-02930-RGA (D. Del. June 23, 2025), ECF1902; Appx14314-17. Nevertheless, the district court's post-trial decision granted an adverse inference that producing Dr. Park's sample "would have been unfavorable to Novartis," holding the inference "applies not just in relation to Noratech, but to MSN, too." Appx20-22 (calling this a "common" discovery issue).

#### *2. For three independent reasons, the Court should reverse the adverse inference granted to MSN*

The district court's adverse inference should be reversed for any of three independent reasons.

***Not common discovery*:** First, the district court reversibly erred in concluding this was common discovery giving MSN a basis for belatedly joining Noratech's sanction request. Appx21. The district court cited the scheduling order, but that order required the parties to coordinate only on "discovery that is common to all Defendants," such as "the validity of the patent-in-suit." Appx640, Appx636-53. The order did not render all discovery common. Here, the relevant discovery was expressly requested by only Noratech, in contrast with other discovery that Noratech and MSN jointly requested. *Compare* Appx1061-62 *and* Appx10361-71 (Novartis's response to the relevant Noratech-only requests), *with* Appx656-60 (Novartis's response to a joint request). And only Noratech alleged a discovery violation and

sought a sanction pre-trial. Appx10184. Noratech's and MSN's own actions thus show that neither considered this a common issue.

Although the district court suggested Noratech and MSN would have had "their shared expert, Dr. McCreery, test Dr. Park's glassy solid," Dr. McCreery admitted he lacks the necessary equipment to do so. Appx21; Appx12747-48(747:23-748:4). Nor is this case like the lone out-of-circuit decision on which the district court relied, where the plaintiff was found to have engaged in "willful and repeated violations of discovery orders" that "prejudiced both parties." *Payne v. Exxon*, 121 F.3d 503, 510 (9th Cir. 1997); Appx21-22. No such conduct was present (or even alleged) here. Also, unlike that case, the only party in this case that alleged a discovery dispute entered a consent judgment and withdrew before any sanction. On these facts, MSN had no basis for receiving the benefit of a sanction related to Novartis and Noratech's dispute that no longer existed.

***No discovery violation*:** Second, because no defendant requested production of Dr. Park's amorphous TVS sample, the district court reversibly erred in concluding there had been a discovery violation at all. Rule 37(c)(1) authorizes a discovery sanction only "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1); *see* 8B Wright & Miller's Federal Practice & Procedure §2282 (3d ed. 2025) (Rule 37 "dependent" upon Rule

26 and merely addresses "consequences of a failure to respond properly to discovery").

The required predicate violation is missing here. Noratech's October 2023 fact-discovery request did not require producing Dr. Park's amorphous TVS sample because it was undisputed that, at that time, Novartis had not identified Dr. Park as a testifying expert witness in this case; she was instead an expert employed only for trial preparation. Appx11045(15:8-10). Rule 26(b)(4)(D) protects the work of non-testifying experts from discovery, generally prohibiting discovery into any expert retained "in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness," with limited exceptions inapplicable here. Fed. R. Civ. P. 26(b)(4)(D); Wright & Miller §2032 (non-testifying experts retained in anticipation of litigation or preparation for trial "are treated very differently from those who are expected to be called"); *Lowery v. Circuit City Stores*, 158 F.3d 742, 765 (4th Cir. 1998) (affirming that Rule 26(b)(4)(B) (now Rule 26(b)(4)(D)) prohibited discovery into data, computer programs, and codes produced and developed by non-testifying consultants), *judgment vacated and remanded on other grounds*, 572 U.S. 1031 (1999).

When Novartis later identified Dr. Park as a testifying expert, her work became subject to discovery under the specific provisions for testifying experts, such as the requirements for a report under Rule 26(a)(2) and depositions under Rule

26(b)(4)(A). Fed. R. Civ. P. 26(a)(2), (b)(4)(A); *see Williams v. Rene*, 72 F.3d 1096, 1103-04 (3d Cir. 1995) (recognizing rules treat fact and expert witnesses differently and reversing exclusion of witness in part because district court wrongly treated fact witness as expert). Novartis fully complied with its obligations under those rules, including by providing an expert report detailing Dr. Park's preparation and testing of her amorphous TVS sample and by making Dr. Park available for deposition. Appx1418-20; Appx1421-23; Appx1424-27; Appx1428-30; Appx1433-34; Appx7741-43; Appx7744-45. Yet at no time between Dr. Park's May 2024 expert report and Noratech's November 2024 letter alleging a discovery violation did Noratech request production of Dr. Park's amorphous TVS sample, even after Dr. Park's September 2024 deposition made clear she still had the sample. *See* Appx9057-58(24:23-25:18) (after Dr. Park's deposition, Noratech expressly seeking only "a real list of the materials that Dr. Park" considered in preparing her report); Appx9034-75. Novartis thus could not have failed to provide discovery that Noratech never requested.

The district court had no legal basis for concluding otherwise. The district court did not explain its theory of a supposed obligation to supplement a fact-discovery response *not* with fact discovery but with expert discovery, and neither the district court nor Noratech identified authority supporting that theory. Appx11061-63(31:21-33:16); Appx10184. Such an obligation would conflict with

Rule 26's separation of discovery obligations related to experts from other discovery obligations. *E.g.*, Fed. R. Civ. P. 26(a)(2), (b)(4)(A), (b)(4)(D); *Williams*, 72 F.3d at 1103-04. It would also conflict with the district court's own scheduling order, which similarly separated general fact discovery from expert discovery. *Compare* Appx638-45, *with* Appx648-50; *see Drone Techs.*, 838 F.3d at 1297-301 (concluding district court abused discretion by failing to follow own local rules). There is good reason for the separate delineation of those discovery obligations: requiring parties to treat prior fact-discovery requests as extending to every newly identified testifying expert would be unworkable, such as by forcing parties to revisit every document request to see if a newly identified expert might have responsive material.

Regardless, nothing about Dr. Park's subsequent identification as a testifying expert made Novartis's earlier answer to Noratech's request for production of *a* sample of the glassy solid "incomplete or incorrect" so as to trigger a requirement to supplement under Federal Rule of Civil Procedure 26(e). After all, Novartis had already objected that Noratech was "prematurely seek[ing] expert discovery" and "[s]ubject to" that objection, Novartis did not possess any requested sample. Appx10364-69. That remained true after Novartis identified Dr. Park as a testifying expert—Noratech's fact-discovery request was still not a proper basis for expert discovery, and although Dr. Park had a sample, it was one that she had made as part of her work as an expert, not one provided to her by Novartis.

Both the district court's own reasoning and Noratech's arguments show that what Noratech asked for is not the same thing that it complained about not getting. Noratech's fact-discovery request merely asked for *a* sample of amorphous TVS or *a* sample of the glassy solid prepared according to Example 1 of the '918 patent—not *Dr. Park's* sample. Appx10364-69. But it was unrebutted that Noratech could readily make its own by following the '918 patent's teachings—indeed, MSN has publicly acknowledged making that amorphous TVS glassy solid. *E.g.*, Appx11045-46(15:25-16:3); Appx12379-80(379:18-380:12); Appx16308(col.4:25-31), Appx16312(col.12:32-39); Appx16299-320. Yet in alleging a discovery violation, Noratech argued that it did not want just any amorphous TVS sample but instead Dr. Park's sample so it could "check her work" from her expert report. Appx11046(16:4-9) (district court), Appx11048(18:19-22) (same from Noratech's counsel). This makes plain that Noratech's complaint was not about a failure to produce "A sample" of amorphous TVS—the subject of Noratech's fact-discovery request—but a supposed failure to provide *the* sample Dr. Park made and used for her expert report. Because Noratech failed ever to request that expert discovery, Novartis could not have violated a discovery obligation by not producing it.

***Sanction unwarranted*:** Third, even assuming Novartis made what the district court called "some discovery mistake" (Appx13105(1104:3-4)), the court still abused its discretion in granting a windfall adverse inference to MSN. One

factor the Third Circuit considers in reviewing a district court's discovery sanction is "the prejudice or surprise in fact of the party against whom" the disputed evidence is offered. *Quinn v. Consol. Freightways*, 283 F.3d 572, 576-79 (3d Cir. 2002) (reversing sanction where "not a shred of evidence" showing surprise or prejudice); *see* Fed. R. Civ. P. 37(c)(1) (no sanction for "harmless" failure to provide information).

No evidence shows *MSN* experienced either. It never requested any sample, let alone Dr. Park's glassy solid, never moved to compel its production, and thus never itself sought to develop challenges about it during discovery. Nor did MSN even join Noratech's discovery request or the related discovery dispute before trial, or in any way rely on Novartis's objections and responses to Noratech, which were served only on Noratech. Appx1061-62. MSN's own actions thus dispel any question of surprise or prejudice because, unlike Noratech, MSN had no argument that it was relying on Novartis's fact-discovery responses as the basis for not pursuing discovery into Dr. Park's amorphous TVS sample. The district court had no support for speculating that "MSN wished to test Dr. Park's glassy solid" given MSN's utter lack of any effort to do so. Appx20-21.

Other factors that the Third Circuit reviews in similar circumstances also show the district court abused its discretion, including the degree of any bad faith, the affected parties' ability to cure the prejudice, and any disruption to the orderly and

efficient flow of the case. *See ZF Meritor v. Eaton*, 696 F.3d 254, 298 (3d Cir. 2012). Novartis took no efforts to conceal Dr. Park's amorphous solid sample. Dr. Park's May 10, 2024 expert report timely disclosed the sample's existence and all related data were produced following the normal expert-discovery process. Appx7990, Appx8019-20; Appx7986-8042. Dr. Park also explained in her September 2024 deposition that she still had the sample. Appx7881-82(81:15-82:6); Appx7853-90. Yet despite having ample notice by May 2024 that Dr. Park had made her sample and was relying on it, no defendant acted before Noratech's eve-of-trial letter to cure any possible prejudice from non-production of that sample (even assuming Novartis had a preexisting obligation to produce it).

Despite all this, the district court thought Novartis had "acted with 'intent' to withhold the sample" because Novartis supposedly "agree[d]" that the "glassy solid fell under the scope of requested production" yet "did not provide it." Appx20-21 (citing pretrial conference at Appx11045(15:5-6)). But Novartis never agreed that Noratech's fact-discovery request obligated production of the amorphous TVS sample that Dr. Park prepared for her expert report. Novartis merely agreed that the sample Dr. Park had made was a sample of the amorphous TVS complex. Appx11045(15:5-18). Both immediately before and after so stating, Novartis consistently maintained that to obtain Dr. Park's sample, Noratech was required to request it during expert discovery, and that Noratech's earlier fact-discovery request,

before Dr. Park had been identified as a testifying expert in this case, did not obligate Novartis to produce it. Appx11044-45(14:11-15:18). For all the reasons explained, Novartis had at least a good faith basis for that understanding. *Supra* pp.50-54.

On the flip side, the district court wrongly dismissed out of hand Noratech's strategic behavior in waiting until the eve of trial to raise this issue and seek an adverse inference rather than request a continuance or the actual discovery Noratech asserted it was denied. *See ZF*, 696 F.3d at 297 (suggesting that continuance may be "preferred means" for sanction in some circumstances). Such strategic behavior should not warrant an adverse inference for any party, much less a different party altogether. Wright & Miller, §2289 ("failure to move for sanctions in a timely fashion may preclude a belated request").

Given the importance of Dr. Park's glassy solid testing to Novartis's infringement case, the district court rightly did not preclude Novartis's reliance on that evidence, as such a case-dispositive sanction would have been an abuse of discretion under Third Circuit law. *See ZF*, 696 F.3d at 298-300 (holding that importance is "often the most significant factor" and rejecting district court sanction that threatened to be case dispositive against plaintiff); Appx21 (district court stating "adverse inference is a not [*sic*] complete foreclosure of Novartis' claim"). But under all the circumstances here, it was an abuse of discretion to adopt an adverse inference of any kind.

In sum, the adverse inference should be reversed, as it was based on legal error and the misapplication of law to the facts; and any factual findings were clearly erroneous. *See Hanover*, 989 F.2d at 127 (abuse-of-discretion standard). At a minimum, it cannot alone sustain the judgment, as the district court itself made clear. Appx21-22.

*****

Any of these errors requires setting aside the noninfringement judgment. Combined, they compel it. This Court should thus remand for further proceedings, including consideration of Novartis's infringement evidence comparing Dr. Park's reference spectrum to Raman spectra from MSN's ANDA products.

## II. THIS COURT SHOULD CORRECT THE CLAIM CONSTRUCTION FOR REMAND, AS THE DISTRICT COURT ERRED IN READING LIMITATIONS INTO THE PLAIN CLAIM LANGUAGE

The district court expressly stated that its noninfringement judgment was independent of its claim construction of the phrase "[a]n amorphous solid form of a compound." Appx4 n.4. Although this Court thus need not reach the claim-construction issue to set aside the judgment, it should do so in the interests of "judicial economy," including to streamline further proceedings. *Chimie v. PPG Indus.*, 402 F.3d 1371, 1383-85 (Fed. Cir. 2005).

Claim 1 recites "[a]n amorphous solid form of a compound comprising" TVS. Appx58(col.32:42-46). During claim construction, the parties disputed whether that

text requires a specific "purity," with MSN arguing it requires the amorphous compound to be "substantially pure" and Novartis maintaining the text recites no purity requirement. Appx30. The district court rejected both proposals and formulated its own construction, requiring "a solid form of a compound in which the amorphous form of the compound predominates." Appx4; Appx30-35. Under that construction, the claim's scope is tied not only to the presence of amorphous TVS, but also to the presence of other solid forms: where there is a mixture of amorphous TVS and crystalline TVS, the amorphous solid form must "predominate" over the crystalline solid form. Appx30-35.

The district court acknowledged that "the intrinsic record provides virtually no useful guidance" supporting a predominance requirement. Appx34-35. The district court nevertheless thought a predominance requirement was necessary to maintain consistency with a construction of other claims in related but different Novartis patents reciting an entirely different complex (not just a different solid form): crystalline trisodium sacubitril-valsartan hemipentahydrate ("crystalline TSVH"), which, unlike the amorphous TVS complex, includes water as part of the complex's crystalline structure. Appx30-31. The district court also believed that a plain-meaning construction would conflict with the prosecution history, which "makes clear that" the crystalline and amorphous solid forms are "distinct from each other." Appx31-32.

The district court's construction should be reversed. Claim 1 plainly recites amorphous TVS, and nothing more. In the preliminary-injunction appeal, this Court "admit[ted] concern with the district court's construction, particularly in light of its acknowledgement that there is 'virtually no useful guidance' in the intrinsic record supporting [the district court's] conclusion that the claims require any particular amount of amorphous TVS to be present." *Novartis*, 2024 WL 4969281, at *5 (at Appx13280-81). Although the district court's post-trial decision acknowledged that this Court had "called this construction into question," the district court declined to reconsider it absent "actual guidance" from this Court. Appx4 n.4; Appx13043-44(1043:21-1044:10). The Court should provide that guidance now and correct the district court's construction.

### A. The Claim Text's Plain Meaning, and Lack of Any Lexicography or Disclaimer, Require Reversal on Claim Construction

Claim terms should generally be given "their ordinary and customary meaning" in context to one of ordinary skill in the art. *Poly-Am., L.P. v. API Indus.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). And when claim text has a "plain" meaning on an issue with "no genuine uncertainties," "it is particularly difficult" to conclude that terms have a different meaning because "the proper construction" must "stay true to the claim language." *Straight Path IP v. SIPNET EU*, 806 F.3d 1356, 1361 (Fed. Cir. 2015). Absent clear lexicography or disclaimer, a patentee is "entitled to the full scope of its claim language." *Duncan*, 914 F.3d at 1364; *Thorner v. Sony*

*Comput.*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012) ("only two exceptions"—"*clear lexicography*" or "disavowal"—support departing from plain meaning).

Here, claim 1's text has a plain meaning. The claim recites "an amorphous solid form of [TVS]." Appx58(col.32:42-46). Nobody disputes what TVS is, which the claim spells out using exact chemical names and a molar ratio—anionic valsartan, anionic sacubitril, and sodium cations in a 1:1:3 molar ratio. Appx58(col.32:42-46). The parties likewise agree about the meaning of "amorphous solid form" of the TVS compound: it means the "units of valsartan, sacubitril and three sodium atoms" are "oriented at random, with no three-dimensional order." MSN.Br.12, *Novartis*, No. 24-2211, ECF35 (distinguishing from crystalline form, where units "are oriented in the same way and packed in a repeating three-dimensional pattern"); Appx12376(376:5-16) (similar from Novartis's expert Dr. Park). As the district court acknowledged, it "is clear" that a skilled artisan "can identify a compound as existing in an 'amorphous solid form,' as opposed to other forms." Appx34.[3]

Claim 1 thus requires amorphous TVS, nothing more. Claim 1's text nowhere suggests a requirement to consider whether the crystalline TVS form is also present,

[3] The district court misunderstood the technology in suggesting that "any presence of amorphous molecules allows a solid form of a compound to be considered amorphous." Appx31. Individual TVS "molecules" cannot be amorphous or crystalline because those forms depend on whether multiple molecules have (or lack) long-range three-dimensional order. Appx5127-28(¶56); Appx5113-75.

let alone that the amorphous form must predominate over the crystalline form. The relevant question under the plain text is simply whether the amorphous TVS form is present, regardless of what other solid forms of the TVS complex may also be present.

The specification and prosecution history are consistent with this understanding of the plain claim text and contain no redefinition or disavowal. Appx43-61; Appx1226-86. Rather than suggesting any need to compare amorphous and crystalline TVS, the intrinsic evidence shows that the two forms are "mutually exclusive," as the district court acknowledged. Appx30-33; Appx51(col.17:43-45). MSN has previously agreed. MSN.Opp.13, *Novartis*, No. 24-2211, ECF16. Given the agreed categorical distinction between amorphous TVS and crystalline TVS, any comparison between them to determine which "predominates" is superfluous to understanding claim 1. Amorphous TVS is amorphous TVS. Claim 1 is satisfied when amorphous TVS is present in any environment—without regard to whether any unclaimed crystalline TVS also happens to be present or, if so, how much is present.

As this Court noted in the preliminary-injunction appeal, the district court itself recognized the intrinsic record's silence about any "limitation" "regarding the purity of the claimed amorphous compound"—by which the district court meant "the percentage of the compound that is amorphous rather than crystalline." Appx30;

*Novartis*, 2024 WL 4969281, at *5 (at Appx13280-81). After canvassing the intrinsic record, the district court "concede[d] the difficulty of pinpointing an appropriate limitation when the intrinsic record provides virtually no useful guidance." Appx34. That should have been the end of the matter—because the intrinsic record is silent about the existence of a limitation on the relative amounts of amorphous and crystalline TVS, the district court was required to reject any such limitation and give Novartis the "full scope" of its claim. *Duncan*, 914 F.3d at 1364.

### B. The District Court Misread the Prosecution History and Contradicted Precedent in Injecting a "Predominance" Requirement into Claim 1

The district court had no basis for nevertheless creating a predominance requirement from whole cloth. It was wrong that the '918 patent's prosecution history "conflicts with" giving the text its plain meaning, as Novartis proposed. Appx31. The district court pointed to a nonobviousness declaration by Dr. Michael Cima, submitted during prosecution of the '918 patent. Appx31-32, Appx34-35. Quoting a few isolated statements from that declaration about the ways in which amorphous and crystalline forms differ generally, the district court concluded: "To embody these properties, rather than properties associated with a crystalline solid, it follows that an amorphous solid form of a compound must be predominantly amorphous." Appx31, Appx34-35.

That was legal error twice over—it misreads the intrinsic evidence and contradicts precedent. Far from supporting the district court's "predominance" requirement, that prosecution-history declaration confirms claim 1's plain meaning and invites no comparison of the claimed amorphous TVS to unclaimed crystalline TVS. It does the opposite. In noting the ways amorphous and crystalline forms generally differ, Dr. Cima explained that possessing the crystalline form of a particular compound would not necessarily make it easier to obtain the amorphous form. Appx1276(¶17); Appx1271-83. Ultimately, Dr. Cima's declaration stands for the proposition that amorphous TVS is its own unique and nonobvious invention from crystalline TVS. Appx1271-83. Regardless, nothing in the declaration dictates a claim construction: a "description of characteristics does not redefine a compound with an established and unambiguous structural definition." *SmithKline Beecham v. Apotex*, 403 F.3d 1331, 1339 (Fed. Cir. 2005).

The district court also erred in relying on the claim construction of different claims from other, related patents—Nos. 8,877,938 and 9,388,134. Appx30-31. As the district court acknowledged, the '938 and '134 patents disclose and claim a different invention: crystalline TSVH. During claim construction for those patents, the district court imposed a "substantially pure" limitation because Novartis and the Examiner had agreed during prosecution of the '938 patent that the crystalline form would be "substantially pure." Appx33; *In re Entresto*, No. 1:20-md-02930-LPS,

2021 WL 2856683, at *4-5 (D. Del. July 8, 2021); Appx1235; Appx1243-44. Because that different, "substantially pure" limitation in the '938 and '134 patents required considering unclaimed substances that might be present alongside crystalline TSVH (i.e., potential impurities of crystalline TSVH), the district court here believed that the presence of unclaimed substances—specifically, other solid forms of the TVS complex—also needed to be considered for claim 1 of the '918 patent.

That too was legal error. As the district court itself recognized, "prosecution disclaimer generally does not apply when the claim term in the descendant patent uses different language." *Ventana Med. Sys. v. Biogenex Lab'ys*, 473 F.3d 1173, 1182 (Fed. Cir. 2006); Appx33-34 (district court quoting same). Here, claim 1 of the '918 patent not only uses different language, but it also recites a different invention with a different solid form from the '938 and '134 patents. And there was no similar colloquy or agreement about purity between Novartis and the Examiner while prosecuting the '918 patent. Because the crystalline TSVH claims of the '938 and '134 patents differ materially from the amorphous TVS claims of the '918 patent, and arise from a different prosecution history, the district court erred in relying upon the "substantially pure" limitation of those different patents to justify limiting the '918 patent's claims. *Ventana*, 473 F.3d at 1182.

The district court also referenced a specification passage reciting "partially crystalline" TVS but rightly recognized that the passage provides no support for a predominance requirement. Appx30-33; Appx51(col.17:41-45). The patent describes how the TVS complex can take different "solid form[s]," including "the crystalline, partially crystalline, amorphous, or polymorphous form." Appx51(col.17:41-45). The parties agree that the partially crystalline form refers to "'a mixture of crystalline and amorphous forms.'" Appx30 (quoting Appx1134-35(¶31)). As the district court recognized, the specification thus cannot be read as establishing "mutual exclusivity" between the partially crystalline form and the amorphous form because the partially crystalline form includes at least some amorphous TVS. Appx33-34; Appx4 (district court's elaboration on construction recognizing same). Yet nothing about that suggests giving claim 1 anything other than its plain meaning: the claim covers any amorphous TVS, in any amount.

In short, there is no basis for the district court's lengthy addition to the claim's plain text. This Court should correct the error now to put this issue to rest.

## CONCLUSION

The noninfringement judgment should be set aside, the claim construction should be corrected, and this case should be remanded for further proceedings.

Dated: September 12, 2025

Respectfully submitted,

/s/ Deanne E. Maynard

DEANNE E. MAYNARD
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8740
DMaynard@mofo.com

REBECCA W. SETRAKIAN
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

NICHOLAS N. KALLAS
JARED L. STRINGHAM
CHRISTINA SCHWARZ
CHRISTOPHER E. LOH
VENABLE LLP
151 W. 42nd Street, 49th Floor
New York, NY 10036

*Counsel for Novartis Pharmaceuticals Corporation*

# ADDENDUM

**ADDENDUM**
**TABLE OF CONTENTS**


| Date | Dkt.[1] | Document | Appx |
|---|---|---|---|
| 07/11/2025 | 1937 (523) | Trial Opinion | Appx1 |
| 07/11/2025 | 1938 (524) | Final Judgment | Appx23 |
| 05/31/2024 | 1374 (194) | Claim Construction Opinion | Appx26 |
| | | U.S. Patent No. 11,096,918 | Appx36 |
| 12/02/2024 | 1667 (410) | Excerpts of Pretrial Conference | Appx11031 |


[1] By order of the district court, all filings in this case were filed in two dockets: No. 1:20-md-02930-RGA (D. Del.) (the MDL docket) and No. 1:22-cv-01395-RGA (D. Del.) (the ’918 docket). The table of contents for this addendum lists the MDL docket numbers with the ’918 docket numbers in parentheses.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | Civil Action No. 20-md-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED,<br><br>Defendants. | Civil Action No. 22-cv-1395-RGA |

# TRIAL OPINION

Daniel M. Silver, Alexandra M. Joyce, MCCARTER & ENGLISH, LLP, Wilmington, DE; Nicholas N. Kallas, Christina Schwarz, Shannon K. Clark, Susanne L. Flanders, Melinda R. Roberts, Erin Belfield, VENABLE LLP, New York, NY,

Attorneys for Plaintiff.

Richard C. Weinblatt, Stamatios Stamoulis, STAMOULIS & WEINBLATT LLC, Wilmington, DE; Ronald M. Daignault, Richard Juang, Elizabeth Bernard, DAIGNAULT IYER LLP, Vienna, VA; Kevin E. Warner, RAKOCZY MOLINO MAZZOCHI SIWIK LLP, Chicago, IL,

Attorneys for Defendants.

July 11, 2025

**ANDREWS, U.S. DISTRICT JUDGE:**

This case is part of the multi-district litigation of patent infringement claims regarding Plaintiff Novartis Pharmaceuticals Corporation's Entresto. Novartis brought C.A. No. 22-1395 against MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, and MSN Life Sciences Private Limited (together, "MSN"), alleging infringement of its U.S. Patent No. 11,096,918 (the "'918 patent"). (Docket No. 22-1395, D.I. 1 ¶ 1). Novartis accuses MSN of infringing claim 1 of the '918 patent, which MSN disputes. (D.I. 1705 at 1; D.I. 1757 at 1).[1]

I held a four-day bench trial from December 10, 2024 to December 13, 2024. (D.I. 1701, 1702, 1703, 1704, hereinafter cited "Tr.__"). I have reviewed the parties' post-trial briefing. (D.I. 1705, 1757, 1764). Having considered the evidence and testimony, I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). I find that Novartis has not proved that MSN infringes the '918 patent.

## I. BACKGROUND

Novartis is the holder of New Drug Application ("NDA") No. 207620 for Entresto, a tablet with active ingredients sacubitril and valsartan, used to treat heart failure. (Docket No. 22-1395, D.I. 1 ¶ 113). The '918 patent is not listed in the FDA Orange Book for Entresto. (*See* D.I. 1185 at 2). The priority date of the '918 patent is April 4, 2006. ('918 patent). The '918 patent is directed to the chemical compound that comprises Entresto, which is the amorphous solid form of sacubitril, valsartan, and sodium cations ("amorphous TVS"). (*Id.* at Abstract).

MSN submitted an Abbreviated New Drug Application ("ANDA") for approval to market generic versions of Entresto. (Docket No. 22-1395, D.I. 1 ¶ 31). Novartis then initiated this lawsuit.

---

[1] Unless otherwise specified, the docket referred to is C.A. No. 20-md-2930.

## II. LEGAL STANDARD

A patent is directly infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. § 271(a). Determining infringement is a two-step analysis. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). First, the court must construe the asserted claims to ascertain their meaning and scope. *Id.* The trier of fact must then compare the properly construed claims with the accused infringing product. *Id.* This second step is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). The patent owner bears the burden of proving infringement by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

In a Hatch-Waxman case, the plaintiff's infringement claim is based on the accused infringer's future conduct, rather than past acts of infringement. Under § 271(e)(2), the "infringement inquiry . . . is focused on the product that is likely to be sold following FDA approval." *Abbott Lab'ys v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002). "Because drug manufacturers are bound by strict statutory provisions to sell only those products that comport with the ANDA's description of the drug, an ANDA specification defining a proposed generic drug in a manner that directly addresses the issue of infringement will control the infringement inquiry." *Id.*

## III. ANALYSIS

The '918 patent is directed to amorphous TVS. ('918 patent at Abstract). The only claim at issue is Claim 1 of the '918 patent, which recites:

> 1. An amorphous solid form of a compound comprising anionic [valsartan[2]], anionic [sacubitril[3]], and sodium cations in a 1:1:3 molar ratio.

(*Id.* at 32:42–46).

I issued a claim construction opinion on May 31, 2024, where I construed "[a]n amorphous solid form of a compound" as "a solid form of a compound in which the amorphous form of the compound predominates. An amorphous solid form is mutually exclusive from a crystalline solid form, but not necessarily mutually exclusive from a partially crystalline solid form."[4] (D.I. 1374 at 5).

The only issue is whether Novartis successfully proved MSN's ANDA infringes claim 1 of the '918 patent by a preponderance of the evidence. MSN withdrew its invalidity arguments at trial. (Tr. 1035:17–19).

**A. Findings of Fact**

**1. Level of Ordinary Skill in the Art**

The parties agree on the definition of a person having ordinary skill in the art ("POSA"). A POSA for claim 1 of the '918 patent "is a person with a Ph.D. in chemistry or related field and two or more years of experience with solid forms of pharmaceutical compounds, such as

---

[2] The chemical name "(S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine" recited in claim 1 describes valsartan.

[3] The chemical name "(2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester" recited in claim 1 describes sacubitril.

[4] The Federal Circuit called this construction into question in an appeal of my denial of Novartis' motion for a preliminary injunction. *Novartis Pharms. Corp. v. MSN Pharms., Inc.*, 2024 WL 4969281, at *5 (Fed. Cir. Dec. 4, 2024). Even if I had adopted a different construction (like Novartis' proposal that no construction was needed, and thus any amount of amorphous TVS could infringe), I would still find that Novartis failed to prove MSN infringes. Novartis failed to prove MSN's ANDA contains any amorphous TVS due to the unreliability of Dr. Park's Raman spectrum.

synthesizing, crystallizing, and characterizing solid forms of pharmaceutical compounds." (Tr. 375:1–6).

### 2. Raman Spectroscopy

The parties generally agree about how Raman spectroscopy works. Raman spectroscopy provides a way to classify and identify molecular compounds and materials. (*See* Tr. 385:24–386:5). A Raman instrument shines a laser beam into a sample and records the energy levels produced by the sample. (Tr. 385:11–17, 718:8–15). The sample will "scatter" some of the light shined into it. (Tr. 718:8–24). The energy levels measured by the Raman instrument are the differences between the energy of the light shone into the material and the energy of the scattered light. (*Id.*; Tr. 720:10–12). The energy differentials will depend on the vibration of the bonds in the molecules, which will depend on the types of bonds in the molecules. (Tr. 385:11–17, 718:19–24, 720:18–22).

Conducting a Raman spectroscopy test on a sample will produce a Raman spectrum. (*See* Tr. 718:6–24, 720:10–12). A Raman spectrum is a graph with "Raman Shift" (in units of $cm^{-1}$) on the x-axis and "Intensity" or "Counts" on the y-axis, and it has peaks reflecting the recorded energy levels. (*See, e.g.*, PTX-1709; DTX-780 at 1). The peaks vary in intensity. (*See* Tr. 722:20–22).

A certain molecule, compound, or complex will produce a unique Raman spectrum. (Tr. 385:24–386:5, 719:19–24). The Raman spectrum can be thought of as a "fingerprint." (*Id.*). A Raman spectrum for a sample of a compound should be the same as a Raman spectrum for a different sample of the same compound. (*See id.*).

The Raman spectrum of a physical mixture of multiple compounds will be different from the Raman spectrum of an amorphous complex of the same multiple compounds. (*See* Tr. 730:20–24; '918 patent at 28:64–67).

An unknown compound can be identified by creating a Raman spectrum of the unknown compound and comparing it to reference Raman spectra of known compounds. (*See* Tr. 498:1–3, 829:16–18). If the spectrum of the unknown compound and the spectrum of a known compound generally contain the same peaks and intensity of peaks, one can conclude the unknown compound is the same as the known compound. (*See id.*).

### 3. Physical Mixtures and Amorphous Complexes

A physical mixture is the combination of two or more compounds with no significant chemical interactions among the compounds. (Tr. 376:9–11). An amorphous complex is the combination of two or more compounds with chemical interactions among the compounds, like "covalent-noncovalent" bonds. (Tr. 376:12–16).

Novartis' expert witness, Dr. Park, created a spectrum of an amorphous physical mixture by making amorphous valsartan disodium and amorphous sacubitril sodium, creating spectra of the two, normalizing the two spectra, then adding the two spectra together. (Tr. 383:11–15, 387:17–19).

MSN argues that the mathematically-created amorphous physical mixture spectrum is unreliable. (D.I. 1757 at 7 n.2). I disagree. Dr. Park testified that adding together the spectra of two components in a physical mixture is an accepted way to create the spectrum of that physical mixture, citing literature to support her testimony. (Tr. 387:24–388:10; JTX-138; JTX-127;

JTX-130). MSN's expert, Dr. McCreery,[5] said, "I don't like that practice, and I would far rather have a real physical mixture." (Tr. 723:14–15). But Dr. McCreery admitted that adding together two spectra to create a physical mixture spectrum is a method used by those in the field and described in relevant literature. (Tr. 723:7–8). Dr. McCreery described the potential distortion in intensity that may result from adding two spectra together (Tr. 722:20–24), but Dr. Park testified extensively that she normalized the spectra before adding them together, and cited literature to support her normalization procedures. (Tr. 425:19–429:23). Dr. McCreery did not say that Dr. Park's methods were inappropriate. He said he did not like it. I think Dr. Park's mathematically-created amorphous physical mixture spectrum is reliable.

**4. Dr. Park's Glassy Solid**

The parties dispute whether MSN's ANDA is predominately amorphous TVS. Dr. Park created a reference sample (also called the "glassy solid") of purportedly amorphous TVS to compare with MSN's ANDA. The parties dispute whether that reference sample and the corresponding Raman spectrum of the sample are sufficiently reliable.[6]

Amorphous TVS is different from an amorphous physical mixture of valsartan and sacubitril; this the parties agree on. (D.I. 1705 at 1; D.I. 1757 at 1). The parties disagree about

---

[5] Novartis alleges that Dr. McCreery is not a POSA. (D.I. 1705 at 11). MSN makes no responsive arguments in its post-trial brief. This issue was the subject of a pre-trial *Daubert* motion. (*See* D.I. 1625 at 6 n.6). While true that "testimony on any issue that is analyzed through the lens of an ordinary skilled artisan" must come from an expert qualified as a POSA, *Kyocera Senco Indus. Tools Inc. v. ITC*, 22 F.4th 1369, 1377–78 (Fed. Cir. 2022), the opinions from Dr. McCreery that I rely on are not POSA opinions. I rely on his opinions about Raman spectroscopy. Dr. McCreery is an expert in Raman spectroscopy. (*See* Tr. 716:14–717:21).

[6] Though the parties argue about whether Novartis' reference spectrum is sufficiently "reliable," and I ultimately find the spectrum is not "reliable," the crux of the dispute is credibility of expert testimony. "[D]isputes over the expert's credibility or over the accuracy of the underlying facts" are questions of fact. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299 (Fed. Cir. 2015).

whether Dr. Park successfully made amorphous TVS, as opposed to an amorphous physical mixture. The parties point to the Raman spectrum of Dr. Park's glassy solid. Novartis says it is different from the Raman spectrum of an amorphous physical mixture of sacubitril and valsartan; MSN says it is not.

I think the Raman spectrum of Dr. Park's glassy solid is not reliable. That is, I do not think Novartis has shown by a preponderance of the evidence that the reference Raman spectrum is of amorphous TVS.

Dr. Park is the chief operating officer at Triclinic Labs. (Tr. 371:14–15). Dr. Park testified that she created, with assistance from those that work at Triclinic, amorphous TVS according to Example 1 of the '918 patent. (Tr. 373:12–19).[7] Dr. Park then ran tests on her sample to confirm that what she created was, in fact, amorphous TVS. (Tr. 386:13–18). Dr. Park created spectra of her sample from three spectroscopy methods: solid-state nuclear magnetic resonance ("ssNMR"), infrared ("IR"), and Raman. (*Id.*). To confirm that what she made was amorphous TVS, she compared the spectra of her sample to her spectra of an amorphous physical mixture and noted the differences between the two sets of spectra. (Tr. 387:1–11, 388:21–396:18).

[7] MSN attempts to poke holes in how the glassy solid was made, chiefly arguing that the Triclinic technicians performed more steps than those listed in Example 1 of the '918 patent. (*See* D.I. 1757 at 17). Dr. Park was cross-examined on the issue (*see* Tr. 445:6–448:11), but MSN offered no expert of its own to testify that those extra steps so contaminated the process that the final product could not be amorphous TVS. MSN gives no explanation on how any extra steps affected the process. Though I do find the reference spectrum to be unreliable, I have no reason to doubt Dr. Park's testimony that Triclinic followed Example 1 as faithfully as possible. (*See* Tr. 379:15–17, 445:6–13).

Case: 25-1927 Document: 23 Page: 90 Filed: 07/11/25

MSN argues that Dr. Park created an amorphous physical mixture, not amorphous TVS, pointing to the similarities between Dr. Park's glassy solid Raman spectrum and her mathematically calculated amorphous physical mixture Raman spectrum. (D.I. 1757 at 7–8).

The reference glassy solid Raman spectrum, purportedly showing a spectrum of amorphous TVS, is strikingly similar to the amorphous physical mixture spectrum. Below are two "zoomed in" portions of the overlaid spectra, as presented by Novartis:




(PTX-1277 at 1 of 2).



(*Id.* at 2 of 2).

The peaks are at approximately the same height,[8] but the peaks are slightly shifted. That is, the spectrum for Dr. Park's glassy solid is shifted to the right of the amorphous physical mixture spectrum. Novartis points to three peak shifts (which can be seen in the images above) to show that the two spectra are different and that Dr. Park's glassy solid is amorphous TVS. The peak shifts are as follows (listed physical mixture first, Dr. Park's glassy solid second): 1283.4 $cm^{-1}$ to 1287.2 $cm^{-1}$ (difference of 3.8 $cm^{-1}$), 1600.6 $cm^{-1}$ to 1603.4 $cm^{-1}$ (difference of 2.8 $cm^{-1}$), and 1611.2 $cm^{-1}$ to 1614.0 $cm^{-1}$ (difference of 2.8 $cm^{-1}$).[9] (Tr. 394:21–395:5).

But, as testified to by Dr. McCreery, when looking at the Raman spectra as a whole, not just the two zoomed in portions, it appears that the entire Raman spectrum of the glassy solid is shifted approximately 3 $cm^{-1}$ to the right of the Raman spectrum of the physical mixture. (Tr. 725:7–726:15). Below are MSN's depictions of several other regions of the two spectra:[10]

---

[8] The parties do not address the similarity in peak heights. This is merely my observation.

[9] When asked why the shifts all end in .8 or .7, Dr. Park responded, "[M]y Raman data was collected at about almost one wavenumbers, close to one. So that's why the difference [always ends in] about .8 or .7 because it's close to about 0.9 wavenumber . . . . That's the number of data points." (Tr. 409:18–22). MSN does not raise any issues about this testimony.

[10] MSN did provide a graph with the entirety of the two spectra overlaid, but with Dr. Park's glassy solid spectrum shifted 3 $cm^{-1}$ to show that the spectra are substantially the same. (*See* DTX-646A at 3 of 11). It is nearly impossible to distinguish the two spectra. Perhaps that was MSN's intention, but I think several additional "zoomed in" areas on the spectra, without MSN's 3 $cm^{-1}$ shift, are more informative.




(DTX-646A at 4 of 11).




(*Id.* at 5 of 11).




(*Id.* at 6 of 11).

Novartis argues the peak shifts show that the glassy solid is amorphous TVS, not an amorphous physical mixture, pointing to Redenti, a paper published in 1996. (D.I. 1705 at 3; D.I. 1764 at 7; Tr. 395:7–11). Indeed, Redenti says and shows that, at least with respect to the compounds at issue there, an amorphous complex and an amorphous physical mixture of the components in that complex will display different Raman peaks. (*See* JTX-121 at 3, 5 of 6). But Redenti points to more than just peak shifts. It describes the broadening and weakening of various peaks and bands as other notable differences observed between an amorphous complex and an amorphous physical mixture. (*Id.* at 3 of 6). Redenti does point to peak shifts, too, but no systematic shift of an entire Raman spectrum. (*See id.*). The visual comparing the two Raman spectra in Redenti is shown below:




Fig. 3. Diagnostic region of NIR FT-Raman spectra of: (a) physical mixture of the two amorphous components and (b) freeze-dried P:$\beta$-CD (laser power: 30 mW/mm$^2$).

(*Id.* at 5 of 6). Dr. McCreery testified that the changes in peak intensity and shift of some, but not all, peaks show a difference between the two samples in Redenti. (Tr. 730:11–731:17). Redenti itself supports this. (*See* JTX-121 at 3 of 6).

Dr. McCreery testified that the type of systematic shift observed between the amorphous physical mixture Raman spectrum and Dr. Park's glassy solid Raman spectrum is simply "impossible." (Tr. 727:5). He testified that, in considering the bonds and molecular interactions present in an amorphous complex that are not present in an amorphous physical mixture, "most of the molecules shouldn't be affected," and there thus should be no systematic shift between the two spectra. (Tr. 727:5–11). Dr. McCreery testified that, though one spectrum of a sample is typically all that is needed to classify that sample, he would have run several tests and generated several Raman spectra of Dr. Park's glassy solid so he could statistically analyze the spectra and determine if the small changes are indeed significant. (Tr. 736:21–737:6). Dr. McCreery's testimony, combined with Novartis' own reference tending to support his testimony, convince

me that Novartis failed to show by a preponderance of the evidence that MSN's ANDA infringes based on the reference spectrum of Dr. Park's glassy solid.

Novartis has five main arguments in response.

First, Novartis points out that the glassy solid Raman spectrum is not uniformly shifted by precisely 3 $cm^{-1}$. (D.I. 1705 at 13). That is true. The peak shifts, as calculated by Novartis, are between 1.8 $cm^{-1}$ and 5.7 $cm^{-1}$. (Tr. 409:7–11). Dr. McCreery testified that a calculated peak shift will depend on how the peak is selected. (Tr. 734:24–735:2). Dr. McCreery testified that most peak-picking software will pick the maximum height of a peak, which is not always the true normalized center of the peak. (*Id.*). He testified that small differences in peaks, like the ones at issue here, need rigorous evaluation to ensure accuracy. (Tr. 735:6–15). Dr. McCreery further testified that most of the peaks selected by Dr. Park were within Dr. Park's margin of error (1 $cm^{-1}$) of 3 $cm^{-1}$, and that the largest peak difference (5.7 $cm^{-1}$) was on a broad band where the peak could have plausibly been selected differently (as shown by Dr. McCreery shifting the glassy solid Raman spectrum 3 $cm^{-1}$ and showing how closely the two spectra line up, including at the purported 5.7 $cm^{-1}$ shift). (Tr. 733:20–737:6). Dr. Park testified that she accurately selected peak points. (Tr. 411:6–413:2). Dr. Park did not testify about how she picked her peaks or what software she used to pick her peaks. (*See* Tr. 411:24–413:2). While true that Dr. McCreery did not perform an analysis showing a peak selection where all peaks are uniformly shifted by 3 $cm^{-1}$, his testimony sows doubt about Novartis' reference Raman spectrum.

Second, Novartis argues that Dr. Park's instrument was properly calibrated when she conducted Raman spectroscopy on her glassy solid, and MSN has provided no explanation for what would cause a systematic shift in the spectrum other than actual differences between

amorphous TVS and an amorphous physical mixture of sacubitril and valsartan. (D.I. 1705 at 13).

Dr. Park testified that the Raman instrument she used is routinely calibrated using polystyrene, in accordance with American Society of Testing and Materials ("ASTM") standards. (Tr. 414:2–7). That is, the Raman instrument scans polystyrene and produces a spectrum, three peaks in that spectrum are compared to three known polystyrene peaks, and the instrument is calibrated accordingly. (Tr. 414:2–14). Dr. Park's Raman instrument was calibrated three times around the time of her testing her glassy solid: April 13, 2023, June 7, 2023, and August 3, 2023. (Tr. 415:5–7). She tested the glassy solid on April 28, 2023. (Tr. 373:4–8). Dr. Park testified that her "Raman instrument was accurate within plus/minus one wavenumber during [her] testing" and that there were no systematic shifts in the calibration data. (Tr. 414:25–415:2; Tr. 415:15–19). For example, on one calibration day, one peak was off by +1 $cm^{-1}$, another peak was off by +0.2 $cm^{-1}$, and another was off by 0.0 $cm^{-1}$. (Tr. 415:8–14). Dr. Park opined that any difference in peaks among two samples greater than one wavenumber is thus a "real difference between the two samples." (Tr. 415:20–25).

Dr. McCreery led the development of the ASTM standards followed by Dr. Park in calibrating her Raman instrument. (Tr. 737:14–16). He opined that Dr. Park did not do enough to ensure the accuracy of her Raman instrument. (Tr. 738:9–13). Dr. McCreery testified that, after seeing the striking similarities and small differences between the physical mixture and the glassy solid Raman spectra, he would have conducted further testing to ensure that the two spectra were in fact different. (*Id.*). Dr. McCreery did not pinpoint a systemic error that caused the 3 $cm^{-1}$ shift; "It could have various sources." (Tr. 752:20–24).

Though Dr. McCreery and MSN do not point out a specific error in Dr. Park's Raman instrument that caused a uniform shift of 3 $cm^{-1}$, I do not think that is necessary for MSN to sow doubt about Novartis' reference Raman spectrum. For the reasons explained above, I think the reference Raman spectrum is unreliable. I do not doubt the accuracy of the calibration tests conducted on Dr. Park's Raman instrument. But I credit Dr. McCreery's testimony that such abnormally close and uniformly shifted spectra warrant further testing to confirm that the two spectra are in fact different. This is supported by Novartis' reference, Redenti, that shows that differences in peak positions and intensities among Raman spectra can be used to differentiate between an amorphous complex and a physical mixture, but is silent on a systematic shift with virtually no change in intensity. (*See* JTX-121 at 3, 5 of 6).

Third, Novartis points to other spectroscopy tests that purportedly show Dr. Park's Raman spectrum is of amorphous TVS, not an amorphous physical mixture. (D.I. 1705 at 3). Novartis points to ssNMR and IR spectra. (*Id.*). MSN addressed those spectra in a footnote and offered no expert testimony at trial to counter Dr. Park's testimony that the ssNMR and IR spectra show her glassy solid is amorphous TVS. (D.I. 1757 at 5 n.1; Tr. 743:3–17). MSN's arguments about the purported unreliability of the ssNMR and IR spectra are forfeited. *See Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023). I thus credit Dr. Park's testimony that the ssNMR and IR spectra tend to show that her glassy solid is amorphous TVS. Regardless, I think the Raman spectrum of Dr. Park's glassy solid is unreliable, for the reasons I explain above. Novartis used Dr. Park's Raman spectrum to show MSN's ANDA infringes, not the ssNMR or IR spectra. It is the Raman spectrum, not the glassy solid sample or the ssNMR and IR spectra, that I think is unreliable.

Fourth, Novartis offered testimony from Dr. Park to counter Dr. McCreery's testimony that the systematic shift was "impossible." (D.I. 1705 at 16). Dr. Park testified that it was not impossible for amorphous TVS to generate over twenty Raman peak shifts, pointing to the complexity of amorphous TVS. (Tr. 436:18–437:4). But Dr. Park did not address the crux of Dr. McCreery's testimony: that it was impossible for the entire amorphous Raman spectrum to shift by approximately the same amount. I do not think Dr. Park's testimony helps establish the reliability of her glassy solid Raman spectrum.

Fifth, Novartis argues multiple spectra are not needed to classify a compound, contrary to Dr. McCreery's opinion. (D.I. 1705 at 14–15). Dr. Park testified that a pharmaceutical compound can be classified with one spectrum, citing several pieces of literature for support. (Tr. 422:20–423:20). I do not doubt this. But I credit Dr. McCreery's testimony that when two spectra of two supposedly different materials are "very similar" (Tr. 728:6), multiple spectra would be beneficial so one could run statistical tests to determine if those small differences are significant enough to conclude the two materials are in fact different. (Tr. 736:21–737:6). I note that the sources cited by Dr. Park contain more obvious differences in the Raman spectra (like the emergence of new peaks and changes in intensity). (*See* JTX-121 at 5 of 6; PTX-1225 at 4 of 5; PTX-1228 at 4 of 5; PTX-1223 at 2 of 4).

To further support its position, MSN points to a spectrum from Novartis that MSN alleges is of amorphous TVS, but which is different from Dr. Park's glassy solid spectrum. (D.I. 1757 at 15–16).

Novartis had previously developed "LCZ-696," an amorphous compound; it had spectra of that compound. (*See* Tr. 430:9–11; JTX-104 at 8 of 33). MSN argues amorphous LCZ-696 is amorphous TVS, pointing to deposition testimony of a Novartis employee, Dr. Motto, who was

in charge of the Pharmaceutical and Analytical Development group working on Entresto. (D.I. 1757 at 15–16; *see* Tr. 692:13–25, 693:22–694:2). When asked if Novartis had ever characterized a material as amorphous TVS, Dr. Motto said, "Novartis was able to determine that material they had was amorphous [TVS] based on analytical testing of the next step product [(crystalline LCZ-696)] and physical evaluation of the material that they isolated [(LCZ-696 amorphous to glassy solid)]." (Tr. 695:11–22). Dr. Motto's testimony could be clearer. I understand him to say that Novartis determined amorphous TVS was in fact amorphous by comparing crystalline LCZ-696 to amorphous LCZ-696. Dr. Motto later testified that the glassy solid of Example 1 "was characterized as amorphous LCZ-696 or amorphous [TVS]," seeming to equate the two. (Tr. 697:2–5). Though Dr. Motto does not say so explicitly, it seems quite likely that he equated LCZ-696 with amorphous TVS.

Novartis had an internal presentation discussing, among other things, amorphous LCZ-696. (JTX-104). The presentation has a graph displaying Raman spectra of several materials, including amorphous LCZ-696. (*Id.* at 8 of 33). The amorphous LCZ-696 Raman spectrum is different from Dr. Park's glassy solid Raman spectrum. (Tr. 741:8–16). Peak intensities are different and some peaks are present in one and not in the other. (*Id.*). According to Dr. McCreery, "[S]pectroscopy would never claim those were the same material." (Tr. 741:14–15). Dr. Park agreed that the two spectra were different. (Tr. 462:7–10).

The author of the presentation, Charles Pan, is not an inventor of the '918 patent, and the presentation is dated April 21, 2009 while the '918 patent's priority date is April 4, 2006. (Tr. 430:22–431:10; *see* JTX-104 at 1 of 33; '918 patent). The Raman spectrum for amorphous LCZ-696 in the presentation was produced on February 6, 2007. (Tr. 431:17–19). The presentation

does not say amorphous LCZ-696 is amorphous TVS. (Tr. 431:23–25). None of these things foreclose the possibility that LCZ-696 is amorphous TVS.

Novartis argues that the LCZ-696 in its presentation is not Dr. Park's glassy solid. (D.I. 1764 at 4–5). True. That does not matter. Raman spectroscopy is like a fingerprint; the spectrum of one sample of a compound should be the same as the spectrum of a different sample of the same compound. (*See* Tr. 385:24–386:5, 719:19–24). If amorphous LCZ-696 and Dr. Park's glassy solid are both amorphous TVS, the two spectra should be substantially the same. I note that Novartis offered no testimony saying amorphous LCZ-696 is not amorphous TVS. Novartis merely argues Dr. Motto did not explicitly say the two were the same. (D.I. 1764 at 5).

Based on the timing and Dr. Motto's testimony, I think there is a reasonable likelihood that amorphous LCZ-696 is amorphous TVS. Since the amorphous LCZ-696 spectrum is quite different from Dr. Park's glassy solid spectrum, it too causes me to doubt that Dr. Park's glassy solid Raman spectrum is reliable to use as a reference to compare with MSN's ANDA.

### B. Conclusions of Law

#### 1. Adverse Inference

The parties dispute the applicability of an adverse inference. Before trial, I heard a discovery dispute between Novartis and MSN's co-defendants, Gerbera Therapeutics, Inc. and Nanjing Noratech Pharmaceutical Co., Limited (together, "Noratech"). (*See* D.I. 1634 at 3). Noratech went to trial with MSN, but settled its case after trial, and I entered a consent judgment and injunction against Noratech on June 17, 2025. (D.I. 1902). At the discovery dispute, Noratech asserted that Novartis failed to produce Dr. Park's glassy solid sample in violation of Federal Rule of Civil Procedure 26. (*See* D.I. 1634 at 3). At the pretrial conference, I indicated I would take an adverse inference against Novartis for failing to produce the sample. (D.I. 1667 at

31:21–32:4). Novartis re-argues the applicability of an adverse inference, and it argues that any adverse inference does not apply to MSN because MSN was not the defendant that requested the glassy solid. (D.I. 1705 at 34–35).

Whether to impose sanctions, and which sanctions to impose, for discovery violations is in the discretion of the trial court. FED. R. CIV. P. 37(c); *see Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 134 (3d Cir. 2009). Novartis gives three reasons for why an adverse inference is not warranted. As I explained at the pretrial conference, I think an adverse inference is warranted, but I address Novartis' arguments. (D.I. 1667 at 31:21–32:4).

First, Novartis argues a sanction for a discovery violation requires prejudice. (D.I. 1705 at 34). I think there is prejudice here. MSN wanted to test the sample Novartis used to show MSN's ANDA infringes but could not. Indeed, counsel for Novartis asked Dr. Park if "Defendants' experts test[ed] the glassy solid of Example 1." (Tr. 397:7–9). Counsel may have been asking if Defendants' experts tested any glassy solid, not just Dr. Park's, but again, Defendants wanted to test Dr. Park's sample in particular.

Second, Novartis argues there must be bad faith for sanctions to be warranted, citing *Robocast v. Microsoft Corp.*, 2014 WL 789086, at *2 (D. Del. Feb. 25, 2014). *Robocast* dealt with spoliation and a party failing to issue a litigation hold to preserve evidence. *Id.* at *1. The case cited in *Robocast*, a Third Circuit case, dealt with spoliation and the sanction of dismissal with prejudice. *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 72 (3d Cir. 2012). *Bull* says, "Withholding requires intent," and that sanctions are appropriate only for withheld evidence, not evidence accidentally misplaced. *Id.* at 79. Novartis does not contend the glassy solid was misplaced; indeed, Dr. Park still had it at the time of trial. (Tr. 448:25–449:3). The glassy solid fell under the scope of requested production. Novartis agrees. (D.I. 1667 at 15:5–6). Novartis

argued only that Nanjing Noratech brought up the issue too late. (*Id.* at 14:3–6). There is evidence that Novartis knew the sample existed, knew the sample fell within the scope of requested discovery, and did not provide it. I think that is sufficient to show that Novartis acted with "intent" to withhold the sample, and that a sanction is warranted.

Third, Novartis argues complete foreclosure of its claim is a harsh penalty when MSN did not seek to compel production. (D.I. 1705 at 34). An adverse inference is a not complete foreclosure of Novartis' claim.

I think this adverse inference applies not just in relation to Noratech, but to MSN, too.

Novartis argues that the adverse inference should not apply to MSN's case. While true that MSN was not the party that sought production of Dr. Park's glassy solid, this is discovery common to both Defendants. Indeed, the Scheduling Order says, "The parties shall coordinate activities to reduce duplicative and cumulative discovery that is common to all Defendants." (D.I. 1098 at 5). Dr. Park created a Raman spectrum from her glassy solid that was used by Novartis to show that both Defendants' ANDAs infringe. The Defendants would have had their shared expert witness, Dr. McCreery, test Dr. Park's glassy solid. (Tr. 711:1–3; D.I. 1667 at 27:12–19). Novartis points out that MSN never made a glassy solid (*see* Tr. 397:4–6; D.I. 1705 at 34), but MSN wished to test Dr. Park's glassy solid, the material against which its ANDA was compared. I thus think it is appropriate to take an adverse inference against Novartis for failing to produce Dr. Park's glassy solid to Noratech.

In an analogous setting, the Ninth Circuit came to a similar conclusion. *See Payne v. Exxon Corp.*, 121 F.3d 503, 510 (9th Cir. 1997). In *Payne*, the Ninth Circuit affirmed the district court's dismissal of a case against two defendants as a sanction for the plaintiff failing to comply with a discovery order, even though only one of the defendants requested and filed a motion on

the discovery at issue. *Id.* at 507, 510. The court explained, "If Congress had intended to limit the district court's dismissal authority to claims against the party who propounded discovery, it would not have chosen such sweeping language [under Rule 37(b)(2)]."[11] *Id.* at 510. Further, "The district court could reasonably conclude that plaintiffs' failure to comply with court orders prejudiced both parties." *Id.* Here, Novartis' failure to produce Noratech's requested discovery prejudiced both defendants.

I will assume that, had Novartis produced the glassy solid sample to Defendants, it would have been unfavorable to Novartis' case. *See Gronquist v. Nicholas*, 2011 WL 4001103, at *8 (W.D. Wash. Aug. 12, 2011).

### 2. Infringement

Novartis must prove MSN's ANDA infringes by a preponderance of the evidence. *SmithKline*, 859 F.2d at 889. For all the foregoing reasons, I think Novartis did not. The reference Raman spectrum that Novartis used to compare to a Raman spectrum of MSN's ANDA is unreliable as a reference spectrum. Thus, an infringement analysis based on that "reference spectrum" is insufficient. The unreliability of Novartis' reference Raman spectrum, combined with an adverse inference due to Novartis' failure to produce the glassy solid sample reflected in the reference Raman spectrum, leads me to conclude that Novartis did not meet its burden to show MSN's ANDA infringes by a preponderance of the evidence.

## IV. CONCLUSION

For the foregoing reasons, I find that Novartis did not prove that MSN's ANDA infringes by a preponderance of the evidence. I will enter a final judgment consistent with this opinion.

---

[11] At issue here is a violation under Rule 37(c)(1), which allows for the sanctions listed in Rule 37(b)(2). FED. R. CIV. P. 37(c)(1)(C).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | C.A. No. 20-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED,<br><br>Defendants. | C.A. No. 22-1395-RGA |

**FINAL JUDGMENT AS TO**
**DEFENDANTS MSN PHARMACEUTICALS INC., MSN LABORATORIES**
**PRIVATE LIMITED, AND MSN LIFE SCIENCES PRIVATE LIMITED**

**WHEREAS** Plaintiff Novartis Pharmaceuticals Corporation ("Novartis") in the above-captioned suit has asserted that Defendants MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, and MSN Life Sciences Private Limited (collectively "MSN" or "MSN Defendants") infringed claim 1 of Novartis's U.S. Patent No. 11,096,918 ("the '918 Patent") by filing Abbreviated New Drug Application ("ANDA") No. 213748;

**WHEREAS** Novartis has asserted that MSN's generic valsartan/sacubitril ANDA tablets identified in MSN's ANDA No. 213748 ("MSN's ANDA Products") infringe claim 1 of the '918 Patent;

**WHEREAS** MSN withdrew at trial its challenges to the validity of claim 1 of the '918 Patent;

**WHEREAS** the Court on July 11, 2025, issued a decision holding that the filing of MSN's ANDA No. 213748 and MSN's ANDA Products do not infringe claim 1 of the '918 Patent (Docket No. 20-md-2930, D.I. 1937; Docket No. 22-1395, D.I. 523);

**WHEREAS** the '918 Patent will expire the day after November 8, 2026;

**IT IS HEREBY ORDERED, DECREED, AND ADJUDGED:**

1. Judgment is entered in MSN's favor that MSN's filing of ANDA No. 213748, including any amendments or supplements thereto, does not infringe claim 1 of the '918 Patent under 35 U.S.C. § 271(e)(2).

2. Judgment is entered in MSN's favor that any use, sale, offer for sale, and/or manufacture within the United States, and/or importation into the United States of MSN's ANDA Products during the '918 Patent's term would not infringe claim 1 of the '918 Patent.

3. MSN's counterclaim that the '918 patent is invalid is dismissed with prejudice.

Richard G. Andrews
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | Civil Action No. 20-md-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED, NANJING NORATECH PHARMACEUTICAL CO., LIMITED, and GERBERA THERAPEUTICS INC.,<br><br>Defendants. | Civil Action No. 22-cv-1395-RGA |

MEMORANDUM OPINION

Daniel M. Silver, Alexandra M. Joyce, Maliheh Zare, MCCARTER & ENGLISH, LLP, Wilmington, DE; Nicholas N. Kallas, Christina Schwarz, Christopher E. Loh, Susanne Flanders, Jared L. Stringham (argued), Shannon Clark, Laura Fishwick, Gregory J. Manas, VENABLE LLP, New York, NY,

Attorneys for Plaintiff.

Stamatios Stamoulis, Richard Charles Weinblatt (argued), STAMOULIS & WEINBLATT LLC, Wilmington, DE; Ronald M. Daignault, Richard Juang, DAIGNAULT IYER LLP, Vienna, VA,

Attorneys for Defendant MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, and MSN Life Sciences Private Limited.

Dominick T. Gattuso, Denise S. Kraft, HEYMAN ENERIO GATTUSO & HIRZEL, LLP, Wilmington, DE; Don J. Mizerk, Matthew M. Kamps (argued), HUSCH BLACKWELL LLP, Chicago, IL; Thomas P. Heneghan, HUSCH BLACKWELL LLP, Madison, WI,

Attorneys for Defendant Nanjing Noratech Pharmaceutical Co., Limited and Gerbera Therapeutics, Inc..

May 31, 2024

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is the issue of claim construction of one term in U.S. Patent No. 11,096,918 ("the '918 patent"). The parties submitted a Joint Claim Construction Brief. (D.I. 146).[1] I heard oral argument on March 12, 2024. (Markman Tr.).[2] At my request, the parties submitted post-*Markman* hearing supplemental briefing. (D.I. 163, 164, 165).

## I. BACKGROUND

On October 24, 2022, Plaintiff Novartis filed a complaint alleging infringement of the '918 patent by Defendants MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, MSN Life Sciences Private Limited, and Nanjing Noratech Pharmaceutical Co., Limited. (D.I. 1). The complaint also accused several other firms who have since been terminated from this case. (*See* D.I. 68, 124, 140, 151). Gerbera Therapeutics Inc. was joined as a Defendant on April 26, 2024. (D.I. 181). This case is part of a group of patent infringement actions related to Plaintiff's Entresto product and associated patents. (*See* MDL No. 20-2930-RGA). The '918 patent covers the amorphous solid form of a compound ("TVS") present in Entresto that is comprised of sacubitril, valsartan, and sodium cations. (*See* D.I. 1 ¶ 1; '918 patent; Abstract). The '918 patent descends from U.S. Patent No. 9,388,134 ("the '134 patent") and U.S. Patent No. 8,877,938 ("the '938 patent"). The '134 patent is a child of the '938 patent. The '134 and '938 patents cover a compound ("TVSH") comprised of sacubitril, valsartan, sodium cations, and water molecules. (*See* D.I. 146 at 5; '134 patent, 31:41–45; '938 patent, 30:56–63).

---

[1] Docket citations are to Civil Action No. 22-1395 unless otherwise specified.

[2] Citations to the transcript of the argument, which is docketed as D.I. 172, are in the format "Markman Tr. at __."

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (alteration in original) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted). "While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1323).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim

construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (quoting *Markman*, 52 F.3d at 980). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

## III. CONSTRUCTION OF DISPUTED TERM

The parties agree that claim 1 of the '918 patent is representative for the purpose of claim construction. Claim 1 states:

> 1. ***An amorphous solid form of a compound*** comprising anionic [valsartan[3]], anionic [sacubitril[4]], and sodium cations in a 1:1:3 molar ratio.

('918 patent, 32:42–46 (disputed terms bolded and italicized)).

[3] The chemical name "(S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine" recited in claim 1 describes valsartan.

[4] The chemical name "(2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester" recited in claim 1 describes sacubitril.

**1. "an amorphous solid form of a compound" ('918 patent, claims 1–2)**

a. *Plaintiff's proposed construction*: no construction necessary; to the extent claim construction is required, "an amorphous solid form of a compound."[5]
b. *Defendants proposed construction*: "a substantially pure amorphous solid form of a compound"
c. *Court's construction*: "a solid form of a compound in which the amorphous form of the compound predominates. An amorphous solid form is mutually exclusive from a crystalline solid form, but not necessarily mutually exclusive from a partially crystalline solid form."

The parties dispute what limitation, if any, the claims contain regarding the purity of the claimed amorphous compound.[6] Plaintiff contends there is no such limitation. Defendants maintain that the amorphous compound must be "substantially pure."

Plaintiff maintains that, in "[a] mixture that contains the amorphous compound as well as other things, that amorphous compound in that mixture is still amorphous TVS. The other components that are present in that mixture with the amorphous TVS really are irrelevant to the claim construction . . . ." (Markman Tr. at 6:8–7:19). As an initial matter, I understand what Plaintiff refers to as a "mixture" to be the "amorphous solid form of a compound" at issue in the claim construction dispute, while the "compounds" and "components" refer to the molecules that make up the solid. This interpretation is consistent with the parties' agreement that a different solid form of the compound referenced in the specification, the "partially crystalline" solid form, "is a mixture of crystalline and amorphous forms." (D.I. 147-1, Ex. A ¶ 31; Markman Tr. at 15:8–10; *see* '918 patent, 17:43–45). This understanding is consistent with Judge Stark's adoption of a purity requirement for the '938 and '134 patent claims covering the crystalline

[5] I am not sure what Plaintiff is trying to accomplish by proposing that the alternative to no construction is a construction that is word for word the same as the disputed term.

[6] Purity, in the context of the present dispute over the amorphous solid form of TVS, relates to the percentage of the compound that is amorphous rather than crystalline.

solid forms of TVSH.[7] (*See* D.I. MDL 20-2930, D.I. 294 at 8). Applying Plaintiff's proposition to the '938 and '134 patent, *i.e.* that one only need to pay attention to the crystalline TVSH "components" within the "mixture," would render the substantial purity requirement for crystalline TVSH meaningless. I therefore disagree with Plaintiff's assertion that construing the term at issue does not require looking at the overall makeup of the components within the "mixture."

Under this understanding, Plaintiff's position is essentially that any presence of amorphous molecules allows a solid form of a compound to be considered amorphous. (*See* Markman Tr. at 46:1–7). This interpretation conflicts with the prosecution history. During prosecution of the '918 patent, Plaintiff submitted a declaration by Dr. Michael J. Cima. (*See* D.I. 147-1, Ex. 9). Dr. Cima's declaration explains that amorphous and crystalline solid forms are distinguishable and exhibit different properties. (*See id.* ¶ 14 ("Morissette states that co-crystals have the potential to be much more useful in pharmaceutical products than solvates or hydrates. However, this is not pertinent or informative with respect to amorphous solids.") (citation omitted) (cleaned up); *id.* ¶ 17 ("Generally speaking, an amorphous complex of two drugs is not necessarily easier to form than a crystalline complex of these drugs. Likewise, the formation of such an amorphous complex is not any more reasonably predictable than the formation of the crystalline complex."); *id.* ¶ 18 ("Rodriguez-Spong notes that an amorphous solid form of a compound can exhibit greater solubility or bioavailability than the crystalline solid form of the same compound. *See* Rodriguez-Spong, p. 252 ('Pharmaceutical glasses or

---

[7] While the '938 and '134 patents do not claim the same compound as the '918 patent, TVSH and TVS are closely related compounds and the patents share similar specifications that discuss substantial purity and solid forms in the same way. (*Compare* '918 patent, 6:40–43, 17:43–45 *with* '134 patent, 6:6–10, 15:63-67 *and* '938 patent, 6:13–17, 16:60–64).

amorphous solids present an attractive approach to drug delivery because of their improved bioavailability compared to their crystalline counterparts.').") (emphasis omitted)). The prosecution history thus makes clear that these two forms are distinct from each other.

I note that I do not reach the same conclusion regarding mutual exclusivity between the amorphous solid form and other solid forms, namely the partially crystalline form. Defendants' argument for mutual exclusivity among all forms relies on one sentence from the patent specification: "In the solid state [TVS] can be in the crystalline, partially crystalline, amorphous, or polymorphous form, preferably in the crystalline form."[8] ('918 patent, 17:43–45; *see* D.I. 146 at 12–13). A facial reading of the cited text suggests that these forms are different, but does not exclude the possibility of overlap.[9] Defendants do not point to any intrinsic evidence that suggests these categories are mutually exclusive.[10] In contrast, the parties' agree that the

---

[8] I understand the polymorphous form to be a category not relevant to any issues in this case. I therefore focus on the relationship between the amorphous form and the partially crystalline form.

[9] I asked the parties to search for Federal Circuit case law in support of their positions about whether a series of terms in the specification should be read as suggesting mutual exclusivity. (Markman Tr. at 54:6–56:15). Defendants' identified cases, *Duke Univ. v. BioMarin Pharm. Inc.*, 685 F. App'x 967 (Fed. Cir. 2017) and *Perfect Surgical Techs., Inc. v. Olympus America, Inc.*, 841 F.3d 1004 (Fed. Cir. 2016), appear inapposite and do not affect my reading of the terms. Both cases involve only two terms, rather than a series of terms, determined to be alternatives based on broader context. *See Duke Univ.*, 685 F. App'x at 976 (discussing a precursor form and a mature form of human acid α-glucosidase that were referred to in the specification as "alternative[]" embodiments); *Perfect Surgical Techs.*, 841 F.3d at 1012 (concluding the specification's usage of the disjunctive phrase "or otherwise" in the sentence "the jaws may be perforated or otherwise provided with passages" demonstrated the terms did not refer to the same things).

[10] Defendants did provide extrinsic evidence in the form of an expert declaration by Dr. Edmund J. Elder. (*See* D.I. 147-1, Ex. A). Dr. Elder's opinion is the weakest sort of extrinsic evidence. Dr. Elder bases his opinion on a facial reading of the referenced sentence and what it "states explicitly." (*Id.* ¶ 31). I do not think his opinion is drawing on any scientific expertise, and, in any event, I do not credit it.

Case: 25-1927 Document: 23 Page: 113 Filed: 09/12/2025

partially crystalline form of the compound "is a mixture of crystalline and amorphous forms" (D.I. 147-1, Ex. A ¶ 31; Markman Tr. at 15:8–10), which suggests potential overlap along the spectrum of amorphous, partially crystalline, and crystalline forms. I find that the intrinsic record does not support a finding of mutual exclusivity between amorphous and partially crystalline forms.

While I agree with Defendants that construction of the disputed term must distinguish between the amorphous and crystalline forms, I do not agree that "substantially pure" is the proper dividing line. The '918 patent specification only uses the term "substantially pure" in discussing a preferred embodiment. (*See* '918 patent, 6:40–41 ("Preferably, the linked pro-drug is substantially pure . . . .")). "[I]t is improper to read limitations from a preferred embodiment described in the specification . . . into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). To support its position, Defendants primarily rely on the prosecution histories of the '134 and '938 patents, which are ancestors of the '918 patent. (*See* D.I. 146 at 13).

During prosecution of the '938 patent, Plaintiff and the Examiner agreed that the crystalline form of TVSH must be "substantially pure." (D.I. 147-2, Ex. 5). In construing claim terms of the '938 and '134 patents, Judge Stark ruled that claims covering crystalline compounds in the '134 patent, using the same language as the '938 patent claims, imported this purity limitation. (MDL 20-2930, D.I. 294 at 10–11 (citing *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999))). He declined to apply this requirement to other claims of the '134 patent that are not limited to a crystalline form. (*Id.* at 11 (citing *Ventana Med. Sys., Inc. v. Biogenex Lab'ys, Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[T]he doctrine of prosecution

disclaimer generally does not apply when the claim term in the descendant patent uses different language."); *Broadridge Fin. Sols. Inc. v. Inveshare, Inc.*, 2012 WL 1245723, at *4 (D. Del. Apr. 11, 2012) ("[E]ven if the [parent] patent disclaimer relates to the same subject matter at issue in the [child] patent claims, it may not necessarily affect the [child patent's] claim construction if the claim language is materially different."))).

Defendants argue that their construction adopts "parallel claim language" required to make the disputed term "internally consistent with what came before." (Markman Tr at 42:15–18). I disagree. As I stated at oral argument, Defendants are "seizing on a construction . . . made in a related patent for a different term, based on a different intrinsic record." (*Id.* at 41:9–11). *Ventana* and *Broadridge*, the cases Judge Stark cited in the '134 patent claims that were not limited to crystalline compounds, suggest the limitation should not be applied to the disputed term. *See Ventana*, 473 F.3d at 1182; *Broadridge*, 2012 WL 1245723, at *4.

Defendants appeared to recognize the lack of support for their proposed terminology, as they expressed flexibility with alternative constructions, such as "not partially crystalline" or "isn't trace amounts." (Markman Tr. at 40:17–41:1, 46:1–7). Defendants indicated they were seeking "any construction that . . . distinguishes [the amorphous, partially crystalline, crystalline, and polymorphous] buckets from one another." (*Id.* at 42:12–14). A determination that a construction of the terms should include line-drawing, however, is an insufficient reason to adopt a specific demarcation that is unsupported by the intrinsic record.

While I reject Defendants' formulation, I concede the difficulty of pinpointing an appropriate limitation when the intrinsic record provides virtually no useful guidance. What is clear, from the prosecution history, is that a POSA can identify a compound as existing in an "amorphous solid form," as opposed to other forms (though it may, as indicated above,

simultaneously qualify as existing in a partially crystalline solid form). Additionally, an amorphous solid form exhibits certain distinctive properties, as described by Dr. Cima. To embody these properties, rather than properties associated with a crystalline solid, it follows that an amorphous solid form of a compound must be predominantly amorphous. I therefore adopt a definition that encompasses an amorphous solid form's primary nature and its distinctiveness from a crystalline solid form.

## IV. CONCLUSION

For the reasons stated, I adopt the above construction.

US011096918B2

(12) **United States Patent**
**Feng et al.**

(10) **Patent No.: US 11,096,918 B2**
(45) **Date of Patent: *Aug. 24, 2021**

(54) **AMORPHOUS SOLID FORM OF COMPOUNDS CONTAINING S—N-VALERYL-N-{[2'-(1H-TETRAZOLE-5-YL)-BIPHENYL-4-YL]-METHYL}-VALINE AND (2R,4S)-5-BIPHENYL-4-YL-4-(3-CARBOXY-PROPIONYLAMINO)-2-METHYL-PENTANOIC ACID ETHYL ESTER MOIETIES AND SODIUM CATIONS**

(71) Applicant: **Novartis Pharmaceuticals Corporation**, East Hanover, NJ (US)

(72) Inventors: **Lili Feng**, Pine Brook, NJ (US); **Sven Erik Godtfredsen**, Chatham, NJ (US); **Paul Allen Sutton**, Getsville, NY (US); **Mahavir Prashad**, Montville, NJ (US); **Michael J. Girgis**, Montville, NJ (US); **Bin Hu**, Green Brook, NJ (US); **Yugang Liu**, Bridgewater, NJ (US); **Thomas J. Blacklock**, East Hanover, NJ (US); **Piotr Henryk Karpinski**, Lincoln Park, NJ (US)

(73) Assignee: **NOVARTIS PHARMACEUTICALS CORPORATION**, East Hanover, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/579,581**

(22) Filed: **Sep. 23, 2019**

(65) **Prior Publication Data**

US 2020/0016109 A1 Jan. 16, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/006,252, filed on Jun. 12, 2018, now abandoned, which is a continuation of application No. 15/187,872, filed on Jun. 21, 2016, now abandoned, which is a division of application No. 14/311,788, filed on Jun. 23, 2014, now Pat. No. 9,388,134, which is a division of application No. 11/722,360, filed as application No. PCT/US2006/043710 on Nov. 8, 2006, now Pat. No. 8,877,938.

(60) Provisional application No. 60/822,086, filed on Aug. 11, 2006, provisional application No. 60/789,332, filed on Apr. 4, 2006, provisional application No. 60/735,541, filed on Nov. 10, 2005, provisional application No. 60/735,093, filed on Nov. 9, 2005.

(51) **Int. Cl.**

| | |
|---|---|
| ***A61K 31/216*** | (2006.01) |
| ***A61K 31/41*** | (2006.01) |
| ***C07C 233/47*** | (2006.01) |
| ***C07D 257/04*** | (2006.01) |
| ***A61K 45/06*** | (2006.01) |
| ***A61K 31/4422*** | (2006.01) |
| ***A61K 31/5415*** | (2006.01) |
| ***C07D 207/50*** | (2006.01) |

(52) **U.S. Cl.**

CPC ............ ***A61K 31/216*** (2013.01); ***A61K 31/41*** (2013.01); ***A61K 31/4422*** (2013.01); ***A61K 31/5415*** (2013.01); ***A61K 45/06*** (2013.01); ***C07C 233/47*** (2013.01); ***C07D 207/50*** (2013.01); ***C07D 257/04*** (2013.01); *A61K 2300/00* (2013.01)

(58) **Field of Classification Search**

CPC ............................ C07C 233/47; C07D 257/04

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,954,909 | A | 4/1934 | Adler et al. | |
| 2,499,058 | A | 2/1950 | Cusic | |
| 2,534,813 | A | 12/1950 | Cusic | |
| 3,057,731 | A | 10/1962 | Froman et al. | |
| 4,610,816 | A | 9/1986 | Berger | |
| 4,722,810 | A | 2/1988 | Gordon | |
| 4,740,499 | A | 4/1988 | Olins | |
| 4,749,688 | A | 6/1988 | Sybertz, Jr. | |
| 4,929,641 | A | 5/1990 | Haslanger | |
| 5,217,996 | A * | 6/1993 | Ksander | C07C 233/47 514/533 |
| 5,223,516 | A | 6/1993 | Loots | |
| 5,250,522 | A | 10/1993 | De Lombaert | |
| 5,273,990 | A | 12/1993 | De Lombaert | |
| 5,294,632 | A | 3/1994 | De Lombaert | |
| 5,376,293 | A | 12/1994 | Johnston | |
| 5,399,578 | A | 3/1995 | Teruo | |
| 5,520,522 | A | 5/1996 | Teruo | |
| 6,248,729 | B1 | 6/2001 | Coniglio et al. | |
| 6,262,092 | B1 | 7/2001 | Hamanaka | |
| 6,693,216 | B2 | 2/2004 | Raczek | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1061404 A | 5/1992 |
| CN | 1097576 A | 1/1995 |

(Continued)

OTHER PUBLICATIONS

Morissette et al. ("High-throughput crystallization: polymorphs, salts, co-crystals and solvates of pharmaceutical solids"; 2004; Advanced Drug Delivery Reviews; 56: 275-300 (Year: 2004).*

(Continued)

*Primary Examiner* — Timothy P Thomas

(57) **ABSTRACT**

An amorphous solid form of a compound comprising the angiotensin receptor antagonist (ARB) valsartan, the neutral endopeptidase inhibitor (NEPi) (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methylpentanoic acid ethyl ester and sodium cations is provided. This compound is useful for the treatment of hypertension and/or heart failure.

**2 Claims, 1 Drawing Sheet**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,737,430 | B2 | 5/2004 | Pettman |
| 6,869,970 | B2 | 3/2005 | Marti |
| 2002/0098241 | A1 | 7/2002 | Venkatesh |
| 2004/0138274 | A1 | 7/2004 | Watson |
| 2005/0070551 | A1 | 3/2005 | Remenar et al. |
| 2009/0299056 | A1 | 12/2009 | Wang et al. |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| CN | 1246482 | A | 3/2000 | |
| CN | 1397556 | A | 2/2003 | |
| CN | 1513854 | A | 7/2004 | |
| CN | 1603326 | A | 4/2005 | |
| CN | 1651433 | A | 8/2005 | |
| CN | 1793147 | A | 6/2006 | |
| CN | 105037289 | A | 11/2015 | |
| CN | 105503760 | A | 4/2016 | |
| CN | 105873586 | A | 8/2016 | |
| CN | 106905253 | A | 6/2017 | |
| EP | 0034172 | B1 | 5/1983 | |
| EP | 0342850 | A1 | 11/1989 | |
| EP | 0343911 | A2 | 11/1989 | |
| EP | 0361365 | A1 | 4/1990 | |
| EP | 0443983 | A1 | 8/1991 | |
| EP | 0498361 | A2 | 8/1992 | |
| EP | 0509442 | A1 | 10/1992 | |
| EP | 0636621 | A1 | 2/1995 | |
| EP | 0726072 | A2 | 8/1996 | |
| GB | 2218983 | A1 | 11/1989 | |
| JP | 06234754 | A | 8/1994 | |
| JP | 07157459 | A | 6/1995 | |
| WO | 9009374 | A1 | 8/1990 | |
| WO | 9214706 | A1 | 9/1992 | |
| WO | 9309101 | A1 | 5/1993 | |
| WO | 9310773 | A1 | 6/1993 | |
| WO | 9415908 | A1 | 7/1994 | |
| WO | 00/02543 | A2 | 1/2000 | |
| WO | 0073271 | A1 | 12/2000 | |
| WO | 0073298 | A1 | 12/2000 | |
| WO | 0174348 | A2 | 10/2001 | |
| WO | 2002/06253 | A1 | 1/2002 | |
| WO | 0206253 | A1 | 1/2002 | |
| WO | WO-0206253 | A1 * | 1/2002 | ............. A61K 31/41 |
| WO | 0240007 | A1 | 5/2002 | |
| WO | 02/083066 | A2 | 10/2002 | |
| WO | 02092622 | A2 | 11/2002 | |
| WO | 2003/035046 | A2 | 5/2003 | |
| WO | 03059345 | A1 | 7/2003 | |
| WO | WO-03059345 | A1 * | 7/2003 | ........... A61K 31/192 |
| WO | 03066606 | A1 | 8/2003 | |
| WO | 2003074474 | A2 | 9/2003 | |
| WO | 2003/089417 | A1 | 10/2003 | |
| WO | 03/094915 | A1 | 11/2003 | |
| WO | 03/097045 | A1 | 11/2003 | |
| WO | 2003097098 | A1 | 11/2003 | |
| WO | 2004/078163 | A2 | 9/2004 | |
| WO | 2004/083192 | A1 | 9/2004 | |
| WO | 2004078161 | A2 | 9/2004 | |
| WO | 2004101535 | A1 | 11/2004 | |
| WO | 06086456 | A2 | 8/2006 | |
| WO | 2007056546 | A1 | 5/2007 | |
| WO | 2016037552 | A1 | 3/2016 | |
| WO | 2016049663 | A1 | 3/2016 | |
| WO | 2016/201238 | A1 | 12/2016 | |
| WO | 2017009784 | A1 | 1/2017 | |
| WO | 2017/042700 | A1 | 3/2017 | |
| WO | 2018/069833 | A1 | 4/2018 | |
| ZA | 8400670 | A | 1/1984 | |

OTHER PUBLICATIONS

Rodriguez-Spong et al. ("General principles of pharmaceutical solid polymorphism: a supramolecular perspective"; 2004; Advanced Drug Delivery Reviews; 56:241-274 (Year: 2004).*

"Polymorphism in Pharmaceutical Solids" in Drugs and the Pharmaceutical Sciences 1999, vol. 95 (edited by H. G. Brittain, Marcel Dekker, Inc) pp. 197-199.

Medicinal Chemistry, 2nd Edition, Edited by Zongru Guo: China Medicinal Science and Technology Publishing House Published in Aug. 2003.

Chen 2003 Science Press : Principle and Practice of Single Crystal Structure Analysis, edited by Chen Xiaoming and Cai Jiwen, 2003, Science Press, cover page, copyright page, Table of Contents, pp. 2, 41-44, 126-127.

Shou 2006 Chemical Engineer: Shou Kaisheng, Cultivation of singe crystal for X-ray diffraction test, Chemical Engineer, No. 4, Apr. 2006, pp. 64-66.

Randy Webb Declaration, signed May 11, 2006 (Filed in U.S. Appl. No. 10/341,868).

Applicant's submissions pursuant to rule 116 EPC of Feb. 11, 2013 in EP Patent Application No. 06827689.8.

Entresto Label, Nov. 24, 2015.

Response to the communication under Article 94(3) EPC dated Oct. 3, 2013 in EP Patent Application No. 10176094.0.

Vranic, "Amorphous Pharmaceutical Solids", Bosnian Journal of Basic Medical Sciences, 4(3):35-39. 2004.

Decision X ZR 126/09 of the German Supreme Court: Obvious to combine two active ingredients into one pharmaceutical preparation—leflunomide (GRUR 2012, 1130), German document with English translation.

EMEA (European Medicines Agency) Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances, May 2000.

Novartis Response to A94(3), Jan. 4, 2018 in EP Patent Application No. 10176094.0.

Novartis Response to A94(3), Jan. 7, 2010 in EP Patent Application No. 06827689.8.

Sekiguchi and Ito, "Studies on the Molecular Compounts of Organic Medicinals. I. Dissolution Behavior of the Molecular Compound of Sulfanilamide and Sulfathiazole", Chem Pharm Bull 13(4):405-413, 1965.

French and Morrison, "Identification of Complexes of Phenobarbital with Quinine, Quinidine, or Hydroquinidine in Pharmaceutical Dosage Forms", J Pharm Sci, 54(8):1133-1136, 1965.

Guillory et al., "Interactions Between Pharmaceutical Compounds by Thermal Methods", J Pharm Sci, 58(3):301-308, 1969.

Fujioka and Tan, "Biopharmaceutical Studies on Hydantoin Derivatives. III. Physio-Chemical Properties, Dissolution Behavior, and Bioavailability of the Molecular Compound of 1-Benzenesulfonyl-5,5-Diphenylhydantoin and Anti-Pyrine", J Pharm Dyn, 5:475-484, 1982.

Caira, "Molecular complexes of sulfonamides. 2. 1:1 complexes between drug molecules: sulfasimidine-acetylsalicyclic acis and sulfadimidine-4-aminosalicyclic acid", J Crystallogr Spectrosc Res, 72(2): 193-200, 1992.

Sardone et al., "Trimethoprim-Sulfadimidine 1:2 Molecular Complex Monohydrate", Acta Cryst, C53,1295-1299, 1997.

Sangster, "Phase Diagrams and Thermodynamic Properties of Binary Systems of Drugs", J Phys Chem Ref Data, 28 (4):889-930, 1999.

EMA (European Medicines Agency) Note for Guidance on Pharmaceutical Development (May 2006).

Wikipedia entry "Van der Waals force", retrieved from "https://en.wikipedia.org/w/index.php? title=Van_der_Walls_force&oldid=1012426507", last edit date Mar. 16, 2021.

Encyclopedia Britannica entry "Van der Waals force", retrieved from https://www.britannica.com/science/van-der-Waals-forces, access date Apr. 13, 2021.

Wikipedia entry "Sacubitril" (in German).

Rifaximin alpha decision by the federal Supreme Court (BGH), GRUR 2019, 157. English translation.

Definition of "Supramolecular assembly" https//en.wikipedia.org/wiki/Supramolecular_assembly, downloaded Oct. 22, 2019.

Nakao, et al. "The crystal and molecular structure of the 2: 1 molecular complex of theophylline with phenobarbital", Acta Crystallogr. B, 33 (1977), pp. 1373-1378.

(56) **References Cited**

OTHER PUBLICATIONS

Bettinetti, et al. "Methanol solvate of the 1: 1 molecular complex of trimethoprim and sulfadimidine", Acta Crystallogr. C: Struct. Chem, 53 (1997), pp. 594-597.
Zaitu, et al. "A 2:1 Molecular Complex of Theophylline and 5-Fluorouracil as the Monohydrate", Acta Crystallogr. C: Struct. Chem., 51 (1995), pp. 1857-1859.
Brittain, Methods for the Characterization. . . Polymorphism in Pharmaceutical Solids 1999 pp. 227-278.
Byrn et al., "Solid-state Pharmaceutical Chemistry", Chem. Mater., 6, 1148-1158 (1994).
Byrn et al., Solid State Chemistry of Drugs (2d ed. 1999), pp. 47-58.
Haleblian, et al. "Pharmaceutical Applications of Polymorphism", 58 J. Pharm. Sci., 911-929 (1969).
Haleblian, et al. "Characterization of Habits and Crystalline Modifications of Solids and Their Pharmaceutical Applications", J. Pharm. Sci., 64, 8, 1269-1288 (1975).
Hsieh et al., "Non-Isothermal Dehydration Kinetic Study of Aspartame Hemihydrate using DSC, TGA, and DSC-FTIR Microspectroscopy", Asian J. Pharm. Sci., 13, 212-219 (2018).
Khankari et al., "Pharmaceutical hydrates", Thermochimica Acta, 248, 61-79 (1995).
Rose, Erythromycin and Some of Its Derivatives, Analytical Chemistry, 26, 5, 938-939 (1954).
Wells, Structural Inorganic Chemistry, p. 572 (3d ed. 1962).
Zumdahl et al., Chemistry 68-110 (10th ed. 2018).
Reports on the filing or determination of an action regarding a patent; File history of U.S. Pat. No. 8,877,938; Jun. 29, 2020-Mar. 31, 2021.
Reports on the filing or determination of an action regarding a patent; File history of U.S. Pat. No. 9,388,134; Jun. 29, 2020-Mar. 31, 2021.
Defendants' Joint Initial Invalidity Contentions Under Local Patent Rules; Action regarding U.S. Pat. No. 8,877,938 and U.S. Pat. No. 9,388,134; Dec. 4, 2020.
Remenar, et al. "Crystal Engineering of Novel Cocrystals of a Triazole Drug with 1,4-Dicarboxylic Acids" J. Am. Chem. Soc. 125:8456-8457, 2003.
Joint Claim Construction Brief and Appendices; Action regarding U.S. Pat. No. 8,877,938; and U.S. Pat. No. 9,388,134; May 21, 2021.
Prescribing Information for ENTRESTO (sacubitril and valsartan), for oral use, revised Feb. 2021.
Prescribing Information for ENTRESTO (sacubitril and valsartan), for oral use, revised Oct. 2019.
Kaneniwa & Otsuka, "The Interaction between Water and Cephalexin in the Crystalline and Noncrystalline States," Chem. Parm. Bull. 32(11): 4551-4559 (1984).
"Chemical and Pharmaceutical Bulletin," Instructions to Authors (last updated Jan. 1, 2020).
Aakeroy, C.B., et al., "Avoiding 'Synthon Crossover' in Crystal Engineering with Halogen Bonds and Hydrogen Bonds", Crystal Growth and Design, 11:5333-5336, 2011.
Schartman, R.R., "On the thermodynamics of cocrystal formation", International Journal of Pharmaceutics, 365:77-80. 2009.
Kawashima, Y., et al., "Preparation of directly compressible powders of a physical mixture and a complex of throphylline-phenobarbital using spray-drying", International Journal of Pharmaceutics, 18:345-343, 1984.
Almarsson Organic Crystal Engineering: Frontiers in Crystal Engineering , Edited by Tiekink, E.R.T., Vital, J., and Zaworotko, M., John Wiley and Sons. pp. 69-70,87-90 and 98, 2010.
Principle of IUPAC Nomenclature of Organic Compounds, Zhejiang Science & Technology Publishing house 1985.
Drug Design, Chapter 2—Principles and Methods of Drug Design, edited by Qiu Zhuibai, High Education Press, Edition 1, pp. 223-226, Dec. 1999.
Shimizu and Nishigaki, Structure of 2,4-Diamino-5-(3,4,5-trimethoxybenzyl)pyrimidine-5,5-Diethylbarbituric Acid (1:1), Acta Cryst., B38:2309-2311, 1982.
Remenar, et al., "Salt Selection and Simultaneous Polymorphism Assessment via High-Throughout Crystallization: The Case of Sertraline", Organic Process Research & Development, 7:990-996, 2003.
Carter, et al., "Hydrochlorothiazide Versus Chlorthalidone Evidence Supporting Their Interchangeability", Hypertension, 43:4-9, 2004.
Dahlof, et al., "Prevention of cardiovascular events with an anti-hypertensive regimen of amlodipine adding perindopril as required versus atenol adding bendroflumethiazide as required, in the Anglo-Scandinavian Cardiac Outcomes Trial-Blood Pressure Lowering Arm (ASCOT-BPLA): a multicentre randomized controlled trial", Lancet, 366:895-906, 2005.
Levy, et al., "The Progression From Hypertension to Congestive Heart Failure", JAMA, 275(20): 1557-1562, 1996.
Luft, et al., "Macromolecular crystallization in a high throughput laboratory—the search phase", Journal of Crystal Growth, 232:591-595, 2001.
Morissette, et al., "Elucidation of crystal form diversity of the HIV protease inhibitor ritonavir by high-throughput crystallization", PNAS, 100(5):2180-2184, 2003.
Desiraju, "Chemistry beyond the molecule", Nature, 412(6845):397-400, 2001.
Etter, "Hydrogen Bonds as Design Elements in Organic Chemistry", J. Phys. Chem., 95:4601-4610, 1991.
General Chemistry, Ch. 3: "Substance Structure and Periodic law of Elements", Sec. 7: Intermolecular force and hydrogen bond', edited by Tianpeng Cao, 2000.
Basic Material Science, Part II: "Basic Theory of Material Structure", Ch. 3: "Atomic structure and bonding", edited by Zhangzhong Wang, 2015.
Basic Medical Chemistry, Ch. 8: "Molecular Science", Sec. 3: "Intermolecular force", edited by Zhao, Q and Liu, L, Ed., 2015.
State Food and Drug Administration (SFDA), 2006 National Drug Standard, vol. 49, edited by National Pharmacopoeia Committee.
Online dictionary (Merriam-Webster) for the definition of "subtherapeutic". downloaded 2019.
Chinese Pharmacopoeia, Part IV, 0451: X-ray diffraction method, Edited by National Pharmacopoeia Committee, Chinese Medical Science Press, 2015.
The American Heritage Dictionary of the English Language, 3rd Ed., p. 1792, 1992.
Miroshnyk, et al., "Pharmaceutical co-crystals—an opportunity for drug product enhancement", Expert Opin. Drug. Deliv. 6(4):333-341, 2009.
Izzo, Jr., et al., "Efficacy and Safety of Crystalline Valsartan/Sacubitril (LCZ696) Compared With Placebo and Combinations of Free Valsartan and Sacubitril in Patients With Systolic Hypertension: The RATIO Study", J. Cardiovasc. Pharmacol. 69(6):374-381, 2017.
"Guideline on clinical investigation of medicinal products in the treatment of hypertension", European Medicines Agency, Science Medicines Health, EMA/238/1195/Rev. 3, p. 1-18, 2010.
Organic Chemistry Experimentation, 2.3, Recrystallization and Filtration, Edited by Guanggen XI, Changhong Zhao, Zhongde Zhao, et al., Published by East China University of Science and Technology Press, 1st edition, 1st printing, pp. 31-37, 1995.
Pharmaceutics, edited by Chuanfu Yu, Published by People's Medical Publishing House, 1st edition, 1st printing, Chapter 15: "Introductions for other formulations", Section 6: "Prodrug Formulation", pp. 417-419, 1986.
Concise Course of Social Chemistry, edited by Pingchu Chen, Wuke Li, Zhengkun Zhan, Published by Higher Education Press, 1st edition, 1st printing, Chapter 2: "Chemistry in modern society", Section 2.5.2: "Supermolecular Chemistry", pp. 64-66, 2004.
Pharmaceutical Chemistry (a training textbook for qualification exam of licensed pharmacist), edited by Mingxia Xu, Published by China Medical Science and Technology Press, 1st edition, 2nd printing, Chapter 19, Section 2, p. 221, 1988.
Etter, M.C., et al, "Hydrogen-Bond Directed Cocrystallization as a Tool for Designing Acentric Organic Solids", Chemistry of Materials, 1(1):10-12, 1989.

(56) **References Cited**

OTHER PUBLICATIONS

Aakeröy, C.B., et.al.; "Crystal Engineering: Strategies and Architectures", Acta Crystallographica Section B, pp. 569-586; ISSN 0108-7681, 1997.
Preparation called Diovan and Co-Diovan in free base form, 2003.
The Merck Index entry for Entresto®, downloaded Aug. 23, 2017.
"Technical Guidelines for Research on Bioavailability and Bioequivalence of Chemical Drug Formulations", (Guidelines No. [H]GCL2-1), issued by CFDA, 2005.
Vishweshwar, Peddy et al., "Crystal engineering of pharmaceutical co-crystals from Polymorphic active pharmaceutical ingredients", Chem. Communication, pp. 4601-4603, 2005.
Xu, textbook portion "Pharmaceutical Chemistry", 1996.
Registration file of the composition valsartan/sacubitril (trade name Entresto)—p. 4 of the Summary Review document, 2015.
Datta Sharmistha et al., "Crystal Structures of Drugs: Advances in Determination, Prediction and Engineering", Nature Reviews, vol. 3, pp. 42-57, 2004.
Berge, Stephen M. et al., Pharmaceutical Salts, Journal of Pharmaceutical Sciences, vol. 66 (1), pp. 1-19, 1977.
Byrn, Stephen et al., "Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations", Pharmaceutical Research, vol. 12 (7), pp. 945-954, 1995.
Biopharmaceutics and Pharmacokinetics, Ch. 11 "Nonlinear Pharmacokinetics", Section One, (2000).
"Principle of Nomenclature of Organic Compounds", Science Publishing House, pp. 146 and 268, 2017.
Yung, S. L., "Hydrothermal Crystallization of Organic Compounds", Thesis, the Hong Kong University of Science and Technology, 2004.
Zhang, W., et al., "A Simplified Table for Conversion Between 2-theta Value and d Value in X-Ray Powder Diffraction Pattern", Journal of Ningxia University (Natural Science Edition), 2007.
English-Chinese Dictionary of Chemistry and Chemical Engineering (4th Edition), 2000.
Compiled references relating to the compounds listed in Annex 2 named using "butylcarbamoyl" or "carbamoylpropionate" nomenclature, 2017.
Packer, M., et al., "Comparison of Omapatrilat and Enalapril in Patients With Chronic Heart Failure", Circulation, 920-926, 2002.
Medpage Today 5 Game-Changers in Cardiology in 2015: Entresto, 2015.
King, J. B., et al., "Neprilysin Inhibition in Heart Failure with Reduced Ejection Fraction: A Clinical Review", Pharmacotherapy, 35(9):823-837, 2015.
Kario, K., et al., "Efficacy and Safety of LCZ696, a First-in-Class Angiotensin Receptor Neprilysin Inhibitor, in Asian Patients with Hypertension, A Randomized, Double-Blind, Placebo-Controlled Study", Hypertension, 63:698-705, 2014.
Gu. J., et al., "Pharmacokinetics and Pharmacodynamics of LCZ696, a Novel Dual-Acting Angiotensin Receptor—Neprilysin Inhibitor (ARNi)",The Journal of Clinical Pharmacology, 50:401-414, 2010.
Aitipamula, S., et al., "Polymorphs, Salts, and Cocrystals: What's in a Name?", Crystal Growth & Design, 12:2147-2152, 2012.
Aakeroy, C. B., et al., "Cocrystal or Salt: Does It Really Matter?", Molecular Pharmaceutics, 4(3):317-322, 2007.
Braga, D., et al., "From unexpected reactions to a new family of ionic co-crystals: the case of barbituric acid with alkali bromides and caesium iodide", Chem. Comm. 46:7715-7717, 2010.
US FDA Entresto Prescribing Information, 2015.
Aakeroy, C.B., et al., "Building co-crystals with molecular sense and supramolecular sensibility", Cryst. Eng. Comm., 7 (72):439-448, 2005.
Rissanen K. et al; Self-assembly by co-ordination and strong hydrogen bonding. X-ray crystal structures of a dimeric trisodium complex of a new acidic complexing ligand and its dehydrate. Supramolecular Chemistry. 247-250, 1991.
De-Dong W. et al.; Formation of Various Polymeric Frameworks by Dicarboxylate-Like Ligands: Synthesis and Crystal Structures of Polymeric Complexes of Sodium Perchlorate with Flexible Double Betaines. Structural Chemistry, vol. 7, No. 2, 1996.
Andrews P.C.et al.; Synthesis and Crystal Structures of [C6H4SC(-S)-NNa-3P(NMe2)3O.NAN-(S-)CSC6HJ and [C6H4SC(~S}~NLiÿpmdien] (pmdien = N.N.N',N",N"-Pentamethyldiethylenetriamine): Alkali-metal Amides from 2-Sulfanyfbenzothiazole. J. Chem. Soc. Dalton Trans. 4059-4065, 1995.
Wang Y. et al.; Crystal Structures and Spectroscopic Properties of Zinc(II) Ternary Complexes of Vitamin L, Hÿ and Their Isomer/«-Aminobenzoic Acid with Bipyridine; Chem. Pharm. Bull; 53(6):645-652, 2005.
Papadimitriou C. et al.; Chloranilate bridged sodium chains. Inorganic Chemistry Communications 1; 418-420, 1998.
Novartis' letter of Feb. 11, 2013 to the European Patent authority.
Affidavit of Alan Graff; Dated Feb. 17, 2016.
Novartis Notice of Marketing of Entresto, Summary of Product Characteristics, Ministry of Health, Nov. 2015 (English Translation).
Testimony of Prof. Dahloff, Mar. 4, 2015 (English Translation).
Petition for Patent Term Extension-IL Patent Application No. 184027 (under opposition) and IL Patent Registration No. 162661, Feb. 17, 2016 (English Translation).
Ksander et al., Journal of Medicinal Chemistry, vol. 38, No. 10, 1995, pp. 1689-1700.
Vishweshwar, Peddy, Journal of Pharmaceutical Sciences, vol. 95, No. 3, Mar. 2006; Review: Pharmaceutical Co-Crystals, (Univ of South Florida), pp. 499-516.
Morissette et al.; "High-throughput crystallization: ploymorphs, salts, co-crystals and solvates of pharmaceutical solids"; 2004; Advanced Drug delivery Reviews; 56: 275-300.
Matsumoto et al, "Blockade of rennin-angiotensin system and enhancement of atrial natriuretic peptide with neutral endopeptidase inhibition cause natriuresis in congestive heart failure and renal dysfunction in conscious dogs", Abstract, JASN, Hemodynamics and Vascular Regulation, Sep. 1993, pp. 517.
Almeida et al, "Clearance Function of Type C receptors of Atrial Natriuretic Factor in rats", American Journal of Physiology, 1999, vol. 256, pp. R469-R475.
Bazil K et al, "Telemetric monitoring of cardiovascular parameters in conscious spontaneously hypertensive rats", Journal of Cardiovascular Pharmacology, 1993, vol. 22, pp. 897-905.
Consensus Trial Study Group, "Effects of enalapril on mortality in severe congestive heart failure", New England Journal of Medicine, 1987, vol. 316, No. 23, pp. 1429-1435.
Stephenson et al, "The hydrolysis of a human atrial natriuretic peptide by pig kidney microvillar membranes is initiated by endopeptidase-24.11", Biochem J., 1987, vol. 243, pp. 183-187.
Erdos, "Angiotensis I converting enzyme and the changes in our concepts through the years", Lewis K. Dahl Memorial Lecture, Hypertension, 1990, vol. 16, No. 4, pp. 363-370.
Intengan, Thibault, Li et al, "Blood Pressure and Small Arteries in DOCA-salt-treated genetically AVP-deficient rats", Hypertension, 1999, vol. 34, No. 4, Part 2, pp. 907-913.
Needleman et al, "The biochemical pharmacology of atrial peptides", Annual Reivew Pharm., Tox., 1989, vol. 29, pp. 23-41.
Sybertz et al, "Atrial natriuretic factor-potentiating and antihypertensive activity of SCH 34826", Hypertension, 1990, vol. 15, No. 2, pp. 152-161.
Williford, Sharma et al, "Spatial Heterogeneity of Intracellular Ca concentration in nonbeating guinea pig ventricular myocytes", Circ Res, 1990, vol. 66, No. 1, pp. 241-248.
Zannad, "The Emerging Role of ACE inhibitors in the treatment of disease", Journal of Cardiovasc. Pharmacol., 1990, vol. 15, Suppl. 2, pp. S1-S5.
Taub et al, CAPLUS Abstract AN 1986:573042, ZA 8400670, Sep. 25, 1985.
Sugano et al, CAPLUS Abstract AN 1995:931230; JP 07157459, Jun. 29, 1995.
Yamada et al, CAPLUS Abstract AN 1995:4126620, Aug. 23, 1994.
Intengan et al, "Resistance Artery mechanics, structure, and Extracellular Components in Spontaneously Hypertensive Rats", Circulation, Nov. 30, 1999, pp. 2267-2275.

(56) **References Cited**

OTHER PUBLICATIONS

Ruilope, Luis M, et al, "Blood-pressure reduction with LCZ696, a novel dual-acting inhibitor of the angiotensin II receptor and neprilysin" Lancet 2010; 375:1255-66.
Waeber, Bernard and Feihl, Francois, The Lancet, "Blood pressure reduction with LCZ696" Mar. 16, 2010, vol. 375 No. 97222 pp. 1228-1229.
Wood et al., "Structure-based design of aliskiren, a novel orally effective renin inhibitor" Biochemical and Biophysical Research Communications, 2003, vol. 308, pp. 698-705.
Day, et al, Significant progress in predicting the crystal structures of small organic molecules—a report on the fourth blind test, Acta Cryst. B65, pp. 107-125 (2009).
Duniz, et al, Exercises in prognostication: Crystal structures and protein folding, PNAS, 2004, vol. 101, vol. 101, No. 40, pp. 14309-14311.
Stahly, G. Patrick, "A Survey of Cocrystals Reported Prior to 2000"Crystal Growth and Design Perspective, 2009, vol. 9, pp. 4212-4229.
Stephenson and Kenny, "Metabolism of Neuropeptides", Biochem. Journal, 1987, vol. 241, pp. 237-247.
Feng et al. "LCZ696: a dual-acting sodium supramolecular complex"; 2012; Tetrahedron Letters 53:275-276.
Almarsson, Oern et al., Chem. Community, 2004, pp. 1889-1896.
Aakeröy,Christer et.al.; Acta Crystallographica Section B, pp. 569-586; ISSN 0108-7681.
Patentee's submission of Feb. 11, 2013, in EP 06 827 689.8.
Stahl, Heinrich et al., Helvetica Chimica Acta,"Handbook of Pharmaceutical Salts. . ." 2002, pp. 265-327.
McMurray et al.; Angiotensin-Neprilysin Inhibition versus Enalapril in Heart Failure; 2014; New England Journal of Medicine; vol. 371, No. 1, pp. 993-1004.
Nakao et al: "The Crystal and Molecular Structure of the 2:1 Molecular Complex of Theophylline with Phenobarbital", Acta Cryst., 1977, B33, pp. 1378-1384.
Black et al., "Valsartan, a new angiotensin II antagonist for the treatment of essential hypertension: efficacy, tolerability and safety compared to an angiotensin-converting enzyme inhibitor, lisinopril", Journal of Human Hypertension, 1997, vol. 11, pp. 483-489.
Entresto Prescribing Information, Aug. 2015.
Polymorphism in Molecular Crystals, Joel Bernstein, Clarendon Press/Oxford, Oxford (UK), pp. 27,46-49, 112, 150 and 151, (2002).
Polymorphism in Pharmaceutical Solids in Drugs and the Pharmaceutical Sciences, vol. 95 (edited by H. G. Brittain), Marcel Dekker, Inc, pp. 229-278, (1999).
Hickey, et al., "Performance comparison of a co-crystal of carbamazepine with marketed product", European Journal of Pharmaceutics and Biopharmaceutics, 67:112-119. 2007.
Bettinetti and Giordano, "Interaction Between Trimethoprim and Some Sulfa Drugs", Drug Development and Industrial Pharmacy, 14(4):431-449. 1988.
Guillory, "Generation of Polymorphs, Hydrates, Solvates, and Amorphous Solids", Polymorphism in Pharmaceutical Solids (ed. Harry G. Brittain), vol. 95, Chapter 5, pp. 183-226. 1999.
Regulatory Classification of Pharmaceutical Co-Crystals Guidance for Industry, 2018, P3.
Variankaval, et al., "Preparation and Solid-State Characterization of Nonstoichiometric Cocrystals of a Phosphodiesterase-IV Inhibitor and L-Tartaric Acid", Crystal Growth & Design, 6(3):690-700. 2005.
Martin, et al., "Polyphenol-Caffeine Complexation", J. Chem. Soc., Chem. Commun. 2:105-106. 1986.
Brittain and Byrn, "Structural Aspects of Polymorphism", Polymorphism in Pharmaceutical Solids (ed. Harry G. Brittain), vol. 95, Chapter 3, pp. 74-124. 1999.
Vippagunta et al., "Crystalline solids", Advanced Drug Delivery Reviews, 48:3-26. 2001.
Morris and Rodriguez-Hornedo, "Hydrates", Encyclopedia of Pharmaceutical Technology, 7:393-440. 1993.
Vogt, et al., "A Study of variable hydration states in topotecan hydrochloride", Journal of Pharmaceutical and Biomedical Analysis, 40:1080-1088. 2006.
Griesser, "The Importance of Solvates", Polymorphism in the Pharmaceutical Industry, (Ed. Rolf Hilfiker) Ch. 8, p. 211-233. 2006.
Drug Design, (ed. Qiu Zhuibai), Higher Education Press, Edition 1, p. 105. 1999.
Physical Pharmaceutics, (ed. Desen Su and Siling Wang), Chemical Industry Press, Edition 1, p. 9 and 17. 2004.
"Jiuzhou Pharmaceutical: the sale of Entresto is slower than expected, and an extended layout is expected in a short term", Guang Fa Securities, Tencent News. 2016.
Rodriguez-Spong, et al., "General principles of pharmaceutical solid polymorphism: a supramolecular perspective", Advanced Drug Delivery Reviews, 56(3):241-274. 2004.
Bettinetti et al., "Structure and Solid-State Chemistry of Anhydrous and Hydrated Crystal Forms of the Trimethoprim-Sulfamethoxypyridazine 1:1 Molecular Complex", Journal of Pharmaceutical Sciences, 89(4):478-489. 1999.
Israili, "Clinical pharmacokinetics of angiotensin II (AT1) receptor blockers in hypertension", Journal of Human Hypertension, 14, Suppl 1, S73-S86. 2000.
Feng, et al., "High-throughput crystallization in pharmaceutical research and development", Acta Pharmaceutica Sinica, 40(6):481-485. 2005.
Zhou, Academic Dissertation for Master Degree, "Theoretical Study of Intermolecular Interaction Between Tetrazole Compounds and Dimers of Tetrazole and Water", Ch. II, 2005.
Zhang, "Use of Coloring Agent in Pharmaceutical Formulation", Tianjing Pharmacy, 8(4):36-38. 1996.
Zhang et al., "Technology and Principle for Manufacture of Tablets", Chinese Textbook with English translation, 1991.
Polymorphic Drugs, Ed. Yang Lu & Guanhua Du, People Health Publishing House, First Edition, Ch. II, 2009.
"ICH Harmonized Tripartite Guideline", Good Manufacturing Practice Guide for Active Pharmaceutical Ingredients, 2000.
"Handbook of Pharmaceutical Salts Properties, Selection, and Use", Ed. Stahl and Wermuth, forward, preface, contents and p. 214. 2002.
FDA Co-Crystal Directives of 2013: Guidance for Industry: Regulatory Classifcation of Pharmaceutical Co-Crystals. 2013.
FDA Chemical Review NDA 207620—In the registration file of the composition valsartan/sacubitril (trade name Entresto) it is mentioned (p. 95). 2015.
Data which Novartis submitted to the Examiner in letter dated May 14, 2012.
Hoffman, D., "Is Novartis' CZ696 "revolutionary" or just a marginal improvement?", Philly.com. 2014 (downloaded Dec. 11, 2015).
Examiner's reservation of Aug. 17, 2015 in the scope of Examination of divisional application 219782.
Cody, Robert J. et al., "Physiologic and Pharmacologic Studies of Atrial Natriuretic Factor: Anatriuretic and Vasoactive Peptide", Therapeutic Review, J Clin Phrmacol 1987, 27:927-936.
Fields, Larry E. et. al, The Burden of Adult Hypertension in the United States 1999 to 2000. A Rising Tide. Hypertension. 2004; 44:398-404.
Rubattu, Speranza, et.al, "The atrial natriuretic peptide: a changing view." Journal of Hypertension, 2001, vol. 19, No. 11, pp. 1923-1931.
Kearney, Patricia M., et. al, "Global burden of hypertension: analysis of worldwide data" Lancet, 365: 217-223, 2005.
Takasu, K, et. al, "Synthesis ad Evaluation Carbolinium Cations as New Antimalarial Agents based on Delocalized Lipophilic Cation (DLC) Hypothesis", Chem. Pharm. Bull. 53(6) 653-661 (Jun. 2005).
Patel, Mona et.al, "Treatment of non-insulin-dependent diabetes mellitus", Expert Opin. Investig. Drugs (2003) 12 (4):623-633.
Roques, Bernard P. et.al, Neutral endopeptidase 24.11: Structure, Inhibition, and Experimental and Clinical Pharmacology, Pharmacological Reviews, vol. 45, No. 1, pp. 87-146, 1993.
Sonnenberg, J.L. et. al, "Identification of Protease 3.4.24.11 as the Major Atrial Natriuretic Factor Degrading Enzyme in the Rat Kidney," Peptides, vol. 9, pp. 173-180, May 29, 1987.

(56) **References Cited**

OTHER PUBLICATIONS

Trapani, Angelo J., et. al, "CGS 35601 and its orally Active Prodrug CGS 37808 as Triple Inhibitors of Endothelin-converting Enzyme-1, Neutral Endopeptidase 24.11, and Angiotensin-converting Enzyme." J Cardiovasc Pharmacol, vol. 44, Supplement 1, Nov. 2004, S211-S215.
Stout, G.H. et al., "X-ray Structure Determination, A Practical Guide, Symmetry Operations and Space Groups", 1968, Chpt. 3.
"Drug Structures and Formulations" edited by Jianmin Shen and Zhenqing Wu, Aug. 1989, preface, contents, and p. 104.
"The Practice of Medicinal Chemistry" edited by Camille Georges Wermuth et.al. and translated by Yumin Chi, Apr. 2005, preface, contents, and p. 822.
Bohlender, J., et al., "High Human Renin Hypertension in Transgenic Rats", Hypertension, vol. 29, No. 1, Part 2, Jan. 1997, pp. 428-434.
Childs S. L. et al.; Crystal Engineering Approach To Forming Cocrystals of Amine Hydrochlorides with Organic Acids. Molecular Complexes of Fluoxetine Hydrochloride with Benzoic, Succinic, and Fumarie Acids. JACS Articles; vol. 126: 13335-13342, Apr. 1, 2004.
Shefter E. et al.; Structural Studies on Molecular Complexes V: Crystal Structures of Sulfathiazole-Sulfanilamide and Sulfathiazole-Theophylline Complexes. Journal of Pharmaceutical Sciences. vol. 60(2): 282-286, Feb. 2, 1971.
Nakai H. et al.; X-Ray and Infrared Spectral Studies of the Ionic Structure of Trimethoprim t-Sulfamethoxazolet1 :1 Molecular Complex. J. Chem. Soc. Perkin Trans; 1459-1464, 1984.
Hughes D.L. et al; Crystal Structures of Complexes between Alkali-metal Salts and Cyclic Polyethers. Part IX.t Complex formed between Dibenzo-24-crown-8 (6,7,9,10,12,13,20,21,23,24,26,27-Dodecahydrodibenzo[b,n] [1,4,7,10,13,16,19,22]octaoxacyclotetracosin) and two molecules of Sodium IMitrophenolate. J. Chem. Soc., Dalton Trans., 2374-2378, Jan. 1, 1975.
3rd party observation, Opposition against EP1948158B (EP06827689.8), Feb. 19, 2016.
Sokolov et al, "Synthesis and the crystal structure of the supramolecular complex [Cl3InW3S4(H2O)9]2+ with cucurbituril", Russian Chemical Bulletin, International Edition, vol. 50, No. 7, p. 1144-1147, (2001).
Reply to Communication pursuant to Art 94(3) dated Mar. 25, 2013 regarding European Patent Application No. 10176094.0 submitted Oct. 3, 2013.
IUPAC nomenclature of organic chemistry from Wikipedia, downloaded Apr. 10, 2017.
Interim Development Report, Feb. 23, 2017.
European Medicines Agency, Guidelines by the European Medicines Agency of May 2000, "ICH Topic Q6A—Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances", 2000.
German Supreme Court, GRUR, 2012 [English Translation].
Sybertz et al, "SCH 39370, a neutral metalloendopeptidase inhibitor, potentiates biological responses to atrial natriuretic factor and lowers blood pressure in desoxycorticosterone acetate-sodium hypertensive rats", J Pharmacol. Exp. Ther., 1989, vol. 250, No. 2, pp. 624-631.

* cited by examiner



# AMORPHOUS SOLID FORM OF COMPOUNDS CONTAINING S—N-VALERYL-N-{[2'-(1H-TETRAZOLE-5-YL)-BIPHENYL-4-YL]-METHYL}-VALINE AND (2R,4S)-5-BIPHENYL-4-YL-4-(3-CARBOXY-PROPIONYLAMINO)-2-METHYL-PENTANOIC ACID ETHYL ESTER MOIETIES AND SODIUM CATIONS

## RELATED APPLICATIONS

This application is a continuation application of U.S. application Ser. No. 16/006,252, filed on Jun. 12, 2018, which is a continuation application of U.S. application Ser. No. 15/187,872, filed on Jun. 21, 2016, which is a divisional application of U.S. application Ser. No. 14/311,788, filed on Jun. 23, 2014, now U.S. Pat. No. 9,388,134, which is a divisional application of U.S. application Ser. No. 11/722,360, filed on Jan. 15, 2008, now U.S. Pat. No. 8,877,938, which is a national stage application, filed under 35 U.S.C. § 371, of International Application No. PCT/US06/43710, filed on Nov. 8, 2006, which claims the benefit of and priority to U.S. Provisional Application Nos. 60/822,086, filed Aug. 11, 2006, 60/789,332, filed Apr. 4, 2006, 60/735,541, filed on Nov. 10, 2005, and 60/735,093, filed on Nov. 9, 2005, the entire contents of each of which are incorporated herein by reference in their entireties.

## FIELD OF THE INVENTION

The present invention is directed to dual-acting compounds and combinations of angiotensin receptor blockers and neutral endopeptidase inhibitors, in particular a dual acting molecule wherein the angiotensin receptor blocker and neutral endopeptidase inhibitor are linked via non-covalent bonding, or supramolecular complexes of angiotensin receptor blockers and neutral endopeptidase inhibitors, also described as linked pro-drugs, such as mixed salts or co-crystals, as well as to pharmaceutical combinations containing such a dual-acting compound or combination, methods of preparing such dual-acting compounds and methods of treating a subject with such a dual-acting compound or combination. Specifically, the invention is directed to a dual acting compound or supramolecular complex of two active agents having the same or different modes of action in one molecule.

## BACKGROUND OF THE INVENTION

Angiotensin II is a hormone that causes blood vessels to constrict. This, in turn, can result in high blood pressure and strain on the heart. It is known that angiotensin II interacts with specific receptors on the surface of target cells. Two receptor subtypes for angiotensin II, namely AT1 and AT2, have been identified thus far. In recent times, great efforts have been made to identify substances that bind to the AT1 receptor. Angiotensin receptor blockers (ARBs, angiotensin II antagonists) are now known to prevent angiotensin II from binding to its receptors in the walls of blood vessels, thereby resulting in lower blood pressure. Because of the inhibition of the AT1 receptor, such antagonists can be used, therefore, as anti-hypertensives or for the treatment of congestive heart failure, among other indications.

Neutral endopeptidase (EC 3.4.24.11; enkephalinase; atriopeptidase; NEP) is a zinc-containing metalloprotease that cleaves a variety of peptide substrates on the amino side of hydrophobic residues [see Pharmacol Rev, Vol. 45, p. 87



(1993)]. Substrates for this enzyme include, but are not limited to, atrial natriuretic peptide (ANP, also known as ANF), brain natriuretic peptide (BNP), met- and leu-enkephalin, bradykinin, neurokinin A, endothelin-1 and substance P. ANP is a potent vasorelaxant and natriuretic agent [see J Hypertens, Vol. 19, p. 1923 (2001)]. Infusion of ANP in normal subjects resulted in a reproducible, marked enhancement of natriuresis and diuresis, including increases in fractional excretion of sodium, urinary flow rate and glomerular filtration rate [see J Clin Pharmacol, Vol. 27, p. 927 (1987)]. However, ANP has a short half-life in circulation, and NEP in kidney cortex membranes has been shown to be the major enzyme responsible for degrading this peptide [see Peptides, Vol. 9, p. 173 (1988)]. Thus, inhibitors of NEP (neutral endopeptidase inhibitors, NEPi) should increase plasma levels of ANP and, hence, are expected to induce natriuretic and diuretic effects.

While substances, such as angiotensin receptor blockers and neutral endopeptidase inhibitors may be useful in the control of hypertension, essential hypertension is a polygenic disease and is not always controlled adequately by monotherapy. Approximately 333 million adults in economically developed countries and about 65 million Americans (1 in 3 adults) had high blood pressure in 2000 [see Lancet, Vol. 365, p. 217 (2005); and Hypertension, Vol. 44, p. 398 (2004)]. Prolonged and uncontrolled hypertensive vascular disease ultimately leads to a variety of pathological changes in target organs, such as the heart and kidney.

Sustained hypertension can lead as well to an increased occurrence of stroke. Therefore, there is a strong need to evaluate the efficacy of anti-hypertensive therapy, an examination of additional cardiovascular endpoints, beyond those of blood pressure lowering, to get further insight into the benefits of combined treatment.

The nature of hypertensive vascular diseases is multifactorial. Under certain circumstances, drugs with different mechanisms of action have been combined. However, just considering any combination of drugs having different modes of action does not necessarily lead to combinations with advantageous effects. Accordingly, there is a need for efficacious combination therapy which does not have deleterious side effects.

## SUMMARY OF THE INVENTION

In a first aspect, the present invention is directed to a dual-acting compound, such as a supramolecular complex, comprising:

(a) an angiotensin receptor antagonist;

(b) a neutral endopeptidase inhibitor (NEPi); and optionally

(c) a pharmaceutically acceptable cation.

The present invention is also directed to a dual-acting compound, such as a supramolecular complex, obtainable by:

(i) dissolving an angiotensin receptor antagonist and a neutral endopeptidase inhibitor (NEPi) in a suitable solvent;

(ii) dissolving a basic compound of Cat in a suitable solvent, wherein Cat is a cation;

(iii) combining the solutions obtained in steps (i) and (ii);

(iv) precipitation of the solid, and drying same to obtain the dual-acting compound; or alternatively obtaining the dual-acting compound by exchanging the solvent(s) employed in steps (i) and (ii) by

(iva) evaporating the resulting solution to dryness;

(va) re-dissolving the solid in a suitable solvent;

(via) precipitation of the solid and drying same to obtain the dual-acting compound.

The present invention is also directed to linked pro-drugs comprising:

(a) an angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof; and

(b) a NEPi or a pharmaceutically acceptable salt thereof, wherein the angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof and the NEPi or a pharmaceutically acceptable salt thereof are linked by a linking moiety.

The present invention is also directed to a combination comprising:

(a) a pharmaceutically acceptable salt of an angiotensin receptor antagonist; and

(b) a pharmaceutically acceptable salt of a neutral endopeptidase inhibitor (NEPi);

wherein the pharmaceutically acceptable salt of the angiotensin receptor antagonist and the NEPi is the same and is selected from a salt of Na, K or $NH_4$.

In preferred embodiments, the angiotensin receptor antagonist and NEPi have acidic groups which facilitate formation of the dual acting compound, such as the supramolecular complex of the present invention.

Preferably, the angiotensin receptor antagonist is selected from the group consisting of valsartan, losartan, irbesartan, telmisartan, eprosartan, candesartan, olmesartan, saprisartan, tasosartan, elisartan and combinations thereof.

In preferred embodiments, the NEPi is selected from the group consisting of: SQ 28,603; N—[N-[1(S)-carboxyl-3-phenylpropyl]-(S)-phenylalanyl]-(S)-isoserine; N—[N-[((1S)-carboxy-2-phenyl)ethyl]-(S)-phenylalanyl]-β-alanine; N-[2(S)-mercaptomethyl-3-(2-methylphenyl)-propionyl]methionine; (cis-4-[[[1-[2-carboxy-3-(2-methoxyethoxy)propyl]-cyclopentyl]carbonyl]amino]-cyclohexanecarboxylic acid); thiorphan; retro-thiorphan; phosphoramidon; SQ 29072; N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid ethyl ester; (S)-cis-4-[1-[2-(5-indanyloxycarbonyl)-3-(2-methoxyethoxy)propyl]-1-cyclopentanecarboxamido]-1-cyclohexanecarboxylic acid; 3-(1-[6-endo-hydroxymethyl-bicyclo[2,2,1]heptane-2-exo-carbamoyl]cyclopentyl)-2-(2-methoxyethyl)propanoic acid; N-(1-(3-(N-t-butoxycarbonyl-(S)-prolylamino)-2(S)-t-butoxy-carbonylpropyl)cyclopentanecarbonyl)-O-benzyl-(S)-serine methyl ester; 4-[[2-(mercaptomethyl)-1-oxo-3-phenylpropyl]amino]benzoic acid; 3-[1-(cis-4-carboxycarbonyl-cis-3-butylcyclohexyl-r-1-carbamoyl)cyclopentyl]-2S-(2-methoxyethoxymethyl)propanoic acid; N-((2S)-2-(4-biphenylmethyl)-4-carboxy-5-phenoxyvaleryl)glycine; N-(1-(N-hydroxycarbamoylmethyl)-1-cyclopentanecarbonyl)-L-phenylalanine; (S)-(2-biphenyl-4-yl)-1-(1H-tetrazol-5-yl)ethylamino) methylphosphonic acid; (S)-5-(N-(2-(phosphonomethylamino)-3-(4-biphenyl)propionyl)-2-aminoethyl)tetrazole; β-alanine; 3-[1,1'-biphenyl]-4-yl-N-[diphenoxyphosphinyl)methyl]-L-alanyl; N-(2-carboxy-4-thienyl)-3-mercapto-2-benzylpropanamide; 2-(2-mercaptomethyl-3-phenylpropionamido)thiazol-4-ylcarboxylic acid; (L)-(1-((2,2-dimethyl-1,3-dioxolan-4-yl)-methoxy)carbonyl)-2-phenylethyl)-L-phenylalanyl)-β-alanine; N—[N-[(L)-[1-[(2,2-dimethyl-1,3-dioxolan-4-yl)-methoxy]carbonyl]-2-phenylethyl]-L-phenylalanyl]-(R)-alanine; N—[N-[(L)-1-carboxy-2-phenylethyl]-L-phenylalanyl]-(R)-alanine; N-[2-acetylthiomethyl-3-(2-methyl-phenyl)propionyl]-methionine ethyl ester; N-[2-mercaptomethyl-3-(2-methylphenyl)propionyl]-methionine; N-[2(S)-mercaptomethyl-3-(2-methylphenyl)propanoyl]-(S)-isoserine; N—(S)-[3-mercapto-2-(2-methylphenyl)propionyl]-(S)-2-methoxy-(R)-alanine; N-[1-[[1(S)-benzyloxycarbonyl-3-phenylpropyl]amino]cyclopentylcarbonyl]-(S)-isoserine; N-[1-[[1(S)-carbonyl-3-phenylpropyl]amino]-cyclopentylcarbonyl]-(S)-isoserine; 1,1'-[dithiobis-[2(S)-(2-methylbenzyl)-1-oxo-3,1-propanediyl]]-bis-(S)-isoserine; 1,1'-[dithiobis-[2(S)-(2-methylbenzyl)-1-oxo-3,1-propanediyl]]-bis-(S)-methionine; N-(3-phenyl-2-(mercaptomethyl)-propionyl)-(S)-4-(methylmercapto)methionine; N-[2-acetylthiomethyl-3-phenyl-propionyl]-3-aminobenzoic acid; N-[2-mercaptomethyl-3-phenyl-propionyl]-3-aminobenzoic acid; N-[1-(2-carboxy-4-phenylbutyl)-cyclopentane-carbonyl]-(S)-isoserine; N-[1-(acetylthiomethyl)cyclopentane-carbonyl]-(S)-methionine ethyl ester; 3(S)-[2-(acetylthiomethyl)-3-phenyl-propionyl]amimo-ε-caprolactam; N-(2-acetylthiomethyl-3-(2-methylphenyl)propionyl)-methionine ethyl ester; and combinations thereof. Preferably, the dual-acting compound or combination, in particular the supramolecular complex, is a mixed salt or a co-crystal. It is also preferred that the linked pro-drug is a mixed salt or a co-crystal.



In a second aspect, the present invention is directed to pharmaceutical composition comprising

(a) the aforementioned dual-acting compound or combination, such as the aforementioned complex; and

(b) at least one pharmaceutically acceptable additive.

The present invention is also directed to pharmaceutical compositions comprising a linked pro-drug comprising:

(a) an angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof;

(b) a NEPi or a pharmaceutically acceptable salt thereof, wherein the angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof and the NEPi or a pharmaceutically acceptable salt thereof are linked by a linking moiety; and

(c) at least one pharmaceutically acceptable additive.

In a third aspect, the present invention is directed to a method of preparing a dual-acting compound, in particular a supramolecular complex, comprising

(a) an angiotensin receptor antagonist;

(b) a neutral endopeptidase inhibitor (NEPi); and optionally

(c) a pharmaceutically acceptable cation selected from the group consisting of Na, K and $NH_4$;

said method comprising the steps of:

(i) dissolving an angiotensin receptor antagonist and a neutral endopeptidase inhibitor (NEPi) in a suitable solvent;

(ii) dissolving a basic compound of Cat in a suitable solvent, wherein Cat is a cation;

(iii) combining the solutions obtained in steps (i) and (ii);

(iv) precipitation of the solid, and drying same to obtain the dual-acting compound; or alternatively obtaining the dual-acting compound by exchanging the solvent(s) employed in steps (i) and (ii) by

(iva) evaporating the resulting solution to dryness;

(va) re-dissolving the solid in a suitable solvent;

(via) precipitation of the solid and drying same to obtain the dual-acting compound.

The present invention is also directed to a method of making a linked pro-drug comprising:

(a) an angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof;

(b) a NEPi or a pharmaceutically acceptable salt thereof, wherein the angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof and the NEPi or a pharmaceutically acceptable salt thereof are linked by

a linking moiety; and comprising adding a linking moiety and a solvent to a mixture of an angiotensin receptor antagonist and a NEPi; and

(d) isolating the linked pro-drug.

In a fourth aspect, this invention is directed to a method of treating or preventing a disease or condition, such as hypertension, heart failure (acute and chronic), congestive heart failure, left ventricular dysfunction and hypertrophic cardiomyopathy, diabetic cardiac myopathy, supraventricular and ventricular arrhythmias, atrial fibrillation, atrial flutter, detrimental vascular remodeling, myocardial infarction and its sequelae, atherosclerosis, angina (unstable or stable), renal insufficiency (diabetic and non-diabetic), heart failure, angina pectoris, diabetes, secondary aldosteronism, primary and secondary pulmonary hypertension, renal failure conditions, such as diabetic nephropathy, glomerulonephritis, scleroderma, glomerular sclerosis, proteinuria of primary renal disease, and also renal vascular hypertension, diabetic retinopathy, other vascular disorders, such as migraine, peripheral vascular disease, Raynaud's disease, luminal hyperplasia, cognitive dysfunction (such as Alzheimer's), glaucoma and stroke comprising administering the afore-mentioned dual-acting compound or combination, in particular the supramolecular complex, or the afore-mentioned linked pro-drug, preferably, the complex, to a subject in need of such treatment.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. **1** shows a pictorial representation of the unit cell of the supramolecular complex of trisodium [3-((1 S,3R) −1-biphenyl-4-y lmethyl-3-ethoxy carbonyl-1-butylcarbamoyl)propionate-(S)-3 '-methyl-2'-(pentanoyl {2 "-(tetrazol-5-ylate)biphenyl-4'-y 'methyl} amino)butyrate] hemipentahydrate comprising two asymmetric units. The following color code is used: grey=carbon atom; blue=nitrogen atom; red=oxygen atom; violet=sodium atom.

## DETAILED DESCRIPTION

The present invention relates to a dual-acting compound or combination, in particular a supramolecular complex, or linked pro-drug or in particular a supramolecular complex of two active agents with different mechanisms of action, namely an angiotensin receptor antagonist and a neutral endopeptidase inhibitor, which can form a unique molecular entity for the treatment of patients with various cardiovascular and/or renal diseases.

One embodiment of the invention is directed to a physical combination comprising:

(a) a pharmaceutically acceptable salt of an angiotensin receptor antagonist; and

(b) a pharmaceutically acceptable salt of a neutral endopeptidase inhibitor (NEPi); wherein the pharmaceutically acceptable salt of the angiotensin receptor antagonist and the NEPi is the same and is selected from a salt of Na, K or $NH_4$.

Specifically, it is preferred that the two active agents are combined with each other so as to form a single dual-acting compound, in particular a supramolecular complex. By doing so, a new molecular or supramolecular entity is formed having distinct properties different to the above physical combination.



Thus, the present invention is directed to a dual-acting compound, in particular a supramolecular complex, comprising:

(a) an angiotensin receptor antagonist;

(b) a neutral endopeptidase inhibitor (NEPi); and

(c) a pharmaceutically acceptable cation preferably selected from the group consisting of Na, K and $NH_4$.

The present invention is also directed to a dual-acting compound, in particular a supramolecular complex, obtainable by:

(i) dissolving an angiotensin receptor antagonist and a neutral endopeptidase inhibitor (NEPi) in a suitable solvent;

(ii) dissolving a basic compound of Cat such as (Cat)OH, $(Cat)_2CO_3$, $(Cat)HCO_3$ in a suitable solvent, wherein Cat is a cation preferably selected from the group consisting of Na, K and $NH_4$;

(iii) combining the solutions obtained in steps (i) and (ii);

(iv) precipitation of the solid, and drying same to obtain the dual-acting compound; or alternatively obtaining the dual-acting compound by exchanging the solvent(s) employed in steps (i) and (ii) by

(iva) evaporating the resulting solution to dryness;

(va) re-dissolving the solid in a suitable solvent;

(via) precipitation of the solid and drying same to obtain the dual-acting compound.

The present invention is further directed to linked pro-drugs comprising:

(a) an angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof; and

(b) a NEPi or a pharmaceutically acceptable salt thereof, wherein the angiotensin receptor antagonist or a pharmaceutically acceptable salt thereof and the NEPi or a pharmaceutically acceptable salt thereof are linked by a linking moiety.

The two components are each linked to a linking moiety thereby creating a linked pro-drug.

Preferably, the linked pro-drug is substantially pure; as used herein, "substantially pure" refers to at least 90%, more preferably at least 95% and most preferably at least 98% purity.

As one preferred embodiment of the present invention, the linked pro-drug has a structure such that by linking the two components with the linking moiety, a supramolecular complex is formed.

For the purpose of the present invention, the term "dual-acting compound" is intended to describe that these compounds have two different modes of action in one compound, one is the angiotensin receptor blockade resulting from the ARB molecular moiety of the compound and the other is the neutral endopeptidase inhibition resulting from the NEPi molecular moiety of the compound.

For the purpose of the present invention, the term "compound" is intended to describe a chemical substance comprising covalent bonds within the two pharmaceutically active agents, the ARB and the NEPi molecular moieties, and non-covalent interactions between these two pharmaceutically active agents, the ARB and the NEPi molecular moieties.

Typically, hydrogen bonding can be observed between the two pharmaceutically active agents, the ARB and the NEPi molecular moieties. Ionic bonds can be present between the cation and one or both of the two pharmaceutically active agents, the ARB and the NEPi molecular moieties. Other types of bonds may also be present within the compound

such as van der Waals forces. For illustrative purposes, the dual-acting compound of the present invention could be represented as follows:

(ARB)-(L)$_m$-(NEPi)

wherein L is a linking moiety, such as a cation or is a noncovalent bond and m is an integer from 1 or more. In other words the ARB and NEPi moiety can be connected via non-covalent bonds such as hydrogen bonding. Alternatively or additionally they may be connected via a linking moiety such as a cation.

In one embodiment, the dual-acting compound may be considered to be a linked pro-drug, whereby the linking moiety, such as the cation, linking the two pharmaceutically active agents, the ARB and the NEPi, forms the pro-drug of these agents which are released once the linked pro-drug is ingested and absorbed.

In a preferred embodiment, the dual-acting compound is a complex, in particular a supramolecular complex.

For the purpose of the present invention, the term "supramolecular complex" is intended to describe an interaction between the two pharmaceutically active agents, the cations and any other entity present such as a solvent, in particular water, by means of noncovalent, intermolecular bonding between them. This interaction leads to an association of the species present in the supramolecular complex distinguishing this complex over a physical mixture of the species.

The noncovalent intermolecular bonding can be any interactions known in the art to form such supramolecular complexes, such as hydrogen bonding, van der Waals forces and π-π stacking. Ionic bonds can also be present. Preferably, there exists ionic bonding and additionally hydrogen bonding to form a network of interactions within the complex. The supramolecular complex exists preferably in the solid state but may also be present in liquid media. As a preferred embodiment of the invention, the complex is crystalline and in this case is preferably a mixed crystal or co-crystal.

Typically, the dual-acting compound, in particular the supramolecular complex shows properties such as melting point, IR spectrum etc. that are different from a physical mixture of the species.

Preferably, the dual-acting compound, in particular the supramolecular complex, has a network of non-covalent bonds, in particular hydrogen bonds, between the two pharmaceutically active agents and any solvent, if present, preferably water. Moreover, it is preferred that the dual-acting compound, in particular the supramolecular complex, has a network of non-covalent bonds, in particular ionic and hydrogen bonds, between the two pharmaceutically active agents, the cation and any solvent, if present, preferably water. The cation is preferably coordinated to several oxygen ligands, thus, providing a linkage between these oxygen ligands. The oxygen ligands come from the carbonyl and carboxylate groups present in the two pharmaceutically active agents and preferably also from any solvent, if present, preferably water.

The dual acting compound comprises a molecular moiety of an angiotensin receptor antagonist. This means that a molecular moiety derived from an angiotensin receptor antagonist is participating in the build-up of the dual-acting compound. The angiotensin receptor antagonist is part of the compound and connected to the NEP inhibitor directly or indirectly via non-covalent bonds. For sake of convenience, throughout the application, the term "angiotensin receptor antagonist" will be used when describing this part of the compound. Angiotensin receptor antagonists (ARBs) suitable for use in the present invention include, without limitation, valsartan, losartan, irbesartan, telmisartan, eprosartan, candesartan, olmesartan saprisartan, tasosartan, elisartan, the compound with the designation E-1477 of the following formula




the compound with the designation SC-52458 of the following formula




and

the compound with the designation the compound ZD-8731 of the following formula




Suitable angiotensin II receptor antagonist also includes, but is not limited to, saralasin acetate, candesartan cilexetil, CGP-63170, EMD-66397, KT3-671, LR-B/081, valsartan, A-81282, BIBR-363, BIBS-222, BMS-184698, candesartan, CV-11194, EXP-3174, KW-3433, L-161177, L-162154, LR-B/057, LY-235656, PD-150304, U-96849, U-97018, UP-275-22, WAY-126227, WK-1492.2K, YM-31472, losartan potassium, E-4177, EMD-73495, eprosartan, HN-65021, irbesartan, L-159282, ME-3221, SL-91.0102, Tasosartan, Telmisartan, UP-269-6, YM-358, CGP-49870, GA-0056,

L-159689, L-162234, L-162441, L-163007, PD-123177, A-81988, BMS-180560, CGP-38560A, CGP-48369, DA-2079, DE-3489, DuP-167, EXP-063, EXP-6155, EXP-6803, EXP-7711, EXP-9270, FK-739, HR-720, ICI-D6888, ICI-D7155, ICI-D8731, isoteoline, KRI-1177, L-158809, L-158978, L-159874, LR B087, LY-285434, LY-302289, LY-315995, RG-13647, RWJ-38970, RWJ-46458, S-8307, S-8308, saprisartan, saralasin, Sarmesin, WK-1360, X-6803, ZD-6888, ZD-7155, ZD-8731, BIBS39, CI-996, DMP-811, DuP-532, EXP-929, L-163017, LY-301875, XH-148, XR-510, zolasartan and PD-123319.

Also included within the scope of this aspect of the invention are combinations of the above-identified ARBs.

ARBs to be used for preparing the combination or complex in accordance with the present invention can be purchased from commercial sources or can be prepared according to known methods. ARBs may be used for purposes of this invention in their free form, as well as in any suitable salt or ester form.

Preferred salts forms include acid addition salts. The compounds having at least one acid group (e.g., COOH or 5-tetrazolyl) can also form salts with bases. Suitable salts with bases are, e.g., metal salts, such as alkali metal or alkaline earth metal salts, e.g., sodium, potassium, calcium or magnesium salts, or salts with ammonia or an organic amine, such as morpholine, thiomorpholine, piperidine, pyrrolidine, a mono-, di- or tri-lower alkylamine, e.g., ethyl-, tert-butyl-, diethyl-, diisopropyl-, triethyl-, tributyl- or dimethylpropylamine, or a mono-, di- or trihydroxy lower alkylamine, e.g., mono-, di- or tri-ethanolamine. Corresponding internal salts may furthermore be formed. Salts which are unsuitable for pharmaceutical uses but which can be employed, e.g., for the isolation or purification of free compounds I or their pharmaceutically acceptable salts, are also included. Even more preferred salts are, e.g., selected from the mono-sodium salt in amorphous form; di-sodium salt of valsartan in amorphous or crystalline form, especially in hydrate form, thereof.

Mono-potassium salt of valsartan in amorphous form; di-potassium salt of valsartan in amorphous or crystalline form, especially in hydrate form, thereof.

Calcium salt of valsartan in crystalline form, especially in hydrate form, primarily the tetrahydrate thereof; magnesium salt of valsartan in crystalline form, especially in hydrate form, primarily the hexahydrate thereof; calcium/magnesium mixed salt of valsartan in crystalline form, especially in hydrate form; bis-diethylammonium salt of valsartan in crystalline form, especially in hydrate form; bis-dipropylammonium salt of valsartan in crystalline form, especially in hydrate form; bis-dibutylammonium salt of valsartan in crystalline form, especially in hydrate form, primarily the hemihydrate thereof; mono-L-arginine salt of valsartan in amorphous form; bis-L-arginine salt of valsartan in amorphous form; mono-L-lysine salt of valsartan in amorphous form; bis-L-lysine salt of valsartan in amorphous form.

Preferably when preparing the dual-acting compound, in particular the complex according to the present invention, the free form of the ARB is used.

In a preferred embodiment of this invention, the angiotensin receptor blocker used in the combination or complex of the present invention is Valsartan the molecular structure of which is shown below



Valsartan may be in the racemic form or as one of the two isomers shown below



or



,

preferably



.

Valsartan ((S)—N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine) used according to the present invention can be purchased from commercial sources or can be prepared according to known methods. For example, the preparation of valsartan is described in U.S. Pat. No. 5,399,578 and EP 0 443 983, the entire disclosure of each of which is incorporated by reference herein. Valsartan may be used for purposes of this invention in its free acid form, as well as in any suitable salt form. Additionally, esters or other derivatives of the carboxylic grouping may be applied for the synthesis of linked pro-drugs, as well as salts and derivatives of the tetrazole grouping. Reference to ARBs includes reference to pharmaceutically acceptable salts thereof.

Preferably, the ARB is a diprotic acid. Thus, the angiotensin receptor blocker has a charge of 0, 1 or 2 depending on the pH of the solution.

In the combination of the present invention, the ARB is in the form of a pharmaceutically acceptable salt selected from Na, K or $NH_4$, preferably Na. This includes both the mono- and di-salt of these cations, preferably the di-salt. In particular in the case of valsartan this means that both the carboxylic acid moiety and the tetrazole moiety form the salt.

In the dual-acting compound, in particular the supramolecular complex of the present invention, typically the free form of the ARB is employed in the preparation and the cationic species present in the complex is introduced by using a base, e.g. (Cat)OH.

The dual acting compound comprises a molecular moiety of a neutral endopeptidase inhibitor. This means that a molecular moiety derived from a neutral endopeptidase inhibitor is participating in the build-up of the dual-acting compound. The neutral endopeptidase inhibitor is part of the compound and connected to the ARB directly or indirectly via non-covalent bonds. For sake of convenience, throughout the application, the term "neutral endopeptidase inhibitor" will be used when describing this part of the compound. Neutral endopeptidase inhibitors suitable for use in the present invention include those of formula (I)

(I)




wherein

$R_2$ is alkyl of 1-7 carbons, trifluoromethyl, phenyl, substituted phenyl, —$(CH_2)$1 to 4-phenyl, or —$(CH_2)$1 to 4-substituted phenyl;

$R_3$ is hydrogen, alkyl of 1-7 carbons, phenyl, substituted phenyl, —$(CH_2)$1 to 4-phenyl or —$(CH_2)$1 to 4-substituted phenyl;

$R_1$ is hydroxy, alkoxy of 1-7 carbons or $NH_2$;

n is an integer from 1-15;

and the term substituted phenyl refers to a substituent selected from lower alkyl of 1-4 carbons, lower alkoxy of 1-4 carbons, lower alkylthio of 1-4 carbons, hydroxy, CI, Br or F.

Preferred neutral endopeptidase inhibitors of formula (I) include compounds,

wherein

$R_2$ is benzyl;

$R_3$ is hydrogen;

n is an integer from 1-9; and

$R_1$ is hydroxy.

Another preferred neutral endopeptidase inhibitor is (3S, 2'R)-3-{1-[2'-(ethoxycarbonyl)-4'-phenyl-butyl]-cyclopentan-1-carbonylamino}-2,3,4,5-tetrahydro-2-oxo-1H-1-benzazepine-1-acetic acid or a pharmaceutically acceptable salt thereof.

Preferred neutral endopeptidase inhibitors suitable for use in the present invention include, without limitation, SQ 28,603; N—[N-[1(S)-carboxyl-3-phenylpropyl]-(S)-phenylalanyl]-(S)-isoserine; N—[N-[((1S)-carboxy-2-phenyl)ethyl]-(S)-phenylalanyl]-β-alanine; N-[2(S)-mercaptomethyl-3-(2-methylphenyl)-propionyl]methionine; (cis-4-[[[1-[2-carboxy-3-(2-methoxyethoxy)propyl]-cyclopentyl]carbonyl]amino]-cyclohexanecarboxylic acid); thiorphan; retro-thiorphan; phosphoramidon; SQ 29072; (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester; N-(3-carboxy-1-oxopropyl)-(4S)-p-phenylphenylmethyl)-4-amino-2R-methylbutanoic acid; (S)-cis-4-[1-[2-(5-indanyloxycarbonyl)-3-(2-methoxyethoxy)propyl]-1-cyclopentanecarboxamido]-1-cyclohexanecarboxylic acid; 3-(1-[6-endo-hydroxymethylbicyclo[2,2,1]heptane-2-exo-carbamoyl]cyclopentyl)-2-(2-methoxyethyl)propanoic acid; N-(1-(3-(N-t-butoxycarbonyl-(S)-prolylamino)-2(S)-t-butoxy-carbonylpropyl)cyclopentanecarbonyl)-O-benzyl-(S)-serine methyl ester; 4-[[2-(mercaptomethyl)-1-oxo-3-phenylpropyl]amino]benzoic acid; 3-[1-(cis-4-carboxycarbonyl-cis-3-butylcyclohexyl-r-1-carbamoyl)cyclopentyl]-2S-(2-methoxyethoxymethyl)propanoic acid; N-((2S)-2-(4-biphenylmethyl)-4-carboxy-5-phenoxyvaleryl)glycine; N-(1-(N-hydroxycarbamoylmethyl)-1-cyclopentanecarbonyl)-L-phenylalanine; (S)-(2-biphenyl-4-yl)-1-(1H-tetrazol-5-yl)ethylamino) methylphosphonic acid; (S)-5-(N-(2-(phosphonomethylamino)-3-(4-biphenyl)propionyl)-2-aminoethyl)tetrazole; β-alanine; 3-[1,1'-biphenyl]-4-yl-N-[diphenoxyphosphinyl)methyl]-L-alanyl; N-(2-carboxy-4-thienyl)-3-mercapto-2-benzylpropanamide; 2-(2-mercaptomethyl-3-phenylpropionamido)thiazol-4-ylcarboxylic acid; (L)-(1-((2,2-dimethyl-1,3-dioxolan-4-yl)-methoxy)carbonyl)-2-phenylethyl)-L-phenylalanyl)-β-alanine; N—[N-[(L)-[1-[(2,2-dimethyl-1,3-dioxolan-4-yl)-methoxy]carbonyl]-2-phenylethyl]-L-phenylalanyl]-(R)-alanine; N—[N-[(L)-1-carboxy-2-phenylethyl]-L-phenylalanyl]-(R)-alanine; N-[2-acetylthiomethyl-3-(2-methyl-phenyl)propionyl]-methionine ethyl ester; N-[2-mercaptomethyl-3-(2-methylphenyl)propionyl]-methionine; N-[2(S)-mercaptomethyl-3-(2-methylphenyl)propanoyl]-(S)-isoserine; N—(S)-[3-mercapto-2-(2-methylphenyl)propionyl]-(S)-2-methoxy-(R)-alanine; N-[1-[[1(S)-benzyloxycarbonyl-3-phenylpropyl]amino]cyclopentylcarbonyl]-(S)-isoserine; N-[1-[[1(S)-carbonyl-3-phenylpropyl]amino]-cyclopentylcarbonyl]-(S)-isoserine; 1,1'-[dithiobis-[2(S)-(2-methylbenzyl)-1-oxo-3,1-propanediyl]]-bis-(S)-isoserine; 1,1'-[dithiobis-[2(S)-(2-methylbenzyl)-1-oxo-3,1-propanediyl]]-bis-(S)-methionine; N-(3-phenyl-2-(mercaptom-

ethyl)-propionyl)-(S)-4-(methylmercapto)methionine; N-[2-acetylthiomethyl-3-phenyl-propionyl]-3-aminobenzoic acid; N-[2-mercaptomethyl-3-phenyl-propionyl]-3-amino-benzoic acid; N-[1-(2-carboxy-4-phenylbutyl)-cyclopentane-carbonyl]-(S)-isoserine; N-[1-(acetylthiomethyl)cyclopentane-carbonyl]-(S)-methionine ethyl ester; 3(S)-[2-(acetylthiomethyl)-3-phenyl-propionyl]amimo-ε-caprolactam; N-(2-acetylthiomethyl-3-(2-methylphenyl) propionyl)-methionine ethyl ester; and combinations thereof.

Neutral endopeptidase inhibitors can be purchased from commercial sources or can be prepared according to known methods, such as those set forth in any of U.S. Pat. Nos. 4,722,810, 5,223,516, 4,610,816, 4,929,641, South African Patent Application 84/0670, UK 69578, U.S. Pat. No. 5,217,996, EP 00342850, GB 02218983, WO 92/14706, EP 00343911, JP 06234754, EP 00361365, WO 90/09374, JP 07157459, WO 94/15908, U.S. Pat. Nos. 5,273,990, 5,294,632, 5,250,522, EP 00636621, WO 93/09101, EP 00590442, WO 93/10773, U.S. Pat. No. 5,217,996, the disclosure of each of which is incorporated by reference. Neutral endopeptidase inhibitors may be used for purposes of this invention in their free form, as well as in any suitable salt form. Reference to neutral endopeptidase inhibitors includes reference to pharmaceutically acceptable salts thereof.

Additionally esters or other derivatives of any carboxylic grouping may be applied for the synthesis of linked pro-drugs, as well as salts and derivatives of any other acidic grouping. In a preferred embodiment of this invention, the NEPi is 5-biphenyl-4-yl-4-(3-carboxy-priopionylamino)-2-methyl-pentanoic acid ethyl ester of formula (II) or the respective hydrolysed form 5-biphenyl-4-yl-4-(3-carboxy-priopionylamino)-2-methyl-pentanoic acid.

(II)




The compound of formula (II) can exist as the (2R,4S), (2R,4S), (2R,4S) or (2R,4S) isomer. Preferred is (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester as shown below:






The compound of formula (II) is a specific inhibitor of NEP and is described in U.S. Pat. No. 5,217,996. It can be purchased from commercial sources or can be prepared according to known methods. The compound of formula (II) may be used for purposes of this invention in its free form, as well as in any suitable salt or ester form.

Preferably the NEPi is a monoprotic acid. Thus, the NEPi has a charge of 0 or 1 depending on the pH of the solution.

In the combination of the present invention, the NEPi is in the form of a pharmaceutically acceptable salt selected from Na, K or $NH_4$, preferably Na.

In the dual-acting compound, in particular the supramolecular complex of the present invention, typically the free form of the NEPi is employed in the preparation and the cationic species present in the complex is introduced by using a base, (Cat)OH.

The dual acting compound preferably comprises non-covalent bonds between the ARB and the NEPi. Alternatively or in addition, it optionally comprises a linking moiety such as a pharmaceutically acceptable cation.

The linking moiety includes, but is not limited to, generally regarded as safe (GRAS) compounds or other pharmacologically acceptable compounds. The linking moiety may be an ion or a neutral molecule. In the case wherein the linking moiety is an ion the linked pro-drug is a salt and when the linking moiety is a neutral molecule the linked pro-drug is a co-crystal. Without being bound by any particular theory, the acidic portion of the ARB and NEPi donate a proton to the basic linking moiety such that all three components then become united to form one molecule. When the linked pro-drug is ingested by the subject intended to be treated the more acidic nature of the ingestion environment causes the linked pro-drug to separate into individual components concomitant with ingestion and absorption and therefore be converted into active agents to provide their beneficial biological action to treat the intended diseases.

In the case of a linked pro-drug salt or the dual-acting compound, the linking moiety or the cation, respectively, is preferably a positively charged mono-, di- or tri-valent cation, an organic base or an amino acid. Preferred cations (Cat) both for the linked pro-drug in general and the dual-acting compound, in particular the complex are basic cations, even more preferably metallic cations. Preferred metallic cations include, but are not limited to Na, K, Ca, Mg, Zn,

Fe or $NH_4$. Amine bases and salt forming agents may also be employed, such as benzathine, hydrabamine, ethylenediamine, n-n-dibenzyl-ethylenediamine, L-arginine, choline hydroxide, N-methyl-glucamine, (Meglumine), L-Lysine, dimethylaminoethanol (Deanol), t-butylamine, diethylamine, 2-(diethylamino)-ethanol, 4-(2-hydroxyethyl)-morpholine, Thromethanine (TRIS), 4-acetamidophenol, 2-amino-2-methyl-1,3-propanediol, 2-amino-2-methyl-propanol, benzylamine, cyclohexylamine, diethanolamine, ethanolamine, imidazole, piperazine and triethanolamine.

Most preferably, the cation is Na, K or $NH_4$, such as Na. In one embodiment Ca is preferred.

In the case of a linked pro-drug co-crystal, the linking moiety is may also be a neutral molecule which provides hydrogen-bonding functionality.

In one embodiment, the linked pro-drugs of this invention are represented as set forth below, wherein scheme (1) and (2) represent a salt and scheme (3) represents a co-crystal:

NEPi·Xa·ARB scheme (1)

NEPi·XaYb·ARB scheme (2)

NEPi·Zc·ARB scheme (3),

wherein

X is Ca, Mg, Zn or Fe;

Y is Na, K or NH4;

Z is a neutral molecule; and

a, b and c reflect the stoichiometry of the linked pro-drug, preferably, a, b and c are a valence of $1^+$, $2^+$ or $3^+$.

For the linked pro-drugs of schemes (1) and (2), above, preferably the NEPi is a monoprotic acid and ARB is a diprotic acid. The angiotensin receptor blocker has a charge of 0, 1 or 2 and the NEPi has a charge of 0 or 1 depending on the pH of the solution, while the overall molecule will be neutral. Ratios of ARB to NEPi will be 1:1, 1:2, 1:3, 3:1, 2:1, 1:1, preferably 1:1, 1:2 or 1:3, most preferably 1:1.

Multi-component salts, particularly with zinc and calcium have been reported in the literature, e.g., *Chem Pharm Bull*, Vol. 53, p. 654 (2005). These ions require a coordination geometry that facilitates the crystallization of multi-component systems. The metal ions have coordinating geometries governed by the atomic orbitals for each species

Valsartan comprises two acidic groupings: the carboxylic acid and the tetrazole. In one embodiment of this aspect of the present invention, the molecular structure of linked pro-drugs of valsartan and a NEPi comprise a linkage between the carboxylic acid and the linking moiety or a linkage between the tetrazole grouping and the linking moiety. In yet another embodiment, the linked pro-drug comprises a trivalent linking moiety linked to the valsartan carboxylic acid grouping, the tetrazole grouping and the NEPi grouping.

In an embodiment of this aspect of the invention, valsartan is linked to (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester by a calcium salt ion.

In a preferred embodiment of the present application, the angiotensin receptor antagonist and the neutral endopeptidase inhibitor are present in a molar ratio of 1:1, 1:2, 1:3, 3:1, 2:1, more preferably 1:1 in the combination as well as in the supramolecular complex. This is also true for the linked pro-drug. Moreover, in the complex, angiotensin receptor antagonist, the neutral endopeptidase inhibitor and the cation are present in a molar ratio of 1:1:1, 1:1:2, 1:1:3, more preferably 1:1:3. This applies equally to the linked pro-drug.



The combination or the dual-acting compound, in particular the complex of the present invention may contain a solvent. This is particularly preferred in the case of the dual-acting compound, in particular the complex, where the solvent may contribute to the intermolecular structure, e.g. the supramolecular interactions. Preferred solvents include water, methanol, ethanol, 2-propanol, acetone, ethyl acetate, methyl-t-butylether, acetonitrile, toluene, and methylene chloride, preferably water. If a solvent is present, one or more molecules per molecule of the active agent can be present. In this case, namely if a stoichiometric amount of the solvent is present, preferably 1, 2, 3, 4 or 5, more preferably 3, molecules of solvent, such as water, can be present per molecule of active agent. Alternatively, the solvent may be present in non-stoichiometric amounts. This means preferably any stoichiometric fraction of the solvent, such as 0.25, 0.5, 0.75, 1.25, 1.5, 1.75, 2.25, 2.5, 2.75, 3.25, 3.5, 3.75, 4.25, 4.5 and 4.75, preferably 2.5, molecules of solvent, such as water, can be present per molecule of active agent. If the dual-acting compound, in particular the complex is in the crystalline form, the solvent may be part of the molecular packing and be trapped in the crystal lattice.

Thus in a preferred embodiment of the present invention, the dual-acting compound, in particular the supramolecular complex is described by the sum formula:

[ARB(NEPi)]$Na_{1-3}$.x$H_2O$, wherein x is 0, 1, 2 or 3, such as 3, preferably

[ARB(NEPi)]$Na_3$.x$H_2O$, wherein x is 0, 1, 2 or 3, such as 3, more preferably

[valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]$Na_3$.x $H_2O$, wherein x is 0, 1, 2 or 3, such as 3.

Thus in a preferred embodiment of the present invention, the dual-acting compound, in particular the supramolecular complex is described by the sum formula:

[ARB(NEPi)]$Na_{1-3}$.x$H_2O$, wherein x is 0 to 3, such as 2.5, preferably

[ARB(NEPi)]$Na_3$.x$H_2O$, wherein x is 0 to 3, such as 2.5, more preferably

[(N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine) (5-biphenyl-4-yl-4-(3-carboxy-priopionylamino)-2-methyl-pentanoic acid ethyl ester]$Na_3$.x $H_2O$, in particular [((S)—N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine) ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester]$Na_3$.x $H_2O$, wherein x is 0 to 3, such as 2.5. In this most preferred example, the complex is termed trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino) butyrate] hemipentahydrate.

A simplified structure of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{22"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate used to formally calculate the relative molecular mass, is shown below.




Valsartan comprises two acidic groupings: the carboxylic acid and the tetrazole. In one embodiment of this aspect of the present invention, the molecular structure of the dual-acting compound, in particular, the complex, of valsartan and a NEPi comprises an interaction between the carboxylic acid and the cation, such as Na, or the solvent, such as water, or a linkage between the tetrazole grouping and the cation, such as Na, or the solvent, such as water. In yet another embodiment, the dual-acting compound, in particular, the complex, comprises an interaction between the valsartan carboxylic acid grouping, the tetrazole grouping or the NEPi grouping and the cation, such as Na, or the solvent, such as water.

The combination or dual-acting compound, in particular, the complex, of the present invention is preferably in the solid form. In the solid state it can be in the crystalline, partially crystalline, amorphous, or polymorphous form, preferably in the crystalline form.

The dual-acting compound, in particular, the complex, of the present invention is distinct from a combination of an ARB and a NEPi obtained by simply physically mixing the two active agents. Thus, it can have different properties that make it particularly useful for manufacturing and therapeutic applications. The difference of the dual-acting compound, in particular, the complex, and the combination can be exemplified by the dual-acting compound of (S)—N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester which is characterized by very distinct spectral peaks and shifts that are not observed in the physical mixture.

Specifically, such a dual-acting compound is preferably characterized by an X-ray powder diffraction pattern taken with a Scintag XDS2000 powder diffractometer using Cu-Ka radiation (lamda=1.54056 A) with a Peltier-cooled Silicon detector at room temperature (25 degree C.). Scan range was from 1.5 degree to 40 degree in 2 theta with a scan rate of 3 degree/minute. The most important reflections in the X-ray diffraction diagram comprise the following interlattice plane intervals:

The preferred characterization of trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate is obtained from the interlattice plane intervals d of the ascertained X-ray diffraction diagrams, whereby, in the following, average values 2Θ in [°] are indicated (error limit of ±0.2)

4.5, 5.5, 5.6, 9.9, 12.8, 15.7, 17.0, 17.1, 17.2, 18.3, 18.5, 19.8, 21.5, 21.7, 23.2, 23.3, 24.9, 25.3, 27.4, 27.9, 28.0, 30.2.

or with an error limit of ±0.1:

4.45, 5.52, 5.57, 9.94, 12.82, 15.66, 17.01, 17.12, 17.2, 18.32, 18.46, 19.76, 21.53, 21.72, 23.17, 23.27, 24.88, 25.3, 27.4, 27.88, 28.04, 30.2.

The most intensive reflections in the X-ray diffraction pattern show the following interlattice plane intervals:

2Θ in [°]: 0.4.5, 5.6, 12.8, 17.0, 17.2, 19.8, 21.5, 27.4, in particular 4.45, 5.57, 17.01, 17.2, 19.76, 21, 27.4.

A preferred method of checking the above-indicated average values of the interlattice plane intervals and intensities measured by experimentation from X-ray diffraction, for a given substance, consists in calculating these intervals and their intensities from the comprehensive single crystal structure determination. This structure determination yields cell constants and atom positions, which enable the X-ray diffraction diagram corresponding to the solid to be calculated by means of computer-aided calculation methods. The program used is Powder Pattern within the application software Materials Studio (Accelrys). A comparison of these data, namely the interlattice plane intervals and intensities of the most important lines of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{22"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate, obtained from measurements and from calculating the single crystal data, is illustrated in the table below.

TABLE

| measured | | calculated | | measured | | calculated | |
|---|---|---|---|---|---|---|---|
| 2θ in [°] | Intensity | 2θ in [°] | Intensity | 2θ in [°] | Intensity | 2θ in [°] | Intensity |
| 4.45 | very strong | 4.15 | very strong | 19.76 | strong | 19.6 | very weak |
| 5.52 | Strong | 5 | strong | 21.53 | weak | 19.8 | very weak |
| 5.57 | strong | 6.5 | strong | 21.72 | very weak | 21.4 | very weak |
| 9.94 | very weak | 9.75 | weak | 23.17 | weak | 23.1 | very weak |
| 12.82 | very strong | 12.6 | weak | 23.27 | weak | 23.15 | very weak |
| 15.66 | very weak | 15.05 | strong | 24.88 | very weak | | very weak |
| 17.01 | weak | 16.9 | very strong | 25.3 | weak | 25.3 | very weak |
| 17.12 | strong | 17.1 | strong | 27.4 | weak | 27.3 | very weak |
| 17.2 | weak | 17.15 | weak | 27.88 | very weak | 27.9 | very weak |
| 18.32 | weak | 18.25 | very weak | 28.04 | weak | | |
| 18.46 | weak | 18.3 | weak | 30.2 | weak | | |

Relative intensity between 100% to 50% is referred to as very strong, 50% to 10% as strong, 10% to 5% as weak, and below 5% as very weak.

The invention relates to trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{22"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate, a crystalline solid which is characterized by the data and parameters obtained from single crystal X-ray analysis and X-ray powder patterns. An in-depth discussion of the theory of the methods of single crystal X-ray diffraction and the definition of the evaluated crystal data and the parameters may be found in Stout & Jensen, X-Ray Structure Determination; A Practical Guide, Mac Millian Co., New York, N.Y. (1968) chapter 3.

| Crystal data | |
|---|---|
| sum formula | $C_{48}H_{55}N_6O_8Na_3 \cdot 2.5H_2O$ |
| molecular mass | 957.99 |
| crystal colour | colourless |
| crystal shape | tabular: hexagonal |
| crystal system | monoclinic |
| space group | $P2_1$ |
| Cell parameters | a = 20.344 Å<br>b = 42.018 Å<br>c = 20.374 Å<br>α = 90°<br>β = 119.29°<br>γ = 90° |
| volume of unit cell | 15190.03 $Å^3$ |
| Z (the number of asymmetric units in the unit cell) | 2 |
| calculated density | 1.26845 g/cm3 |
| **Single crystal X-ray measurement data** | |
| diffractometer | Nonius KappaCCD |
| X-ray generator | Nonius FR571 X-ray generator with a copper rotating anode |
| temperature | 270 K and 150 K |

Notes:
Two data sets on two suitable single crystals were collected at two different temperatures to assure no phase change during cooling.
None of the hydrogen atoms on the water or amine nitrogen atoms were observed in the Fourier maps so they were not included in the refinement.

Computer Program Used to Solve the Structure
SHELXD (Sheldrick, Göttingen)

In three dimensions, the unit cell is defined by three edge lengths a, b, and c, and three interaxial angles α, β, und γ. In this way, the volume of the unit cell $V_c$ is determined. A differentiated description of these crystal parameters is illus-



trated in chapter 3 of Stout & Jensen (see above). The details for trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate from the single crystal measurements, especially the atom coordinates, the isotropic thermal parameters, the coordinates of the hydrogen atoms as well as the corresponding isotropic thermal parameters, show that a monoclinic unit cell exists, its cell content of twelve formula units of $C_{48}H_{55}N_6O_8Na_3.2.5\ H_2O$ occurring as a result of two asymmetric units on two-fold positions.

The acentric space group $P2_1$ determined from the single crystal X-ray structure is a common space group for enantiomorphically pure molecules. In this space group there are two general positions which means that for twelve formula units in the unit cell there must be 18 sodium ions and 15 waters in the asymmetric unit.

A pictorial representation of the unit cell of the supramolecular complex of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate comprising two asymmetric units is shown in FIG. **1**.

Based on the single crystal structure solution, the asymmetric unit of the trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate supramolecule comprises six each of ARB and NEPi moieties, 18 sodium atoms, and 15 water molecules. Trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-utylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate may be considered a sodium supramolecular complex, coordinated by oxygen ligands. These oxygens come from twelve carboxylate groups and eighteen carbonyl groups of the above moieties, and from 13 of the 15 water molecules. The crystal is an infinite 3-dimensional network of these sodium complexes.

Such a compound may also be characterized by an infrared absorption spectrum obtained using Attenuated Total Reflection Fourier Transform Infrared (ATR-FTIR) spectrometer (Nicolet Magna-IR 560) showing the following significant bands, expressed in reciprocal wave numbers ($cm^{-1}$):

2956 (w), 1711 (st), 1637 (st), 1597 (st), 1488 (w), 1459 (m), 1401 (st), 1357 (w), 1295 (m), 1266 (m), 1176 (w), 1085 (m), 1010 (w), 942 (w), 907 (w), 862 (w), 763 (st), 742 (m), 698 (m), 533 (st). Characteristic to the complex are in particular the following peaks 1711 (st), 1637 (st), 1597 (st) and 1401 (st). The error margin for all absorption bands of ATR-IR is ±2 $cm^{-1}$. The intensities of the absorption bands are indicated as follows: (w)=weak; (m)=medium; and (st) =strong intensity.

Such a compound may also be characterized by a Raman spectrum measured by dispersive Raman spectrometer with 785 nm laser excitation source (Kaiser Optical Systems, Inc.) showing the following significant bands expressed in reciprocal wave numbers ($cm^{-1}$):

3061 (m), 2930 (m, broad), 1612 (st), 1523 (m), 1461 (w), 1427 (w), 1287 (st), 1195 (w), 1108 (w), 11053 (w), 1041 (w), 1011 (w), 997 (m), 866 (w), 850 (w), 822 (w), 808 (w), 735 (w), 715 (w), 669 (w), 643 (w), 631 (w), 618 (w), 602 (w), 557 (w), 522 (w), 453 (w), 410 (w), 328 (w).

The error margin for all Raman bands is ±2 $cm^{-1}$. The intensities of the absorption bands are indicated as follows: (w)=weak; (m)=medium; and (st)=strong intensity.

Such a compound may also be characterized by distinct melting properties measured by differential scanning calorimetry (DSC). Using Q1000 (TA Instruments) instrument, the melting onset temperature and the peak maximum temperature for such a complex are observed at 139° C. and 145° C., respectively. The heating rate is 10 K/min.

The second embodiment of the present invention is directed to pharmaceutical compositions comprising a combination, a linked pro-drug or a dual-acting compound, in particular the complex as described herein and at least one pharmaceutically acceptable additive. The details regarding the combination and the complex, including the ARB and the NEPi, are as described above with regard to the first embodiment of the invention.

The pharmaceutical compositions according to the invention can be prepared in a manner known per se and are those suitable for enteral, such as oral or rectal, and parenteral administration to mammals (warm-blooded animals), including man, comprising a therapeutically effective amount of the combination or dual-acting compound, in particular the complex, alone or in combination with at least one pharmaceutically acceptable carrier, especially suitable for enteral or parenteral application. Typical oral formulations include tablets, capsules, syrups, elixirs and suspensions. Typical injectable formulations include solutions and suspensions.

Pharmaceutically acceptable additives suitable for use in the present invention include, without limitation and provided they are chemically inert so that they do not adversely affect the combination or the dual-acting compound, in particular the complex of the present invention, diluents or fillers, disintegrants, glidants, lubricants, binders, colorants and combinations thereof. The amount of each additive in a solid dosage formulation may vary within ranges conventional in the art. Typical pharmaceutically acceptable carriers for use in the formulations described above are exemplified by: sugars, such as lactose, sucrose, mannitol and sorbitol; starches, such as cornstarch, tapioca starch and potato starch; cellulose and derivatives, such as sodium carboxymethyl cellulose, ethyl cellulose and methyl cellulose; calcium phosphates, such as dicalcium phosphate and tricalcium phosphate; sodium sulfate; calcium sulfate; polyvinylpyrrolidone; polyvinyl alcohol; stearic acid; alkaline earth metal stearates, such as magnesium stearate and calcium stearate; stearic acid; vegetable oils, such as peanut oil, cottonseed oil, sesame oil, olive oil and corn oil; non-ionic, cationic and anionic surfactants; ethylene glycol polymers; β-cyclodextrin; fatty alcohols; and hydrolyzed cereal solids, as well as other non-toxic compatible fillers, binders, disintegrants, buffers, preservatives, antioxidants, lubricants, flavoring agents and the like commonly used in pharmaceutical formulations.

Pharmaceutical preparations for enteral or parenteral administration are, e.g., in unit dose forms, such as coated tablets, tablets, capsules or suppositories and also ampoules. These are prepared in a manner which is known per se, e.g., using conventional mixing, granulation, coating, solubilizing or lyophilizing processes. Thus, pharmaceutical compositions for oral use can be obtained by combining the linked pro-drug, combination or dual-acting compound, in particular the complex with solid excipients, if desired, granulating a mixture which has been obtained, and, if required or necessary, processing the mixture or granulate into tablets or coated tablet cores after having added suitable auxiliary substances.



The dosage of the active compounds in the combination or dual-acting compound, in particular the complex can depend on a variety of factors, such as mode of administration, homeothermic species, age and/or individual condition. The projected efficacy in animal disease models ranges from about 0.1 mg/kg/day to about 1000 mg/kg/day given orally, and the projected dose for human treatment ranges from about 0.1 mg/day to about 2000 mg/day. Preferred ranges are from about 40 mg/day to about 960 mg/day of the linked pro-drug, preferably about 80 mg/day to about 640 mg/day. The ARB component is administered in a dosage of from about 40 mg/day to about 320 mg/day and the NEPi component is administered in a dosage of from about 40 mg/day to about 320 mg/day. More specifically, the dosages of ARB/NEPi, respectively, include 40 mg/40 mg, 80 mg/80 mg, 160 mg/160 mg, 320 mg/320 mg, 40 mg/80 mg, 80 mg/160 mg, 160 mg/320 mg, 320 mg/640 mg, 80 mg/40 mg, 160 mg/80 mg and 320 mg/160 mg, respectively. These dosages are "therapeutically effective amounts". Preferred dosages for the linked pro-drug, combination or dual-acting compound, in particular the complex of the pharmaceutical composition according to the present invention are therapeutically effective dosages.

The pharmaceutical compositions may contain in addition another therapeutic agent, e.g., each at an effective therapeutic dose as reported in the art. Such therapeutic agents include:

a) antidiabetic agents such as insulin, insulin derivatives and mimetics; insulin secretagogues such as the sulfonylureas, e.g., Glipizide, glyburide and Amaryl; insulinotropic sulfonylurea receptor ligands such as meglitinides, e.g., nateglinide and repaglinide; peroxisome proliferator-activated receptor (PPAR) ligands; protein tyrosine phosphatase-1B (PTP-1B) inhibitors such as PTP-112; GSK3 (glycogen synthase kinase-3) inhibitors such as SB-517955, SB-4195052, SB-216763, NN-57-05441 and NN-57-05445; RXR ligands such as GW-0791 and AGN-194204; sodium-dependent glucose cotransporter inhibitors such as T-1095; glycogen phosphorylase A inhibitors such as BAY R3401; biguanides such as met-formin; alpha-glucosidase inhibitors such as acarbose; GLP-1 (glucagon like peptide-1), GLP-1 analogs such as Exendin-4 and GLP-1 mimetics; and DPPIV (dipeptidyl peptidase IV) inhibitors such as LAF237;

b) hypolipidemic agents such as 3-hydroxy-3-methyl-glutaryl coenzyme A (HMG-CoA) reductase inhibitors, e.g., lovastatin, pitavastatin, simvastatin, pravastatin, cerivastatin, mevastatin, velostatin, fluvastatin, dalvastatin, atorvastatin, rosuvastatin and rivastatin; squalene synthase inhibitors; FXR (farnesoid X receptor) and LXR (liver X receptor) ligands; cholestyramine; fibrates; nicotinic acid and aspirin;

c) anti-obesity agents such as orlistat; and

d) anti-hypertensive agents, e.g., loop diuretics such as ethacrynic acid, furosemide and torsemide; angiotensin converting enzyme (ACE) inhibitors such as benazepril, captopril, enalapril, fosinopril, lisinopril, moexipril, perinodopril, quinapril, ramipril and trandolapril; inhibitors of the Na—K-ATPase membrane pump such as digoxin; ACE/NEP inhibitors such as omapatrilat, sampatrilat and fasidotril; 3-adrenergic receptor blockers such as acebutolol, atenolol, betaxolol, bisoprolol, metoprolol, nadolol, propranolol, sotalol and timolol; inotropic agents such as digoxin, dobutamine and milrinone; calcium channel blockers such as amlodipine, bepridil, diltiazem, felodipine,

nicardipine, nimodipine, nifedipine, nisoldipine and verapamil; aldosterone receptor antagonists; and aldosterone synthase inhibitors. Most preferred combination partners are diuretics, such as hydrochlorothiazide, and/or calcium channel blockers, such as amlodipine or a salt thereof.

Other specific anti-diabetic compounds are described by Patel Mona in *Expert Opin Investig Drugs,* 2003, 12(4), 623-633, in the FIGS. 1 to 7, which are herein incorporated by reference.

A compound of the present invention may be administered either simultaneously, before or after the other active ingredient, either separately by the same or different route of administration or together in the same pharmaceutical formulation.

The structure of the therapeutic agents identified by code numbers, generic or trade names may be taken from the actual edition of the standard compendium "The Merck Index" or from databases, e.g., Patents International (e.g. IMS World Publications). The corresponding content thereof is hereby incorporated by reference.

Accordingly, the present invention provides pharmaceutical compositions in addition a therapeutically effective amount of another therapeutic agent, preferably selected from antidiabetics, hypolipidemic agents, anti-obesity agents or anti-hypertensive agents, most preferably from antidiabetics, anti-hypertensive agents or hypolipidemic agents as described above.

The person skilled in the pertinent art is fully enabled to select a relevant test model to prove the efficacy of a combination of the present invention in the hereinbefore and hereinafter indicated therapeutic indications.

Representative studies are carried out with trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate, e.g. applying the following methodology:

The antihypertensive and neutral endopeptidase 24.11 (NEP)-inhibitory activities of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino) butyrate] hemipentahydrate is assessed in conscious rats. The blood pressure-lowering effect is evaluated in double-transgenic rats (dTGRs) that overexpress both human renin and its substrate, human angiotensinogen (Bohlender, et al, High human renin hypertension in transgenic rats. Hypertension; 29(1 Pt 2):428-34, 1997). Consequently, these animals exhibit an angiotensin II-dependent hypertension. The NEP-inhibitory effect of trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate is determined in conscious Sprague-Dawley rats infused with exogenous atrial natriuretic peptide (ANP). Potentiation of plasma ANP levels is used as an index of NEP inhibition in vivo. In both models, trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{22"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate is administered orally as a powder in gelatin mini capsules. The results are summarized below.

Trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate exhibits a dose-dependent and long-lasting antihypertensive effect after oral administration in conscious dTGRs, a rat model of fulminant hypertension.



Oral administration of trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate) biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate rapidly and dose-dependently inhibits NEP with a long duration of action, as reflected by its potentiation of plasma ANP immunoreactivity (ANPir) in conscious Sprague-Dawley rats infused with exogenous ANP.

Antihypertensive Effect In Vivo

The dTGRs are instrumented with radiotelemetry transmitters for continuous measurement of arterial blood pressure and heart rate. Animals are randomly assigned to vehicle (empty capsule) or treatment (at 2, 6, 20 or 60 mg/kg, p.o.) groups. Baseline 24-hr mean arterial pressure (MAP) is approximately 170-180 mmHg in all groups. Trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino) butyrate] hemipentahydrate dose-dependently reduces MAP. The values obtained from the treatment groups are dose-dependent, and the results from the three highest doses are significantly different from the vehicle controls

Inhibition of NEP In Vivo

The extent and duration of trisodium [3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl) propionate-(S)-3'-methyl-2'-(pentanoyl{22"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate for NEP inhibition in vivo is assessed with methodologies as described previously (Trapani, et al, CGS 35601 and its orally active prodrug CGS 37808 as triple inhibitors of endothelin-converting enzyme-1, neutral endopeptidase 24.11, and angiotensin-converting enzyme. J Cardiovasc Pharmacol; 44(Suppl 1):S211-5, 2004). Rat ANP(1-28) is infused intravenously at a rate of 450 ng/kg/min in conscious, chronically cannulated, male Sprague-Dawley rats. After one hour of infusion, rats are randomly assigned to one of six groups: untreated control, vehicle (empty capsule) control, or one of four doses of drug (2, 6, 20, or 60 mg/kg, p.o.). ANP infusion is continued for an additional eight hours. Blood samples are collected for measuring plasma ANPir by a commercial enzyme immunoassay kit at −60 min (i.e., before initiating ANP infusion), −30 min (after 30 min of ANP infusion), 0 min ("baseline"; after 60 min of ANP infusion but before dosing with drug or its vehicle), and at 0.25, 0.5, 1, 2, 3, 4, 5, 6, 7, and 8 hr post-dosing.

Before ANP infusion, ANPir is low (0.9-1.4 ng/ml) and similar in all six groups. ANP infusion rapidly (by 30 min) elevates ANPir to ~10 ng/ml. This ANPir level is sustained for the duration of the experiment in the untreated and vehicle control groups. In contrast, trisodium [3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-butylcarbamoyl)propionate-(S)-3'-methyl-2'-(pentanoyl{2"-(tetrazol-5-ylate)biphenyl-4'-ylmethyl}amino)butyrate] hemipentahydrate rapidly (within 15 min) and dose-dependently augments ANPir. In summary, orally administered LCZ696 rapidly and dose-dependently inhibited NEP with a long duration of action as reflected by the potentiation of plasma ANPir.

The available results indicate an unexpected therapeutic effect of a compound according to the invention.

In a third aspect, the present invention is directed to a method of making a linked pro-drug of an ARB or a

pharmaceutically acceptable salt thereof and a NEPi or a pharmaceutically acceptable salt thereof comprising the steps of:

(a) adding an inorganic salt forming agent to a solvent to form a linked pro-drug salt forming solution;
(b) adding the salt forming solution to a mixture of an ARB and a NEPi such that the ARB and NEPi form a linked pro-drug; and
(c) isolating the linked pro-drug.

Preferably, the components are added in an equivalent amount.

The inorganic salt forming agent includes, but is not limited to, calcium hydroxide, zinc hydroxide, calcium methoxide, calcium acetate, calcium hydrogen carbonate, calcium formate, magnesium hydroxide, magnesium acetate, magnesium formate and magnesium hydrogen carbonate, sodium hydroxide, sodium methoxide, sodium acetate, sodium formate. The inorganic salt forming agent releases the linking moiety into the solvent such that when an ARB and a NEPi are present a linked pro-drug is formed.

Solvents included in the scope of the present invention include, but are not limited to, solvents in which the ARB, NEPi and inorganic salt forming agent preferably exhibit a lower solubility that allows the linked pro-drug to crystallize. Such solvents may comprise, but are not limited to, water, methanol, ethanol, 2-propanol, ethyl acetate, methyl-t-butylether, acetonitrile, toluene, and methylene chloride and mixtures of such solvents.

The inorganic salt forming agent and the solvent when combined should have a pH which promotes linked pro-drug formation. The pH may be between about 2 and about 6, preferably between about 3 and about 5, most preferably between 3.9 and 4.7.

The linked pro-drug is isolated by crystallization and chromatography. Specific types of chromatography include, e.g., ligand specific resin chromatography, reverse phase resin chromatography and ion-exchange resin chromatography.

A specific example comprises contacting a divalent salt of one component with a monovalent salt of the other component of the linked pro-drug. Specifically the mixed salt of valsartan and a mono-basic NEPi are synthesized by contacting the calcium salt of valsartan with the sodium salt of the NEPi component. Isolation of the desired mixed salt is carried out by selective crystallization or chromatography using ligand specific resins, reverse phase resins or ion-exchange resins. Similarly this process can be conducted with a monovalent salt of both components, such as the sodium salt of both components.

In another embodiment of this aspect of the invention, a co-crystal of the linked pro-drug is obtained. In a method of making a linked pro-drug co-crystal the inorganic salt forming agent is replaced with a neutral molecule which provides hydrogen binding properties. The solvent may be part of the molecular packing and be trapped in the crystal lattice.

In a preferred embodiment of the third aspect, the present invention is directed to a method of preparing a dual-acting compound comprising

(a) an angiotensin receptor antagonist;
(b) a neutral endopeptidase inhibitor (NEPi); and optionally
(c) a pharmaceutically acceptable cation;

said method comprising the steps of:

(i) dissolving an angiotensin receptor antagonist and a neutral endopeptidase inhibitor (NEPi) in a suitable solvent;
(ii) dissolving a basic compound of Cat in a suitable solvent, wherein Cat is a cation;
(iii) combining the solutions obtained in steps (i) and (ii);
(iv) precipitation of the solid, and drying same to obtain the dual-acting compound; or alternatively obtaining the dual-acting compound by exchanging the solvent(s) employed in steps (i) and (ii) by
(iva) evaporating the resulting solution to dryness;
(va) re-dissolving the solid in a suitable solvent;
(via) precipitation of the solid and drying same to obtain the dual-acting compound.

The details regarding the complex, including the ARB, the NEPi and the cation, are as described above with regard to the first embodiment of the invention.

Preferably, in step (i) the ARB and the NEPi are added in an equivalent molar amount. Both the ARB and the NEPi are preferably used in the free form. The solvent used in step (i) may be any solvent that allows dissolution of both the ARB and the NEPi. Preferred solvents include those mentioned above, namely water, methanol, ethanol, 2-propanol, acetone, ethyl acetate, isopropyl acetate, methyl-t-butylether, acetonitrile, toluene, DMF, NMF and methylene chloride and mixtures of such solvents, such as ethanol-water, methanol-water, 2-propanol-water, acetonitrile-water, acetone-water, 2-propanol-toluene, ethyl acetate-heptane, isopropyl acetate-acetone, methyl-t-butyl ether-heptane, methyl-t-butyl ether-ethanol, ethanol-heptane, acetone-ethyl acetate, acetone-cyclohexane, toluene-heptane, more preferably acetone.

Preferably, in step (ii) the basic compound of Cat is a compound capable of forming a salt with the acidic functionalities of the ARB and the NEPi. Examples include those mentioned above, such as calcium hydroxide, zinc hydroxide, calcium methoxide, calcium ethoxide, calcium acetate, calcium hydrogen carbonate, calcium formate, magnesium hydroxide, magnesium acetate, magnesium formate, magnesium hydrogen carbonate, sodium hydroxide, sodium carbonate, sodium hydrogen carbonate, sodium methoxide, sodium ethoxide, sodium acetate, sodium formate, potassium hydroxide, potassium carbonate, potassium hydrogen carbonate, potassium methoxide, potassium ethoxide, potassium acetate, potassium formate, ammonium hydroxide, ammonium methoxide, ammonium ethoxide, and ammonium carbonate. Perchlorates may also be used. Amine bases or salt forming agents such as those mentioned above may also be used, in particular benzathine, L-arginine, cholin, ethylene diamine, L-lysine or piperazine. Typically an inorganic base is employed with Cat as specified herein. More preferably, the basic compound is (Cat)OH, $(Cat)_2CO_3$, $(Cat)HCO_3$, still more preferably Cat(OH), such as NaOH. The basic compound is employed in an amount of at least 3 equivalents relative to either the ARB or the NEPi, preferably it is employed in stoichiometric amount to obtain the dual-acting compound, in particular the complex with three cations. The solvent used in step (ii) may be any solvent or mixtures of solvents that allow dissolution of Cat(OH). Preferred solvents include water, methanol, ethanol, 2-propanol, acetone, ethyl acetate, isopropyl acetate, methyl-t-butylether, acetonitrile, toluene, and methylene chloride and mixtures of such solvents, more preferably water.

In step (iii) the solutions obtained in steps (i) and (ii) are combined. This can take place by adding the solution obtained in step (i) to the solution obtained in step (ii) or vice versa, preferably, the solution obtained in step (ii) to the solution obtained in step (i).

According to the first alternative, once combined and preferably mixed, the dual-acting compound, in particular

the complex precipitates in step (iv). This mixing and precipitation is typically effected by stirring the solutions for an appropriate amount of time such as 20 min to 6 h, preferably 30 min to 3 h, more preferably 2 h, at room temperature. It is advantageous to add seeds of the dual acting compound. This method facilitates precipitation.

In step (iv) according to this first alternative, a co-solvent is typically added. The co-solvent employed is a solvent in which the ARB and the NEPi in the complexed form exhibit a lower solubility that allows the compound to precipitate. Distillation, either continuous or stepwise, with replacement by this co-solvent results in a mixture predominantly of the co-solvent. Preferred solvents include ethanol, 2-propanol, acetone, ethyl acetate, isopropyl acetate, methyl-t-butylether, acetonitrile, toluene, and methylene chloride and mixtures of such solvents, more preferably isopropyl acetate. Preferably, a minimum amount of solvent is employed to facilitate precipitation. The solid is collected, e.g. by filtration, and is dried to obtain the dual-acting compound, in particular the complex in accordance with the present invention. The drying step can be performed at room temperature or elevated temperature such as 30 to 60° C., preferably 30 to 40° C. Reduced pressure can be employed to facilitate removal of the solvent, preferably, drying is effected at ambient pressure or reduced pressure of e.g. 10 to 30 bar, such as 20 bar.

According to a second alternative, once combined and preferably mixed, the dual-acting compound, in particular the complex the mixture preferably forms a clear solution. This mixing is typically effected by stirring the solutions for an appropriate amount of time such as 20 min to 6 h, preferably 30 min to 3 h, more preferably 1 h, at room temperature. If necessary, the temperature may be raised so as to ensure a clear solution.

The obtained mixture is then further treated by solvent exchange to obtain the dual-acting compound, in particular the complex.

In step (iva) according to this second alternative, the solution is preferably evaporated to dryness at elevated temperatures such as >room temperature to 50° C., more preferably 30 to 40° C.

Preferably, in step (va) the solvent or solvent mixture employed is a solvent in which the ARB and the NEPi in the complexed form exhibit a lower solubility that allows the dual-acting compound, in particular the complex to precipitate. Preferred solvents include the ones mentioned above for step (i), such as water, ethanol, 2-propanol, acetone ethyl acetate, isopropyl acetate, methyl-t-butylether, acetonitrile, toluene, and methylene chloride and mixtures of such solvents, more preferably isopropyl acetate. Preferably, a minimum amount of solvent or solvent mixture is employed to facilitate precipitation.

In step (via) precipitation can take place at room temperature. It can be effected by leaving the mixture standing or by agitating the mixture, preferably by agitating it. This is preferably effected by stirring and/or sonication. After precipitation, the solid is collected, e.g. by filtration, and is dried to obtain the compound in accordance with the present invention. The drying step can be performed at room temperature or elevated temperature such as 30 to 60° C., preferably room temperature. Reduced pressure can be employed to facilitate removal of the solvent, preferably, drying is effected at ambient pressure.

In a fourth aspect, this invention is directed to a method of treating or preventing a disease or condition, such as hypertension, heart failure (acute and chronic) congestive heart failure, left ventricular dysfunction and hypertrophic cardiomyopathy, diabetic cardiac myopathy, supraventricular and ventricular arrhythmias, atrial fibrillation, atrial flutter, detrimental vascular remodeling, myocardial infarction and its sequelae, atherosclerosis, angina (unstable or stable), renal insufficiency (diabetic and non-diabetic), heart failure, angina pectoris, diabetes, secondary aldosteronism, primary and secondary pulmonary hypertension, renal failure conditions, such as diabetic nephropathy, glomerulonephritis, scleroderma, glomerular sclerosis, proteinuria of primary renal disease, and also renal vascular hypertension, diabetic retinopathy, other vascular disorders, such as migraine, peripheral vascular disease, Raynaud's disease, luminal hyperplasia, cognitive dysfunction (such as Alzheimer's), glaucoma and stroke comprising administering the afore-mentioned combination, linked pro-drug or the dual-acting compound, in particular the complex to a subject in need of such treatment.

The combination, linked pro-drug or the dual-acting compound, in particular the complex of the first embodiment may be administered alone or in the form of a pharmaceutical composition according to the second embodiment. Information regarding dosing, i.e., the therapeutically effective amount, etc., is the same regardless of how the combination, linked pro-drug or he dual-acting compound, in particular the complex is administered.

The combination, linked pro-drug or the dual-acting compound, in particular the complex is beneficial over a combination of ARBs or neutral endopeptidase inhibitors alone or other ARB/NEPi combinations with regard to use as first line therapy, ease of formulation and ease of manufacture.

Specific embodiments of the invention will now be demonstrated by reference to the following examples. It should be understood that these examples are disclosed solely by way of illustrating the invention and should not be taken in any way to limit the scope of the present invention.

## Example 1

### Preparation of [valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]$Na_3$.2.5 $H_2O$

The dual-acting compound of valsartan and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester is prepared by dissolving 0.42 g of (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester free acid (~95% purity) and 0.41 g of valsartan free acid in 40 ml acetone. Separately, 0.111 g of NaOH are dissolved in 7 ml $H_2O$. The two solutions are combined and stirred at room temperature for 1 hour and a clear solution was obtained. The solution is evaporated at 35° C. to yield a glassy solid. The glassy solid residue is then charged with 40 ml acetone and the resulting mixture is stirred and sonicated until precipitation occurred (~5 minutes). The precipitate was filtered and the solid is dried at room temperature in open air for 2 days until a constant mass of the crystalline solid is obtained.

Characterization by various methods could confirm the presence of both valsartan and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester and complex formation in contrast to a simple physical mixture. Significant spectral peaks for the complex are observed e.g. in the XRPD, IR, and Raman spectroscopy which are not present for the physical mixture. See below for details on the characterization.

## Example 2

### Alternative Preparation of [valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]$Na_3$.2.5 $H_2O$

The dual acting compound of valsartan and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester is prepared by dissolving 22.96 mmol of (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester free acid (~95% purity) and valsartan (10.00 g; 22.96 mmol) in acetone (300 mL). The suspension is stirred at room temperature for 15 min to obtain a clear solution. A solution of NaOH (2.76 g; 68.90 mmol) in water (8 mL) water is then added to this solution over a period of 10 min. Solids start to precipitate in 10 min. Alternatively, precipitation can be induced by seeding. The suspension is stirred at 20-25° C. for 2 h. This suspension is concentrated at 15-30° C. under reduced pressure (180-250 mbar) to a batch volume of ~150 mL. Isopropyl acetate (150 mL) is then added to the batch and the suspension is concentrated again at 15-30° C. under reduced pressure (180-250 mbar) to a batch volume of ~150 mL. This operation (addition of 150 mL of isopropyl acetate to the batch and concentration) is repeated once again. The suspension is stirred at 20-25° C. for 1 h. The solids are collected by filtration under nitrogen over a Büchner funnel, washed with isopropyl acetate (20 mL), and dried at 35° C. under reduced pressure (20 mbar) to afford the compound.

Characterization revealed the same product as in Example 1.

## Example 3

### Alternative Preparation of [valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]$Na_3$.2.5 $H_2O$ Using Seeding

A reactor is charged with 2.00 kg (2,323 mmol) of AHU377 calcium salt and 20 L of isopropyl acetate. The suspension is stirred at 23±3° C., and 4.56 L of 2 N HCl was added. The mixture is stirred at 23±3° C. for 15 min to obtain a clear two-phase solution. The organic layer is separated and washed with 3×4.00 L of water. The organic layer is concentrated at 30-100 mbar and 22±5° C. to ~3.5 L (3.47 kg) of AHU377 free acid isopropyl acetate solution as a colorless solution.

To the above reactor containing ~3.5 L (3.47 kg) of AHU377 free acid isopropyl acetate solution is added 1.984 kg (4,556 mmol) of Valsartan and 40 L of acetone. The reaction mixture is stirred at 23±3° C. to obtain a clear solution which is filtered into a reactor. To the reaction mixture is added a solution of 547.6 g (13,690 mmol) of NaOH in 1.0 L of water at 23±3° C. (which was pre-cooled to 20±5° C. and in-line filtered) over a period of 15-30 min while maintaining the internal temperature at 20-28° C. (slightly exothermic). The flask is rinsed with 190 mL of water and added into the reaction mixture. The reaction mixture is stirred at 23±3° C. for 15 min and a slurry of 4.0 g of [valsartan ((2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester)]$Na_3$.2.5 $H_2O$ seeds in 50 mL of isopropyl acetate is added. The mixture is stirred at 23±3° C. for 2 h to obtain a suspension. The suspension is heated to an internal temperature at 40±3° C. over a period of 20 min and 20 L of isopropyl acetate is added over a period of 20 min while maintaining the internal temperature at 40±3° C. The suspension is stirred at this temperature for an additional 30 min. The mixture is concentrated at an internal temperature at 35±5° C. ($T_j$ 45±5° C.) under reduced pressure (200-350 mbar) to ~35 L of a white slurry (solvent collected: ~25 L). Then 30 L of isopropyl acetate is added the mixture is concentrated at an internal temperature at 35±5° C. ($T_j$ 45±5° C.) under reduced pressure (100-250 mbar) to ~30 L of a white slurry (solvent collected: ~40 L). Again 40 L of isopropyl acetate is added and the mixture is concentrated at an internal temperature at 35±5° C. ($T_j$ 45±5° C.) under reduced pressure (100-200 mbar) to ~30 L of a white slurry (solvent collected: ~30 L). The reaction mixture is cooled to 23±3° C. over ~20 min and stirred at this temperature for an additional 3 h. The solid is collected by filtration under nitrogen over a polypropylene pad on Büchner funnel. The solid is washed with 2×5 L of isopropyl acetate and dried at 35° C. under reduced pressure (20 mbar) until isopropyl acetate content <0.5% to afford the above product as a white solid.



Characterization revealed the same product as in Example 1.

X-Ray Powder Diffraction

Calculation of the interlattice plane intervals from the X-ray powder pattern taken with a Scintag XDS2000 powder diffractometer for the most important lines for the sample give the following results:

d in [Å]: 21.2 (s), 17.0 (w), 7.1 (s), 5.2 (w), 4.7 (w), 4.6 (w), 4.2 (w), 3.5 (w), 3.3 (w)

The error margin for all interlattice plane intervals is ±0.1 Å. The intensities of the peaks are indicated as follows: (w)=weak; (m)=medium; and (st)=strong.

Average values 2Θ in [°] are indicated (error limit of ±0.2) 4.5, 5.5, 5.6, 9.9, 12.8, 15.7, 17.0, 17.1, 17.2, 18.3, 18.5, 19.8, 21.5, 21.7, 23.2, 23.3, 24.9, 25.3, 27.4, 27.9, 28.0, 30.2.

Elemental Analysis

Elemental analysis gives the following measured values of the elements present in the sample. The findings of the elemental analysis, within the error limits, correspond to the overall formula of $(C_{48}H_{55}N_6O_8Na_3)*2.5H_2O$

| | | | |
|---|---|---|---|
| Found | C: 60.05% | H: 6.24% | N: 8.80% |
| Calculated* | C: 60.18% | H: 6.31% | N: 8.77% |

Infrared Spectroscopy

The infrared absorption spectrum for the sample obtained using Attenuated Total Reflection Fourier Transform Infrared (ATR-FTIR) spectrometer (Nicolet Magna-IR 560) shows the following significant bands, expressed in reciprocal wave numbers ($cm^{-1}$):

2956 (w), 1711 (st), 1637 (st), 1597 (st), 1488 (w), 1459 (m), 1401 (st), 1357 (w), 1295 (m), 1266 (m), 1176 (w), 1085 (m), 1010 (w), 942 (w), 907 (w), 862 (w), 763 (st), 742 (m), 698 (m), 533 (st).

The error margin for all absorption bands of ATR-IR is ±2 $cm^{-1}$.

The intensities of the absorption bands are indicated as follows: (w)=weak; (m)=medium; and (st)=strong intensity.

Raman Spectroscopy

Raman spectrum of the sample measured by dispersive Raman spectrometer with 785 nm laser excitation source (Kaiser Optical Systems, Inc.) shows the following significant bands expressed in reciprocal wave numbers ($cm^{-1}$):

3061 (m), 2930 (m, broad), 1612 (st), 1523 (m), 1461 (w), 1427 (w), 1287 (st), 1195 (w), 1108 (w), 11053 (w), 1041 (w), 1011 (w), 997 (m), 866 (w), 850 (w), 822 (w), 808 (w),

735 (w), 715 (w), 669 (w), 643 (w), 631 (w), 618 (w), 602 (w), 557 (w), 522 (w), 453 (w), 410 (w), 328 (w).

The error margin for all Raman bands is ±2 $cm^{-1}$.

The intensities of the absorption bands are indicated as follows: (w)=weak; (m)=medium; and (st)=strong intensity.

High Resolution CP-MAS $^{13}C$ NMR Spectroscopy

The samples are investigated by high resolution CP-MAS (Cross Polarization Magic Angle Spinning) $^{13}C$ NMR spectroscopy using a Bruker-BioSpin AVANCE 500 NMR spectrometer equipped with a 300 Watt high power $^{1}H$, two 500 Watt high power X-amplifiers, necessary high power pre-amplifiers, a "MAS" controller and a 4 mm BioSolids high resolution Bruker probe.

Each sample is packed in a 4 mm $ZrO_2$ rotor. Critical experimental parameters are 3 msec $1^{3}C$ contact times, 12 KHz spinning speed at the magic angle, a "ramped" contact time, using a "SPINAL64" $^{1}H$ decoupling scheme, a recycle delay of 10 secs and 1024 scans at 293 deg K. The chemical shifts are referenced with respect to an external Glycine carbonyl at 176.04 ppm.

High resolution CP-MAS $^{13}C$ NMR shows the following significant peaks (ppm):

179.0, 177.9 177.0, 176.7, 162.0, 141.0, 137.2, 129.6, 129.1, 126.7, 125.3, 64.0, 61.5, 60.4, 50.2, 46.4, 40.6, 38.6, 33.5, 32.4, 29.8, 28.7, 22.3, 20.2, 19.1, 17.8, 16.8, 13.1, 12.1, 11.1.

A physical mixture of individual Na salts of Valsartan and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester revealed a simple inert mixture of the two salts. However, the sample of the complex prepared in Example 1 exhibited distinctly different spectral features in comparison to a 1:1 mixture of the sodium salts.

DSC and TGA

As measured by differential scanning calorimetry (DSC) using Q1000 (TA Instruments) instrument, the melting onset temperature and the peak maximum temperature for the sample is observed at 139° C. and 145° C., respectively.

As shown by DSC and thermogravimetric analysis (TGA), upon heating, the water of hydration is released in two steps: the first step occurs below 100° C. and the second step above 120° C.

Both DSC and TGA instruments are operated at a heating rate of 10 K/min.

### Example 4

### Preparation of Linked Pro-Drug of Scheme (1)

Linked pro-drug of valsartan calcium salt and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester is prepared at room temperature by dissolving 114 mg of the calcium salt of valsartan and 86 mg of (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester free acid in 2 mL methanol, followed by methanol evaporation. The glassy solid residue is then charged with 3 mL of acetonitrile and equilibrated by 10 min. sonication, followed by 20 hours of magnetic stirring. Approximately 120 mg of white solids are collected by filtration. Liquid chromatography (LC) and elemental analysis indicate 1:1 ratio between (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester and valsartan. The sample is amorphous by X-ray powder diffraction.

Preparation of Linked Pro-Drug of Scheme (2)

Linked pro-drug of valsartan calcium salt and (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester and Tris is prepared at room temperature by dissolving 57 mg of the calcium salt of valsartan, 43 mg of (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester free acid, and 12.6 mg of tris(hydroxymethyl)aminomethane (Tris) in 2 mL methanol, followed by methanol evaporation. The glassy solid residue is then charged with 3 mL of acetonitrile and equilibrated by 10 min. sonication, followed by 20 hours of magnetic stirring. Approximately 83 mg of white solids are collected by filtration. LC and elemental analysis indicate 1:1 ratio between (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester and valsartan. The sample is amorphous by X-ray powder diffraction.

While the invention has been described above with reference to specific embodiments thereof, it is apparent that many changes, modifications, and variations can be made without departing from the inventive concept disclosed herein. Accordingly, it is intended to embrace all such changes, modifications and variations that fall within the spirit and broad scope of the appended claims. All patent applications, patents, and other publications cited herein are incorporated by reference in their entirety.

What is claimed is:

**1**. An amorphous solid form of a compound comprising anionic (S)-N-valeryl-N-{[2'-(1H-tetrazole-5-yl)-biphenyl-4-yl]-methyl}-valine, anionic (2R,4S)-5-biphenyl-4-yl-4-(3-carboxy-propionylamino)-2-methyl-pentanoic acid ethyl ester, and sodium cations in a 1:1:3 molar ratio.

**2**. A pharmaceutical composition comprising the amorphous solid form according to claim **1** and at least one pharmaceutically acceptable excipient.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 11,096,918 B2
APPLICATION NO. : 16/579581
DATED : August 24, 2021
INVENTOR(S) : Lili Feng et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

Item [56]

Page 2
Column 2:
Line 33, "Compounts" should read --Compounds--;
Line 48, "acis" should read --acid--; and
Line 50, "72(2): 193-200, 1992." should read --22(2): 193-200, 1992.--.

Page 3
Column 2:
Line 2, "High-Throughout" should read --High-Throughput--.

Page 5
Column 1:
Line 17, "vol 101," (2nd occurrence) should be deleted;
Line 20, "2000"Crystal" should read --2000", Crystal--; and
Line 27, "Aakeröy,Christer" should read --Aakeröy, Christer--.

Column 2:
Line 34, "People Health" should read --People's Health--;
Line 52, "Anatriuretic" should read --A natriuretic--;
Line 62, "ad Evaluation Carbolinium" should read --and Evaluation of *β*-Carbolinium--; and
Line 63, "on Delocalized" should read --on π-Delocalized--.

Page 6
Column 2:
Line 2, "Part IX.t" should read --Part IX--; and
Line 5, "Sodium IMitrophenolate" should read --sodium *o*-nitrophenolate--.

Signed and Sealed this
First Day of February, 2022

Drew Hirshfeld
*Performing the Functions and Duties of the*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*

In the Specification

Column 3:
Line 65, “methyl-phenyl)propionyl]-methionine)” should read --methylphenyl)propionyl]-methionine--.

Column 5:
Line 34, “((1 S,3R) –1-biphenyl-4-y lmethyl-3-ethoxy carbonyl” should read --((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl--;
Line 35, “butylcarbamoyl)propionate-(S)-3 ‘-methyl-2′-(pentanoyl-” should read --butylcarbamoyl)propionate-(S)-3′-methyl-2′-(pentanoyl--; and
Line 36, “{2 ″-(tetrazol-5-ylate)biphenyl-4′-y ‘methyl} amino)bu-” should read --2″-(tetrazol-5-ylate)biphenyl-4′-ylmethyl}amino)bu- --.

Column 15:
Line 15, “is may” should read --may--; and
Line 46, “species” should read --species.--.

Column 16:
Line 63, “onate-(S)-3′-methyl-2′-(pentanoyl{22″-(tetrazol-5-ylate)bi-” should read --onate-(S)-3′-methyl-2′-(pentanoyl{2″-(tetrazol-5-ylate)bi- --.

Column 18:
Line 62, “[3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1-” should read --[3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1- --; and
Line 64, “onate-(S)-3′-methyl-2′-(pentanoyl{22″-(tetrazol-5-ylate)bi-” should read --onate-(S)-3′-methyl-2′-(pentanoyl{2″-(tetrazol-5-ylate)bi- --.

Column 19:
Line 25, “onate-(S)-3′-methyl-2′-(pentanoyl{22″-(tetrazol-5-ylate)bi-” should read --onate-(S)-3′-methyl-2′-(pentanoyl{2″-(tetrazol-5-ylate)bi- --; and
Line 64, “und γ.” should read --and γ.--.

Column 22:
Line 43, “met-formin;” should read --metformin;--; and
Line 62, “3-adrenergic” should read --*β*-adrenergic--.

Column 23:
Line 23, “in addition a” should read --in addition to a--;
Line 34, “[3-((1 S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1” should read --[3-((1S,3R)-1-biphenyl-4-ylmethyl-3-ethoxycarbonyl-1- --;
Line 43, “ylate)biphenyl-4′-ylmethyl}amino) butyrate]” should read --ylate)biphenyl-4′-ylmethyl}amino)butyrate]--; and
Line 60, “bamoyl)propionate-(S)-3′-methyl-2′-(pentanoyl{22″-(tetra-” should read --bamoyl)propionate-(S)-3′-methyl-2′-(pentanoyl{2″-(tetra- --.

Column 24:
Line 30, "propionate-(S)-3′-methyl-2′-(pentanoyl{22″-(tetrazol-5-" should read --propionate-(S)-3′-methyl-2′-(pentanoyl{2″-(tetrazol-5- --.

Column 28:
Line 25, "or he" should read --or the--; and
Line 43, "ester)]$Na_3$.2.5 $H_2O$" should read --ester)]$Na_3$•2.5 $H_2O$--.

Column 29:
Line 5, "ester)]$Na_3$.2.5 $H_2O$" should read --ester)]$Na_3$•2.5 $H_2O$--;
Line 37, "ester)]$Na_3$.2.5 $H_2O$" should read --ester)]$Na_3$•2.5 $H_2O$--; and
Line 15, "(8 mL) water" should read --(8 mL)--.

Column 30:
Line 6, "added" should read --added and--; and
Line 40, "($C_{48}H_{55}N_6O_8Na_3$)*2.5$H_2O$" should read --($C_{48}H_{55}N_6O_8Na_3$)•2.5$H_2O$--.

Column 31:
Line 14, "$1^3C$" should read --$^{13}C$--.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re Entresto (Sacubitril/ Valsartan) Patent Litigation | C.A. No. 20-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, Plaintiff, v. MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED, GERBERA THERAPEUTICS, INC., NANJING NORATECH PHARMACEUTICAL CO., LIMITED, Defendants. | C.A. No. 22-1395-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, Plaintiff, v. GERBERA THERAPEUTICS, INC., NANJING NORATECH PHARMACEUTICAL CO., LIMITED, Defendant. | C.A. No. 23-401-RGA |

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Friday, November 22, 2024
9:02 a.m.
Pretrial Conference

BEFORE: THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

APPEARANCES:

McCARTER & ENGLISH, LLP
BY: DANIEL M. SILVER, ESQUIRE

-and-

VENABLE LLP
BY: CHRISTINA SCHWARZ, ESQUIRE
BY: JARED L. STRINGHAM, ESQUIRE
BY: CHRISTOPHER E. LOH, ESQUIRE
BY: SHANNON K. CLARK, ESQUIRE

For the Plaintiff

HEYMAN ENERIO GATTUSO & HIRZEL LLP
BY: DOMINICK T. GATTUSO, ESQUIRE

-and-

HUSCH BLACKWELL
BY: DON MIZERK, ESQUIRE
BY: MATT KAMPS, ESQUIRE

For the Nanjing Noratech and Gerbera Defendants

STAMOULIS & WEINBLATT LLC
BY: RICHARD C. WEINBLATT, ESQUIRE

-and-

DAIGNAULT IYER
BY: RONALD M. DAIGNAULT, ESQUIRE
BY: KEVIN WARNER, ESQUIRE

For the MSN Defendants

09:02:08 *** PROCEEDINGS ***

09:02:08

09:02:09 DEPUTY CLERK: All rise. Court is now in
09:02:10 session. The Honorable Richard G. Andrews presiding.
09:02:10 THE COURT: All right. Please be seated.
09:02:14 All right. So we're here for the pretrial

THE COURT: Okay. So, Mr. Stringham, I have kept putting you off. There was something you wanted to say. Do you still remember what it is?

MR. STRINGHAM: Yes, Your Honor. With regard to Mr. Mizerk's assertion that they need it to be able to test Dr. Park's sample to see if there were impurities or other issues with it, again, that was an issue that if they thought they needed the sample to do those things, they should have done it in May when it was clear that that's what Dr. Park was relying on, and instead of waiting until after expert reports were done to go back and say, Hey, we actually -- now that expert reports are done, we think we should have gotten that sample to be able to test it.

So I think it's simply too late, Your Honor.

MR. MIZERK: Your Honor, just on that point, he told us in their -- or Novartis told us in their discovery response that they didn't have it. So why would we ask for that when we didn't know they -- when they told us they didn't have it and we didn't know they did have it until we took Dr. Park's deposition, so...

THE COURT: Yeah. So let me tell you what I'm thinking of doing, which is -- so I'm thinking of finding that there was a discovery violation in regards to Novartis giving an answer and then not updating it, assuming that the answer was correct at the time it was given, which I'm not

09:49:02 actually sure that that's the case. And not excluding the testing that Dr. Matzger or Dr. Park did, but including -- or -- but taking an adverse inference from the failure to produce it. And I'm kind of inclined to also accept that the opinions of the defense expert, I guess it's Dr. Strachan at this point, is correct that these are -- these two are the same thing.

Right? That's her opinion; right?

MR. MIZERK: Yeah. I mean, to be clear, her opinion is that all of the stuff is the same, the physical mixture --

THE COURT: Well, I'm just concerned with the two samples here.

MR. MIZERK: Yes.

THE COURT: And thinking that if I do this, there's no substantial harm or prejudice to Noratech, and so that's what I'm thinking of doing. And I'm more -- it's a lot easier to say, I'm going to do the adverse inference because that's really just about me.

I'm going to -- I think I'm going to take the second part of that as a tentative thing that I intend to do, but for -- but I might consider, in the alternative, just doing what I think I'm going to do in a minute anyhow, which is allow Dr. Strachan to submit her supplemental expert report. And her testimony to this effect, I think,

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitations and typeface and type style requirements of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally spaced typeface in 14-point Times New Roman font and includes 13,948 words, excluding the parts of the brief exempted by the Rules.

Dated: September 12, 2025

/s/ Deanne E. Maynard
Deanne E. Maynard